KENNETH W. DONNELLY (LEAD TRIAL ATTORNEY)
(D.C. Bar No. 462996)
donnellyk@sec.gov
JAMES E. SMITH (D.C. Bar No. 482985)
smithja@sec.gov
SCOTT W. FRIESTAD (New York Bar No. 2292183)
friestads@sec.gov
NINA B. FINSTON (D.C. Bar No. 431825)
finstonn@sec.gov

Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5949
Telephone: (202) 551-4946 (Donnelly)
Facsimile:  (202) 772-9292 (Donnelly)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SASAN SABRDARAN and FARHANG AFSARPOUR<br><br>Defendants. | Case No. _____<br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. This is an insider trading case involving transactions in the securities of InterMune, Inc. ("InterMune"), a then publicly traded pharmaceutical company based in Brisbane, California. In March 2010, InterMune submitted to the European Medicines Agency ("EMA") an application for approval to market its drug Esbriet in the European Union ("EU"). Beginning no later than September 2010, Sasan Sabrdaran ("Sabrdaran"), InterMune's then Director of Drug Safety Risk Management, was a part of a small group of employees charged

1. with shepherding Esbriet through the regulatory process ("Esbriet Team") and became privy to material non-public information about the drug's progress in the regulatory process, including communications between InterMune and the Committee for Medicinal Products for Human Use ("CHMP"), an advisory board to the EMA. Sabrdaran subsequently tipped his longtime friend, Farhang Afsarpour ("Afsarpour") to this material non-public information.

2. In advance of a December 17, 2010, public announcement that the CHMP had recommended Esbriet for approval by the EMA, Afsarpour: (a) bought InterMune common stock and spread bets; (b) urged friends to invest, collected their money, and purchased InterMune spread bets on their behalf; and (c) urged two other friends (including a former relative) to buy InterMune securities, one of whom bought InterMune common stock and the other of whom bought spread bets. (A spread bet is an agreement in which the purchaser purchases from a counterparty the right to profit from changes in the price of an underlying asset, in this case, InterMune common stock and InterMune call options.) After the announcement on December 17, 2010, InterMune's common stock jumped 151% and its call options increased by over 356%, resulting in ill-gotten profits subject to disgorgement of approximately $1,077,069.

3. By engaging in the conduct described in this Complaint, Sabrdaran and Afsarpour violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Sabrdaran and Afsarpour should be enjoined from further violations under Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)], ordered on a joint and several basis to pay disgorgement with prejudgment interest, and ordered to pay civil monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]. Sabrdaran also should be barred from serving as an officer and director pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)].

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

4. The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1], over which this Court has subject matter jurisdiction. In connection with the conduct described herein, the defendants directly or

indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange.

5. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(c)(3). Acts, practices, and transactions constituting the violations of law alleged in this Complaint occurred within the Northern District of California and Sabrdaran was employed at InterMune which was headquartered in the District. Because Afsarpour is not a resident of the United States, venue is proper in any district court.

6. Under Civil Local Rule 3-2, this civil action should be assigned to the San Francisco Division. A substantial part of the events which give rise to the claim occurred in San Mateo County, where InterMune was headquartered and Sabrdaran was employed by InterMune.

**DEFENDANTS**

7. **Sasan Sabrdaran**, age 45 and a resident of San Francisco, California, was director of Drug Safety Risk Management at InterMune from April 2006 until he was terminated in March 2012. Sabrdaran is trained as a physician.

8. **Farhang Afsarpour**, age 52, a British citizen and a resident of Manchester, England, is the owner of multiple restaurants.

**RELEVANT ENTITY AND PERSONS**

9. **InterMune, Inc**., a Delaware corporation headquartered in Brisbane, California, is a pharmaceutical company. During the relevant period, InterMune's common stock was registered with the Commission under Exchange Act Section 12(b) [15 U.S.C. § 78l(b)] and traded on The NASDAQ Stock Market under the ticker symbol "ITMN." InterMune options traded on the Chicago Board Options Exchange, the Philadelphia Stock Exchange, the Boston Stock Exchange, the International Securities Exchange, the American Stock Exchange, and the New York Stock Exchange's Arca System. InterMune filed periodic reports, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and related rules thereunder. Effective September 2014, InterMune's securities ceased trading after it was acquired as a wholly-owned subsidiary of Roche Holdings, Inc.

10. **Pharmacist No. 1**, age 54 is a resident of Cheadle, England.

11. **Hairdresser No. 1**, age 51 is a resident of Santa Monica, California and formerly related by marriage to Afsarpour.

## FACTS

**A.** <u>The Processing of InterMune's Marketing Authorization Application</u>

12. In March 2010, InterMune submitted a marketing approval application ("MAA") to the EMA seeking approval to market the drug Esbriet in the EU for the treatment of patients with idiopathic pulmonary fibrosis ("IPF"), a fatal lung disease. Until the MAA was granted, there were no approved treatments in the EU for the treatment of IPF.

13. The CHMP, a scientific advisory committee to the EMA, is responsible for preparing the EMA's opinions on medicines. On receiving an MAA, the CHMP appoints two of its members -- the Rapporteur and co-Rapporteur -- to assess it. The Rapporteur and co-Rapporteur issue questions and comments in prescribed formats at established intervals following receipt of the MAA, and ultimately present their findings and recommendation to the CHMP membership for a vote. The designated dates for formal communications with an applicant (such as questions or comments) are 80 days, 120 days, 150 days, 180 days, and 210 days following receipt of an MAA, excluding the time taken by the applicant to respond to the Rapporteur's and co-Rapporteur's successive inquiries. Informal communications occur between the CHMP and applicant throughout the process.

14. The usual time frame for presenting a recommendation is approximately 210 days following receipt of the MAA, excluding the applicant's response times. In rare instances when there are no significant issues, the CHMP can render an opinion in as few as 180 days following receipt of an MAA, again excluding the applicant's response time to inquiries. Once the CHMP issues an opinion, it is forwarded to the EU commission for ratification, after which the medicine is marketable throughout the EU.

15. Following the submission of its MAA in March 2010, InterMune maintained in its public statements that it anticipated a CHMP opinion and EU decision in the first half of 2011. InterMune's Chief Executive Officer explained in an earnings call on October 28, 2010, that this

1  was based on the "typical timeline" for the CHMP rendering a decision 210 days after an
2  application was submitted "if everything goes perfectly."

3      16.    During the second half of 2010, the Esbriet Team, a small group of people within
4  InterMune shepherding the Esbriet application through the regulatory process (which included
5  Sabrdaran), received information that the regulatory review was going well. On June 15, 2010,
6  July 23, 2010, and September 15, 2010, the group received communications indicating the
7  review was going better than the Esbriet Team had anticipated.

8      17.    On November 15, 2010, an EMA employee who acted as a liaison between the
9  Rapporteur and co-Rapporteur and InterMune's outside consultant emailed the latter that "most
10 probably Esbriet will go for a positive Opinion" at the CHMP's December 2010 meeting, which
11 was scheduled for December 13 through 16, 2010. On November 16 and 17, 2010, a second
12 EMA employee confirmed the substance of the first email explaining that the "trend is positive"
13 and that there were "no major issues" remaining with respect to InterMune's application. On
14 November 29, 2010, the Rapporteur and co-Rapporteur issued to InterMune the Day 150 report
15 which stated, that based on the CHMP's review, Esbriet "could be approvable" provided
16 InterMune provided satisfactory responses to the outstanding issues.

17     18.    On December 2, 2010, InterMune's outside consultant emailed InterMune
18 personnel, including Sabrdaran, stating that "I've just had the feedback from the Rapporteurs and
19 they think that we can reach a positive opinion in December, as long as all the issues are resolved
20 and that no other concerns are raised between now and the end of the CHMP." In response to
21 this email, a senior InterMune manager sent an email to the Esbriet Team (including Sabrdaran)
22 on December 2, 2010 stating, "This is great news!!!"

23     19.    The CHMP's reply to InterMune's Day 150 responses stated, for the first time,
24 that based on the CHMP's review Esbriet "is approvable" provided that InterMune committed to
25 perform a number of post approval follow-up measures. The EMA liaison subsequently
26 confirmed to the Esbriet Team during the week of December 6, 2010, that Esbriet would be put
27 up for a positive opinion during the CHMP's meeting scheduled for December 13 – 16, 2010.
28

1	20.	The foregoing communications described in paragraphs 16 through 20 were private, confidential communications, not shared publicly, either in summary or substance, and were subject to InterMune's policy to share such communications only on a need-to-know basis, even internally.  Until its market-moving announcement on December 17, 2010, InterMune adhered to a policy not to comment publicly on the content or tone of any dialogue with the EMA, including the CHMP, concerning its application to market Esbriet in the EU.

21.	On Friday, December 17, 2010, InterMune announced the issuance of a positive opinion by the CHMP, causing InterMune's stock and options prices to soar in the days to follow (see table below).  On Monday, December 20, heavy trading volume in its stock continued through the day, while InterMune's stock price continued rising.  The value of Afsarpour's common stock and his spread bets, which were directly tied to the price of InterMune's common stock and the price of InterMune call options, also increased.

|  | Closing Price | |
| --- | --- | --- |
| Security | On December 16 | On December 20 |
| InterMune Common Stock | $14.27 | $35.81 |
| InterMune Call Option—April 2011 Expiration, $14 Strike Price | $5.15 | $23.50 |
| InterMune Call Option—December 2010 Expiration, $15 Strike Price | $.09 | $19.00 (option expired on or about December 18) |

**B.	Sabrdaran's Awareness of Material Non-Public Information**

22.	Because of Sabrdaran's direct involvement in shepherding Esbriet through the regulatory process, from June 2010 forward, he was contemporaneously aware of communications between the EMA and InterMune, Esbriet's progress in the regulatory process referenced above, and, eventually, that Esbriet was on the calendar for the CHMP's December 13-16, 2010 meeting and that it was likely to be approved.  Sabrdaran saw the Day 150 Report; the December 2, 2010, email from InterMune's outside consultant and his colleague's enthusiastic response; and the CHMP's reply to InterMune's Day 150 responses.  On December 8, 2010, InterMune's Chief Regulatory and Drug Safety Officer, the senior executive who was leading InterMune's efforts on the Esbriet application ("Esbriet Team Leader"), emailed

6	Complaint

Sabrdaran and others an email entitled "EU Update—HIGHLY CONFIDENTIAL" stating that the "CHMP discussion on Esbriet has now moved on the agenda to the **Tuesday early afternoon** [December 14, 2010]" (emphasis in original). On December 9, 2010, the Esbriet Team Leader sent the Esbriet Team (including Sabrdaran) an email entitled "This is as Good as it gets!!" stating, "I am delighted to tell you that due to the tireless efforts of the team (… [listing names from Esbriet Team, including Sabrdaran] …) over the past 2 weeks we have succeeded in converting our applications classification from could be approvable to is approvable."

23. Sabrdaran knew that he had a duty of confidentiality. In the letter offering Sabrdaran employment in February 2006, InterMune stated that Sabrdaran had a duty of confidentiality. Sabrdaran signed a document stating the duty of confidentiality in April 2006. Sabrdaran's written performance review for 2010 specified that Sabrdaran had a duty to protect InterMune's confidential and proprietary information. Sabrdaran was also subject to InterMune's policy against insider trading and tipping.

24. Sabrdaran knew more particularly that information about the progress of Esbriet in the EU regulatory process was supposed to be kept confidential. EU marketing approval of Esbriet was important to InterMune's development and InterMune management repeatedly highlighted the obligation to share information only on a need-to-know basis, even internally. On November 18, 2010, the Esbriet Team Leader emailed Sabrdaran and others that one could not, "stress enough how critically **confidential** the Day 150 LOI's [List of Issues] will be. Please do not discuss with anyone prior to our meeting" (emphasis in original). On November 29, 2010, the Esbriet Team Leader emailed Sabrdaran and other InterMune employees about the Day 150 LOI's stating, "Remember: please maintain 100% confidentiality." On December 2, 2010, Sabrdaran cautioned InterMune's outside consultant in an email, "[p]lease do not share the possibility of early/Dec opinion with anybody else at InterMune." The same day, InterMune imposed a trading blackout period on the group of employees, including Sabrdaran, who knew about the progress of InterMune's marketing application.

### C. Sabrdaran Tipped his Friend Afsarpour Who Tipped Others

25. Prior to November 2010, Sabrdaran and Afsarpour had been close friends for years. They often engaged in long phone calls discussing personal matters, and regularly visited each other when Sabrdaran was in England or Afsarpour was in the United States. Afsarpour also helped Sabrdaran's father when he was seriously ill.

26. Telephone and text message records establish that Sabrdaran and Afsarpour communicated regularly during the relevant period, and that certain of these communications directly preceded Afsarpour taking actions consistent with Sabrdaran apprising him of developments relating to the CHMP's processing of InterMune's MAA. For example, on October 10, 2010, Sabrdaran, who by this point was aware of favorable developments relating to the Day 80 report and Day 120 list of questions, spoke by phone for 40 minutes with Afsarpour. The next day, October 11, 2010, Afsarpour opened a spread betting account with IG Index, a London-based subsidiary of IG Group, which provides financial spread betting products.

27. A spread bet is an agreement in which the purchaser purchases from a counterparty the opportunity to profit from changes in the price of an underlying asset, in this case, InterMune common stock and InterMune call options.

28. Although Afsarpour had previously placed spread bets on commodities and indices, his spread bets on InterMune common stock in November 2010 were the first he had placed on equities. Although Afsarpour made some smaller spread bets anticipating that InterMune stock price would go up in November 2010, these trades were closed out for only minor profits.

29. On November 30, 2010, Afsarpour called Sabrdaran at the London hotel where Sabrdaran was staying as part of the Esbriet Team meeting with the CHMP. Sabrdaran knew that the Day 150 report, which he had seen the day before, was quite positive and that Esbriet was anticipated to receive a favorable opinion at the CHMP's meeting scheduled for December 13 – 16, 2010, in London. The two men spoke for 39 minutes.

30. On December 7, 2010, Sabrdaran saw the CHMP's reply to the InterMune Day 150 responses which characterized Esbriet as "approvable" provided that InterMune committed

to perform a number of post-approval follow-up measures. On December 9, 2010, Sabrdaran received the email from the Esbriet Team Leader regarding the CHMP's communication entitled "This is as Good as it gets!!" On December 10, 2010, Afsarpour left a voicemail message for Sabrdaran in Farsi inquiring when Sabrdaran was coming to London that week and stating, "I thought you might have some new news for me . . . ." Later that day, Afsarpour and Sabrdaran spoke by phone for 22 minutes.

31. At a poker night held at Afsarpour's home on Sunday, December 12, 2010, Afsarpour urged approximately a half-dozen friends in attendance to purchase InterMune securities. Afsarpour told them that he thought a favorable decision on InterMune's drug application before the EU would increase the share price, that they would need to move quickly, and that if they did not have accounts of their own, they could give him money which he would use to purchase securities on their behalf through his own account.

32. On December 13, 2010, Afsarpour sent a message in Farsi via Facebook to a friend indicating that he had attempted to contact his friend by phone because Afsarpour had, "some good news to tell you. It is not too late if you have money." In a series of follow-up communications via Facebook, Afsarpour agreed to buy InterMune shares on the friend's behalf in exchange for the friend buying gold worth approximately $17,940 for Afsarpour.

33. On December 17, 2010, prior to the public announcement that the CHMP had approved the MAA, Afsarpour confirmed to another friend via e-mail that he had received approximately £20,864, to which the friend responded, "First, thank God that it got there in time. I hope that we become rich people."

**D. Afsarpour Bought Common Stock and Made Spread Bets on InterMune Common Stock and InterMune Call Options**

34. On December 16, 2010, Afsarpour purchased 75 shares of InterMune common stock through an account held in his name at National Securities Corp. in New York City.

35. Between December 9 and 16, 2010, Afsarpour deposited £134,500 into his IG Index spread betting account, including approximately £87,000 (including the value of the gold referenced in paragraph 32 above) obtained from seven friends. Highlighting the urgency with

which he made the deposits, in addition to the funds from friends, Afsarpour obtained £20,000 in cash advances from his credit card, expressing irritation to an IG Index phone representative over the cash advance fees charged by the credit card company and by IG Index.  This was the first time Afsarpour ever used his credit card to obtain a cash advance for spread betting.  Between December 10 and 16, 2010, Afsarpour placed the following spread bets and made the following purchase of InterMune common stock:

| Opening Date | Description of the Spread Bets and Stock Purchase |
|---|---|
| 12/10/2010 | Purchased one $31.40 (£20) daily spread bet and four $15.70 (£10) daily spread bets for every $.01 that InterMune common stock price increased |
| 12/13/2010 | Purchased a $237 (£150.96) spread bet for every $.01 that InterMune $14 April 2011 call option price increased |
| 12/13/2010 | Purchased three $15.70 (£10) daily spread bets for every $.01 that InterMune common stock price increased and closed three $15.70 (£10) daily spread bets for every $.01 that InterMune common stock price increased |
| 12/13/2010 | Closed four $15.70 (£10) daily spread bets and one $31.40 (£20) daily spread bet and simultaneously bought a $96.20 (£60) spread bet expiring in March 2011 for every $.01 that InterMune common stock price increased. |
| 12/14/2010 | Purchased a $32 (£20.38) spread bet for every $.01 that InterMune $14 April 2011 call option price increased |
| 12/15/2010 | Purchased a $20.41 (£13) daily spread bet and a $23.55 (£15) daily spread bet for every $.01 that InterMune common stock price increased |
| 12/15/2010 | Purchased a $40 (£25.47) spread bet for every $.01 that InterMune $15 December 2010 call option price increased |
| 12/16/2010 | Purchased 75 shares of InterMune common stock |

36.     In contrast to the spread bets placed before December 10, 2010, Afsarpour's later spread bets: (a) included not only daily bets but also quarterly bets; (b) were based not only on the price of InterMune common stock but also on the more volatile price of InterMune call options; (c) were significantly larger bets; and (d) were not subject to stop loss instructions. Moreover, Afsarpour initiated the spread bets placed after December 10, 2010, by placing market orders (resulting in the immediate purchase of a spread bet at the then market price) or working orders with price limits that were only slightly below the then market price of InterMune securities.  This differed greatly from the working orders placed before December 10, 2010,

1  which went largely unfilled because they had price limits significantly lower than the then
2  market price.

3    37. At the time Afsarpour opened the IG Index spread bet account, IG Index provided
4  Afsarpour with disclosure documents stating that IG Index may hedge spread bets placed by
5  customers.  The disclosure documents stated, "We may hedge our liability to you by opening
6  analogous positions…in the Underlying Market. The result of our doing this is that when you bet
7  on an Index with us your Bets can, through our hedging, exert a distorting influence on the
8  Underlying Market…."  The disclosures also stated, "you will not place…a Bet that contravenes
9  any primary or secondary legislation or other law against insider dealing [insider trading]…."

10   38. On December 17, 2010, Afsarpour discussed hedging with an IG broker
11 representative who confirmed that IG Index could hedge spread bets placed by Afsarpour.  When
12 hedging its risk by buying InterMune call options or common stock, IG index would not post the
13 spread bet to Afsarpour's account until after the firm had purchased the underlying securities in
14 the U.S. market.  In fact, IG Index did hedge its positions with Afsarpour, buying substantial
15 amounts of InterMune call options traded on an exchange in the United States.  The options were
16 purchased through Barclays Capital, a registered broker dealer in New York.  The UK broker's
17 hedging transactions reduced its risk in executing Afsarpour's and Pharmacist No. 1's spread
18 bets by transferring the economic loss to other investors purchasing the options on U.S.
19 exchanges.

20   39. As a result of Afsarpour's InterMune common stock purchases and spread bets, in
21 accounts held in his name, Afsarpour's trading yielded profits of approximately $877,369.

22   **E.** **<u>Afsarpour Tipped Pharmacist No. 1 and Hairdresser No. 1 Who Traded</u>**

23   40. Afsarpour also tipped two friends, Pharmacist No. 1 and Hairdresser No. 1, to
24 InterMune's material, non-public information, and those friends purchased and traded in the
25 securities of InterMune.

26   41. On December 10, 11, and 13, 2010, Afsarpour and Pharmacist No. 1 spoke for 2
27 minutes, nearly 11 minutes, and approximately 16 minutes, respectively.  Afsarpour and
28 Pharmacist No. 1 also spoke for nearly 8 minutes on December 17, 2010, (after InterMune

announced the EU advisory committee had issued a positive opinion for Esbriet) and approximately 25 minutes on December 18, 2010.

42. On December 14, 2010, Pharmacist No. 1 placed through his own IG Index spread betting account a working order for a £10 spread bet for every $.01 that InterMune common stock increased in price by March 2011. Because InterMune common stock price did not reach the price limit Pharmacist No. 1 specified, this order was not filled and Pharmacist No. 1 later deleted it on December 20, 2010.

43. On December 16, 2010, Pharmacist No. 1 placed through the same IG Index account a $50 spread bet for every $.01 that InterMune $14 April 2011 call options increased in price. Based on the increase in price of the underlying security as of the close of business on December 20, 2010, Pharmacist No. 1 had imputed profits of $107,900.

44. As for Hairdresser No. 1, who was living in the United States and opened a brokerage account in the United States in order to trade in InterMune, she and Afsarpour spoke about InterMune prior to her investment on December 16, 2010. Hairdresser No. 1 further repeatedly urged others to invest in InterMune based on Afsarpour's recommendation. Various facts suggest that Afsarpour communicated with Hairdresser No. 1 during the week of December 12. Hairdresser No. 1 then opened her brokerage account on December 13, 2010, deposited in the account $60,000 via wire transfer on December 15, 2010, and using her margin account, bought 4,250 shares of InterMune for $60,400 on December 16, 2010.

45. On the account opening documents, Hairdresser No. 1 stated that she had a net worth of $50,000 to $100,000. Based on the increase in price as of the close of business on December 20, 2010, Hairdresser No. 1's purchase of shares yielded imputed profits of $91,800.

46. Including the imputed profits of Pharmacist No. 1 and Hairdresser No. 1 in the total profits, Sabrdaran's and Afsarpour's total liability for ill-gotten profits is approximately $1,077,069.

### F. Sabrdaran's and Afsarpour's Conduct Following the Inception of the Commission's Investigation

47. Sabrdaran's and Afsarpour's actions after December 2010 provide further support that they engaged in insider trading.

48. First, on being contacted by the staff in early 2011 concerning his activity, Afsarpour responded by email on March 7, 2011, explaining that he had happened across InterMune in June 2010 after having mistakenly typed the wrong ticker symbol into an online search engine. The ticker symbol he purportedly had intended to type in was for International Monetary Systems LTD (symbol: ITNMD). Omitted from his email was any reference to his knowing Sabrdaran. Afsarpour later told one of the attendees of the poker game that he had been tracking the performance of InterMune and its securities since 2009 – ever since Afsarpour first learned that Sabrdaran worked at InterMune.

49. Second, in March 2011, Afsarpour paid $26,000 to Sabrdaran.

50. Third, after the staff of the Commission faxed Sabrdaran (through his attorney) a document request on May 20, 2011, which included a request to inspect his computer devices, and after he had learned that a copy of his InterMune work laptop was sought for review by the staff, Sabrdaran used a file cleaning software on his work laptop on May 24, 2011, to delete files from his laptop the very day before InterMune was to copy his laptop's files, on May 25, 2011.

## CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act [15 U.S. Code § 78j] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

51. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1-50, inclusive, as if they were fully set forth herein.

52. Sabrdaran tipped Afsarpour, deliberately or at least recklessly, to material, non-public information gained in the course of his employment with InterMune concerning the company's progress in the regulatory process for approval to market Esbriet in the EU. At the time of tipping Afsarpour to this information, Sabrdaran knew, or was reckless in not knowing, that the information he had gained in the course of his employment and communicated to Afsarpour was material and non-public, and that in tipping Afsarpour, he breached his fiduciary

1  duty of confidentiality owed to the shareholders of InterMune and for an improper purpose.
2  Sabrdaran received, or expected to receive, a personal benefit in tipping Afsarpour.

3       53.     Afsarpour received material, non-public information about Esbriet's progress in
4  the regulatory process from Sabrdaran, knew that Sabrdaran had learned this information as a
5  senior executive at InterMune, knew that the information was material and non-public, and knew
6  or had reason to know that Sabrdaran had disclosed this information to him in breach of a duty
7  owed to InterMune. Afsarpour used this information to trade stock and place spread bets for
8  himself and others, and armed with this information, he deliberately or at least recklessly,
9  receiving or with the expectation of receiving a personal benefit, tipped still others (namely
10 Pharmacist No. 1 and Hairdresser No. 1), who also placed spread bets and purchased InterMune
11 securities.

12      54.     By virtue of the foregoing, Defendants Sabrdaran and Afsarpour, directly or
13 indirectly, in connection with the purchase or sale of a security, by use of means or
14 instrumentalities of interstate commerce, of the mails, or of a facility of a national securities
15 exchange, with scienter:

16      (a) employed devices, schemes or artifices to defraud;

17      (b) made untrue statements of material fact or omitted to state material facts
18      necessary in order to make the statements made, in the light of the circumstances under
19      which they were made, not misleading; or

20      (c) engaged in acts, practices or courses of business which operated or would have
21      operated as a fraud or deceit upon persons, thereby violating Section 10(b) of the
22      Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

23      55.     By reason of the foregoing, Defendants Sabrdaran and Afsarpour, directly or
24 indirectly, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act and
25 Rule 10b-5 thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining Defendants Sabrdaran and Afsarpour from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants Sabrdaran and Afsarpour to disgorge, with prejudgment interest, on a joint and several basis, all ill-gotten gains they derived from the activities set forth in this Complaint, and the ill-gotten gains of their downstream tippees;

**III.**

Ordering Defendants Sabrdaran and Afsarpour to pay a civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l];

**IV.**

Barring Sabrdaran from serving as an officer and director pursuant to Exchange Act Section 21(d)(2); and

**V.**

Granting such other relief as this Court may deem just and appropriate.

Dated: October 30, 2014          Respectfully submitted,

   /s/  Kenneth W. Donnelly
KENNETH W. DONNELLY
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION