1   MARK P. FICKES (SBN 178570)
    THERESE Y. CANNATA (SBN 88032)
2   JUNA KIM (SBN 230100)
    CANNATA, CHING & O'TOOLE LLP
3   100 Pine Street, Suite 350
    San Francisco, CA 94111
4   Telephone:  (415) 409-8900
    Facsimile:   (415) 409-8904
5
    Attorneys for Defendant
6   SASAN SABRDARAN

7

8                       UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF CALIFORNIA
9                        SAN FRANCISCO DIVISION

10

11   SECURITIES AND EXCHANGE              CASE NO. 3:14-cv-04825-JSC
12   COMMISSION,
                                          **NOTICE OF MOTION AND MOTION TO
13              Plaintiff,                STRIKE PORTIONS OF THE
                                          COMPLAINT PURSUANT TO FEDERAL
14         v.                             RULE OF CIVIL PROCEDURE 12(f);
                                          MEMORANDUM OF POINTS AND
15   SASAN SABRDARAN and FARHANG          AUTHORITIES IN SUPPORT THEREOF**
     AFSARPOUR,
16                                        _____/
                Defendants.
17   _____/     Date:       February 26, 2015
                                          Time:       9:00 a.m.
18                                        Location:   Courtroom F, 15th Floor
                                          Before:     Hon. Jacqueline Scott Corley
19

20   **TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

21          **PLEASE TAKE NOTICE** that on February 26, 2015, at 9:00 a.m. or as soon thereafter

22   as thereafter may be heard in the United States District Court for the Northern District of

23   California, San Francisco Division, Courtroom F, 15th Floor, located at 450 Golden Gate Avenue,

24   San Francisco, CA 94102, defendant Sasan Sabrdaran will, and hereby does, move the Court for

25   an order striking portions of the complaint in this action pursuant to Federal Rule of Civil

26   Procedure 12(f).

27          This motion will be made on the grounds that plaintiff Securities and Exchange

28   Commission's ("SEC") complaint alleges several transactions that cannot serve as a basis for

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415) 409-8900 • FAX: (415) 409-8904

liability under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §87j, and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  First, the transactions at issue involve placing spread bets which are not securities under the Securities Act of 1933 ("Securities Act") (*see* 15 U.S.C. § 77b(a)(1)), the Exchange Act (*see* 15 U.S.C. 78c(a)(10)) or the "economic realities" test articulated by the U.S. Supreme Court in *Tcherepnin v. Knight* 389 U.S. 332, 336 (1967) and *SEC v. W. J. Howrey Co.*, 328 U.S. 293 (1946).  Second, the alleged transactions did not occur in the United States.  Thus, the SEC is improperly seeking to extend the reach of the United States securities laws to extraterritorial transactions in a manner rejected by the U.S. Supreme Count in *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247 (2010).  Third, the SEC has failed to allege that Mr. Afsarpour knew that the tip was made in exchange for a personal benefit, that Mr. Afsarpour tipped the downstream tippees for a personal benefit, and that the downstream tippess knew that Mr. Afsarpour's tip was made in exchange for a personal benefit.  Because these transactions cannot form the basis for liability under the Exchange Act, they are immaterial and should be stricken.  Specifically, Dr. Sabrdaran asks the Court to strike the following from the SEC's complaint:

- Paragraph 2, line 8 in its entirety;
- Paragraph 2, line 9 where the complaint states "spread bets on their behalf";
- Paragraph 2, lines 10-13 where the complaint states "and the other of whom bought spread bets.  (A spread bet is an agreement in which the purchaser purchases from a counterparty the right to profit from changes in the price of an underlying asset, in this case, InterMune common stock and InterMune call options.)";
- Paragraph 2, line 15 where the complaint states "$1,077,069";
- Paragraph 21, lines 11-12 where the complaint states "and his spread bets, which were directly tied to the price of InterMune's common stock and the price of InterMune call options";

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904

- Paragraph 26, lines 12-13 where the complaint states "The next day, October 11, 2010, Afsarpour opened a spread betting account with IG Index, a London-based subsidiary of IG Group, which provides financial spread betting products.";

- Paragraphs 27-28 in their entirety;

- Paragraphs 35-38 in their entirety:

- Paragraph 39 where the complaint states "$877,369";

- Paragraphs 40-46 in their entirety;

- Prayer for Relief, Paragraph II in its entirety.

This motion is based upon this Notice of Motion; the attached Memorandum of Points and Authorities; the Court's records and files in this action; and such further argument as may be presented prior to or at the time of hearing on the motion.


Dated: January 12, 2015                              CANNATA, CHING & O'TOOLE LLP

                                                     /s/ Mark P. Fickes
                                                     MARK P. FICKES
                                                     Attorneys for Defendant
                                                     SASAN SABRDARAN

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ▪ FAX: (415)409-8904

- 3 -
NOTICE OF MOTION AND MOTION TO STRIKE

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES TO BE DECIDED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Parties and Relevant Entities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    InterMune Seeks Approval to Market Esbriet in Europe.. . . . . . . . . . . . . . . . 3

    C.    Dr. Sabrdaran Allegedly Tips Mr. Afsarpour
        Who Allegedly Tipped Others.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    Mr. Afsarpor Makes Spread Bets.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.    Mr. Afsarpor Tips Two Individuals Who Traded. . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    The Legal Standard for a Rule 12(f) Motion to Dismiss. . . . . . . . . . . . . . . . . 6

    II..    The Complaint's Allegations Related to Spread Bets Should Be Stricken Because
         Mr. Afsarpour's Gambling Was Not in Connection with the Purchase or Sale of a
         Security... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    III.    The Complaint's Allegations Related to Spread Bets Should Be Stricken Because
         the SEC Impermissibly Seeks Extraterritorial
         Application of the Exchange Act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    IV.    The Allegations Related to Tippees Should Be Stricken Because the SEC Fails to
         Allege the Tippees Knew That the Information Was Disclosed in Violation of a
         Relationship of Trust and/or Knew that the
         Disclosure Was for Personal Benefit... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    V.    The Allegations Should Be Stricken Without Leave to Amend. . . . . . . . . . . . 16

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415) 409-8900 ● FAX: (415) 409-8904

**TABLE OF AUTHORITIES**

**CASES**

*Absolute Activist Master Fund LLC v. Ficeto,* 677 F.3d 60 (2d Cir. 2012). . . . . . 10, 11, 13, 14, 16

*Bureerong v. Uvawas,* 922 F. Supp. 1450 (C.D. Cal. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dirks v. SEC,* 463 U.S. 646 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fantasy, Inc. v. Fogerty,* 984 F2d 1524, 1527 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fogerty v. Fantasy, Inc.,* 510 US 517, 534-35 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Johnson v. Buckley,* 356 F.3d 1067 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*LLC v. Vestbirk,* No. 2:10-cv-02483-GEB-CKD, 2012 WL 2873371. . . . . . . . . . . . . . . . . . . 11

*Morrison v. National Australia Bank, Limited,*
     561 U.S. 247 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 10, 11, 12, 13, 14, 16

*Nunes v. Ashcroft,* 348 F.3d 815 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*MVP Asset Mgmt.,* 2012 WL 2873371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*In re Optimal U.S. Litigation,* 865 F. Supp. 2d 451 (S.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . 13

*SEC v. Benger,* No. 09 C 676, 2013 WL 593952. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*SEC v. Berger,* 322 F.3d 187 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*SEC v Compania Internacional Financiera S.A.,*
     No. 11 Civ. 4904. 2011 WL 3251813 (S.D.N.Y. Jul. 29, 2011). . . . . . . . . . . . . 11, 12, 13, 14

*SEC v. Sands,* 902 F. Supp. 1149 (C.D. Cal. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*SEC v. Western J. Howrey Company,* 328 U.S. 293 (1946). . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 9

*Sliger v. Prospect Mortg., LLC,* 789 F. Supp. 2d 1212 (E.D. Cal. 2011). . . . . . . . . . . . . . . . . . 6

*Tcherepnin v. Knight* 389 U.S. 332 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*U.S. v. Smith,* 155 F.3d 1051 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Vivendi Universal, S.A.,* 284 F.R.D. 144 (S.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . . . . . 11

*Whittlestone, Inc. v. Handi-Craft Co.,* 618 F3d 970, 973-74 (9th Cir. 2010). . . . . . . . . . . . . . . 6

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415) 409-8900 • FAX: (415) 409-8904

1

# FEDERAL STATUTES

2   15 U.S.C. § 77b(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

3   15 U.S.C. 78c(a)(10).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4   15 U.S.C. §78j(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5   15 U.S.C. §87j. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

# RULES

7   17 C.F.R. § 240.10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 9, 11, 15, 17

8   Federal Rule of Civil Procedure 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9   Federal Rule of Civil Procedure 12(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

The Securities and Exchange Commission ("SEC") seeks to expand its high profile war on insider trading beyond the territorial jurisdiction of the United States by attempting to impose liability for transactions that occurred in the United Kingdom. Even more troubling, the SEC asks the Court to use the federal securities laws to penalize defendant Sasan Sabrdaran for his friend's gambling even though the types of wagers placed by co-defendant Farhang Afsarpour do not involve "securities" as that term is defined under federal law. In other words, the SEC wants Dr. Sabrdaran to disgorge more than $1 million dollars based on conduct that did not occur in the United States, did not involve securities, did not provide any personal benefit, and therefore does not violate federal law.

It is axiomatic that the federal securities laws apply to transactions in securities. Both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") define what constitutes a security. The provisions of the Securities Act and the Exchange Act, however, are not exclusive. Nearly 70 years ago, the U.S. Supreme Court articulated the test to determine whether certain transactions could be defined as securities under federal law in *SEC v. W. J. Howrey Co.*, 328 U.S. 293 (1946). In sum, our Supreme Court held that transactions involving the investment of money in a common enterprise where the profits come solely from the efforts of others (*i.e.*, not the investors) are securities. The wagers for which the SEC seeks to penalize Dr. Sabrdaran do not come close to satisfying the *Howrey* test.

Until recently, the federal courts used a so-called "conduct and effects" test to determine whether the federal securities laws could be applied extraterritorially. Finding this practice completely lacking in textual basis, the U.S. Supreme Court overruled nearly four decades of precedent in *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247 (2010) and dramatically reduced the reach of federal law to securities transactions abroad. Under *Morrison*, Section 10(b) of the Exchange Act, 15 U.S.C. §87j,  and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, only apply to purchases or sales of securities occurring in the United States, or involving

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904

securities listed on a domestic exchange.  Thus, by placing spread bets in the United Kingdom, Mr. Afsarpour's wagers are far beyond the reach of U.S. Law.

The SEC's overreach in the pursuit of its war on insider trading cannot be allowed to stand.  Because substantial portions of the SEC's insider trading claims are based on extraterritorial transactions that do not involve securities, the Court should strike all allegations set forth in the notice of motion pursuant to Federal Rule of Civil Procedure 12(f).

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are:

1.      Whether portions of the complaint should be stricken pursuant to Rule 12(f) as Mr. Afsarpour's gambling was not in connection with the purchase or sale of a security, and therefore certain allegations are immaterial and/or impertinent.

2.      Whether portions of the complaint should be stricken pursuant to Rule 12(f) because the SEC impermissibly seeks extraterritorial application of the Exchange Act, and therefore certain allegations are immaterial and/or impertinent.

3.      Whether portions of the complaint should be stricken pursuant to Rule 12(f) because the SEC fails to allege that certain tippees knew that the information was disclosed in violation of a relationship of trust, that the tips were made in exchange for a personal benefit and that the tippees knew that the tips were made in exchange for a personal benefit, and therefore certain allegations are immaterial and/or impertinent.

4.      Whether the SEC should be denied leave to amend the complaint.

## FACTUAL BACKGROUND

**A.      The Parties and Relevant Entities**

The SEC charged Dr. Sasan Sabrdaran and his friend Farhang Afsarpour with insider trading.  Dr. Sabrdaran is a resident of the Bay Area and was employed as the Director of Drug Safety and Risk Management for InterMune, Inc. ("InterMune") during the time period at issue in the SEC's complaint.  (Cmplt. ¶ 7.)  Farhang Afsarpour resides in Manchester, England.  (*Id.* ¶ 8.)

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

1  InterMune is a pharmaceutical company headquartered in Brisbane California. (*Id.* ¶ 9.)

2  During the time frame alleged in the complaint, InterMune's common stock was registered with

3  the SEC and traded on the NASDAQ Stock Market. (*Ibid.*) InterMune options traded on various

4  exchanges in the United States. (*Ibid.*) In and around September 2014, InterMune's securities

5  stopped trading after the company was acquired as a wholly-owned subsidiary of Roche

6  Holdings, Inc. (*Ibid.*)

7  **B.     InterMune Seeks Approval to Market Esbriet in Europe**

8  In March 2010, InterMune ("Applicant") submitted a Marketing Authorisation

9  Application ("MAA") to the European Medicines Agency ("EMA") seeking approval to market

10  the drug Esbriet in the European Union ("EU") for the treatment of patients with Idiopathic

11  Pulmonary Fibrosis ("IPF") which is a terminal lung disease. (Cmplt. ¶12.) The Committee for

12  Medicinal Products for Human Use ("CHMP"), which is a scientific advisory panel to the EMA,

13  is responsible for preparing the EMA's opinions on medicines. (*Id.* ¶ 13.). As part of the process

14  for approving medicines for marketing in the EU, the CHMP appoints two of its members – a

15  Rapporteur and co-Rapporteur – to assess the drug. (*Ibid.*) The Rapporteur and co-Rapporteur

16  are required to provide questions and comments to an applicant at the established intervals of 80

17  days, 120 days, 150 days, 180 days, and 210 days following receipt of an MAA. (*Ibid.*) These

18  deadlines, however, are tolled during the time the applicant takes to respond to the questions and

19  comments. (*Ibid.*) In addition to these formal communications at specified time frames, there is

20  often informal interaction between the CHMP and applicant throughout the approval process.

21  (*Ibid.*) Generally, the CHMP must announce its recommendation regarding approval for the

22  marketing of a drug at the 210-day benchmark, which excludes any time tolled while the

23  applicant responds to questions or comments. (*Id.* ¶ 14.) Occasionally, a recommendation is

24  issued sooner. (*Ibid.*)   Following the submission of its MAA in March 2010, InterMune advised

25  the public that it anticipated a CHMP opinion and EU decision regarding Esbriet in the first half

26  of 2011 based on the "standard" 210-day time frame. (*Id.* ¶ 15.)

27  Various InterMune employees, including Dr. Sabrdaran, were involved in the MAA

28  process during the latter part of 2010. (*Id.* ¶ 16.) The SEC alleges that Dr. Sabrdaran received

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

information that the regulatory process was going well.  (*Ibid.*)  According to the SEC, around

November 29, 2010, InterMune received the Day 150 Report indicating that Esbriet could be

approvable.  (*Id.* ¶ 17.)  The SEC further alleges that there were positive indications about the

Esbriet review from mid-November 2010 through mid-December 2010 and that Dr. Sabrdaran

was aware of some of the positive developments.  (*Id.* ¶¶ 17-19.)  The communications regarding

the approval process were confidential and shared only on a "need-to-know basis."  (*Id.* ¶ 20.)

Contrary to the SEC's insider trading theory, Dr. Sabrdaran acknowledged the confidentiality of

the approval process in a December 2, 2010 email where he wrote  "[p]lease do not share the

possibility of early/Dec (*sic*) opinion with anybody else at InterMune."  (*Id.* ¶ 24.)

On December 17, 2010, InterMune publicly announced the issuance of a positive

opinion by the CHMP.  (*Id.* ¶ 21.)  Both InterMune's stock and options prices increased

significantly over the following days.  (*Ibid.*)

**C.**      **Dr. Sabrdaran Allegedly Tips Mr. Afsarpour Who Allegedly Tipped Others**

Dr. Sabrdaran and Mr. Afsarpour are friends.  (Cmplt. ¶ 25.)  The SEC alleges that the

two men communicated regularly in the latter half of 2010.  (*Ibid.*)  In addition, the SEC alleges

that during the relevant period, Mr. Afsarpour opened a spread betting account at England-based

IG Index.  (*Id.* ¶ 26.)  A "spread bet" is an agreement in which a purchaser acquires the chance to

profit from changes in an underlying asset.  (*Id.* ¶ 27.)  The SEC acknowledges that Mr.

Afsarpour had previously placed spread bets on various commodities, but infers something

nefarious from the fact that the newer InterMune spread bets were wagering on equities.  (*Id.* ¶

28.)  In a tacit concession of the weakness of its insider trading theory, the SEC also

acknowledges that Mr. Afsarpour placed some spread bets that InterMune stock prices would rise

in November 2010 – long before the alleged insider tips – but made only minor profits.  (*Ibid.*)

According to the complaint, Dr. Sabrdaran and Mr. Afsarpour spoke on the telephone on

November 30, 2010 when Dr. Sabrdaran was in London following a meeting with the CHMP.

(*Id.* ¶ 29.)  The SEC contends that Dr. Sabrdaran received positive information about the CHMP

process on December 7 and 9, 2010, and that on December 10, 2010, Dr. Sabrdaran spoke on the

telephone.  (*Id.* ¶ 30.)  Two days later, Mr. Afsarpour allegedly urged some friends to buy InterMune securities because he thought the EU would approve the MAA for Esbriet.  (*Id.* ¶ 30.)

**D.     Mr. Afsarpour Makes Spread Bets**

Between December 9 and 16, 2010, deposited about £87,000 into his spread betting account with IG Index in England and placed several spread bets – this in addition to the InterMune-related spread bets he had made well before December 10.  (*Id.* ¶¶ 35-36.)

The SEC alleges that Mr. Afsarpour was advised that IG Index *may* hedge spread bets by purchasing securities in the underlying market.  (*Id.* ¶ 37 (emphasis added).)  According to the SEC, an IG Index broker told Mr. Afsarpour that IG Index *could* hedge Mr. Afsarpour's spread bets.  (*Id.* ¶ 38 (emphasis added).)   This conversation occurred on December 17, 2010, the day the news about Estbriet was publicly announced.[1]  (*Ibid.*)  IG Index hedged some of its positions by purchasing InterMune securities.  (*Ibid.*)  According to the SEC, Mr. Afsarpour made $877,369 in profits, the majority of which came from the spread bets as opposed to the 75 shares of common stock.  (*Id.* ¶ 39.)

In addition to the spread bets, Mr. Afsarpour bought a mere 75 shares of InterMune common stock on December 16, 2010.  (Cmplt. ¶ 34.)

**E.     Mr. Afsarpour Tips Two Individuals Who Traded**

The SEC alleges that Mr. Afsarpour tipped two friends who traded in InterMune Securities.  (Cmplt. ¶ 40.)  One tippee placed spread bets through an IG Index spread betting account and made a profit of about $107,900.  (*Id.* ¶ 42.)  The other tippee bought InterMune stock, making a profit of about $91,800.  (*Id.* ¶ 45.)  The SEC alleges that Dr. Sabrdaran's and Mr. Afsarpour's liability for "ill-gotten" profits is $1,077,069.  (*Id.* ¶ 46.)

---

[1]      Tellingly, the SEC's complaint does not state whether the December 17, 2010 conversation about hedging occurred before or after InterMune's December 17, 2010 announcement about the Esbriet approval.  Likewise, the complaint is devoid of any allegations concerning whether IG Index hedged Mr. Afsarpour's wagers before or after InterMune's December 17, 2010 public announcement.

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904

**ARGUMENT**

**I.       The Legal Standard for a Rule 12(f) Motion to Strike**

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure ("Rule"), a motion to strike is proper to eliminate immaterial and impertinent matters.  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F3d 970, 973-74 (9th Cir. 2010).  The function of a Rule 12(f) motion is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Id.* at 973.  Thus, a motion to strike should be granted if it "will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay, or confusion of the issues."  *Sliger v. Prospect Mortg.*, LLC, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011).  A motion to strike may be used to attack even single words or phrases in a complaint.  *Fantasy, Inc. v. Fogerty*, 984 F2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds in *Fogerty v. Fantasy, Inc.*, 510 US 517, 534-35 (1994).  Allegations are "immaterial" if they have no bearing on the controversy before the court.  *Sliger*, 789 F. Supp. 2d at 1216.  Allegations are impertinent if they are not relevant to issue involved in the action.  *Fantasy, Inc.*, 984 F.2d at 1527.  As with motions to dismiss pursuant to Rule 12(b)(6), the grounds for a motion to strike must appear on the face of the complaint.  *SEC v. Sands*,  902 F. Supp. 1149, 1165 (C.D. Cal. 1994).

While courts generally view motions to strike with disfavor (*see Bureerong v. Uvawas*, 922 F. Supp. 1450, 1478 (C.D. Cal. 1996)), the allegations related to spread bets form the basis for the overwhelming majority of the so-called "ill-gotten" gains for which the SEC seeks disgorgement.[2]

---

[2]       The SEC seeks disgorgement of $1,077,069.  Although the SEC fails to parse out "ill gotten" gains related to spread bets from gains related to stock sales, it appears from the face of the complaint that more than $850,000 in potential disgorgement is related to spread bets.  Thus, the decision on the instant motion to strike would have effect of reducing the SEC's disgorgement claim by almost $900,000.

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

II.     **The Complaint's Allegations Related to Spread Bets Should Be Stricken Because Mr. Afsarpour's Gambling Was Not in Connection with the Purchase or Sale of a Security.**

The SEC's complaint alleges that Dr. Sabrdaran and Mr. Afsarpour violated section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b–5 makes it "unlawful for any person ... (a) [t]o employ any device, scheme, or artifice to defraud, ... or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

Spread bets are essentially wagers on whether the market for an underlying asset will rise or fall.  However, a spread bet does not entail the purchase of the underlying asset and the SEC does not contend otherwise.[3]  Spread bets are not included in the instruments defined as "securities" under either the Securities Act or the Exchange Act.  The Securities Act defines a security as :

> [A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

---

[3]     The complaint defines a spread bet as "an agreement in which a purchaser acquires the chance to profit from changes in an underlying asset."  (Cmplt. ¶ 27.)  Under either definition, a spread bet is not a security.

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

*See* 15 U.S.C. § 77b(a)(1).  The Exchange Act defines a security as:

> [A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

*See* 15 U.S.C. 78c(a)(10).  Thus, spread bets not among the enumerated instruments defined as securities under either the Securities Act or the Exchange Act and therefore cannot serve as the basis for SEC's legal claims.  As such, all allegations related to spread bets are by definition immaterial and impertinent.

Further, spread bets do not qualify as securities under the "economic realities" test articulated by the Supreme Court.  *See Tcherepnin v. Knight* 389 U.S. 332, 336 (1967).  In *Tcherepnin*, the issue was whether withdrawable capital shares in an Illinois savings and loan were securities within the meaning of the Exchange Act.  *Id.* at 333.  The issuance of withdrawable capital shares was one of two ways that Illinois savings and loan associations were permitted to raise capital.  *Id.* at 336.  Each shareholder became a member of the association and had voting rights related to the aggregate value of their shares.  *Ibid.*  Shareholders were not entitled to a fixed rate of return and instead received dividends declared by an association's board of directors and based on the association's profits.  *Id.* at 337.  Although the withdrawable capital shares were made legal by state statute, the Supreme Court had to determine under federal law whether the shares were securities under the Exchange Act.  *Id.* at 337-38.  Relying on the test articulated in *SEC v. W. J. Howrey Co.*, 328 U.S. 293 (1946), the *Tcherepnin* Court stated:

> The test (for an investment contract) is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.  Petitioners are participants in a common enterprise – a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings in making sound loans.  Because Illinois law ties the payment of dividends on withdrawable capital shares to an

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

apportionment of profits, the petitioners can expect a return on their investment only if City Savings shows a profit.  If City Savings fails to show a profit due to the lack of skill or honesty of its managers, the petitioners will receive no dividends.  Similarly, the amount of dividends the petitioners can expect is tied directly to the amount of profits City Savings makes from year to year.  Clearly, then, the petitioners' withdrawable capital shares have the essential attributes of investment contracts as that term is used in [section] 3(a)(10) and as it was defined in *Howrey*.

*Tcherepnin*, 389 U.S. at 338-39 (internal quotations and citations omitted).

In the instant case, the SEC fails to plead any facts that would support the conclusion that spread bets are securities.  There is nothing alleged that the returns on spread bets represent an investment of money in a common enterprise with profits to come solely from the efforts of others as required by *Howrey* and *Tcherepnin*.  Rather, spread bets are only wagers and any profit is derived from a successful guess about the movement in stock or option prices rather than from the skill and work of others.  Further, spread bets are taxable as gambling profits rather than capital gains.[4]  Because Dr. Sabrdaran cannot be liable for transactions that – by their very nature – do not involve the purchase or sale of securities.  Thus, all allegations related to spread bets should be stricken from the complaint as they are immaterial and impertinent.  The importance of striking the allegations about spread bets because they are immaterial and impertinent cannot be understated as these allegations form the basis for nearly $900,000 of the SEC's disgorgement claim.  Granting the instant motion will dramatically reduce the issues to be decided at trial.

**III.    The Complaint's Allegations Related to Spread Bets Should Be Stricken Because the SEC Impermissibly Seeks Extraterritorial Application of the Exchange Act.**

Even if the spread bets are treated as securities, which they clearly are not, the SEC's effort to apply with the Exchange Act to overseas spread bets impermissibly seeks to extend Section 10(b)'s and Rule 10b-5's reach extraterritorially in direct contravention of *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247 (2010) which held that the Exchange Act does not apply

---

[4]    See BIM220i5-Meaning of Trade: Exceptions and Alternatives: Betting and Gambling-introduction, HM Revenue &Customs, http://www.hmrc.gov.uk/manuals/bimmanual/BIM22015.htm (last visited January 12, 2015).

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904

1   to extraterritorial securities transactions.  *See also Absolute Activist Master Fund LLC v. Ficeto*,

2   677 F.3d 60, 66 (2d Cir. 2012).

3        In *Morrison*, the Supreme Court addressed the extraterritorial reach of § 10(b) of the

4   Exchange Act.  An Australian bank (the defendant) purchased an American mortgage servicing

5   company in 1998.  *Morrison*, 561 U.S. at 251.  For several years, the bank touted the success of

6   the mortgage servicing company in numerous public statements.  *Ibid.*  In 2001, however, the

7   Australian Bank wrote down the value of the mortgage company's assets by more than $2 billion,

8   which resulted in a drop in stock value.  *Id.* at 252.  The Plaintiffs were Australian nationals who

9   had bought stock in the Australian bank between 1998 and 2001 who alleged that the bank

10  manipulated financial information to make the business look more profitable then it actually was.

11  *Id.* at 252-53.  The bank's stock was sold on the Australian Stock Exchange Limited and other

12  foreign securities exchanges, but not on any U.S. exchanges.  *Id.* at 251.

13       Before *Morrison*, courts of appeal applied two tests to assess whether United States

14  securities laws could apply to extraterritorial transactions for several decades.  *Id.* at 255.  The

15  "effects test" analyzed "whether the wrongful conduct had a substantial effect in the United

16  States or upon United States citizens" and the "conduct test" examined "whether the wrongful

17  conduct occurred in the United States."  *Id.* at 257 (quoting *SEC v. Berger*, 322 F.3d 187, 192-93

18  (2d Cir. 2003)).

19       Finding that the conduct and effects tests applied by various courts of appeal lacked any

20  textual basis, the Supreme Court observed that unless contrary intent is evident, legislation is

21  meant to apply only within the territorial jurisdiction of the United States.  *Id.* at 255, 258.  In

22  place of the conduct and effects tests, the Court adopted a "transactional test".  *Id.* at 267.  Under

23  this new transactional test, for § 10(b) to apply, "the purchase or sale [must be] made in the

24  United States, or [must] involve[] a security listed on a domestic exchange."  *Id.* at 269-70.

25  Because the Plaintiffs in *Morrison* did not purchase or sell securities listed on a domestic

26  exchange and the transactions at issue did not otherwise occur in the United States, the Supreme

27  Court held that plaintiffs failed to state a claim for relief under §10(b).  *Id.* at 273.  Where the

28  securities are not registered on a domestic exchange, "the exclusive focus [is] on domestic

purchases and sales." *Id.* at 268. "[T]ransactions involving securities that are not traded on a domestic exchange are domestic if [either, (1)] irrevocable liability is incurred or [(2)] title passes within the United States." *Absolute Activist*, 677 F.3d at 67; *see also MVP Asset Mgmt. (USA) LLC v. Vestbirk*, No. 2:10-cv-02483-GEB-CKD, 2012 WL 2873371, at * 5 (E.D. Cal. Jul 12, 2012); *SEC v. Benger*, No. 09 C 676, 2013 WL 593952, at *9 (N.D. Ill. Feb. 15, 2013) (adopting *Absolute Activist* test). That is, "a transaction is domestic if the purchaser incurred irrevocable liability within the United States to take and pay for a security, …or the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist*, 677 F.3d at 69. Irrevocable liability occurs when there is a "meeting of the minds of the parties," *Absolute Activist, id.* at 68, *i.e.*, when the parties enter into a binding contract. *In re Vivendi Universal, S.A.*, 284 F.R.D. 144, 150 (S.D.N.Y. 2012).

In the instant case, the SEC seeks to penalize Dr. Sabrdaran for spread bets made in the United Kingdom by his friend.[5] As noted, spread bets are not securities. *See* Section II, *supra*. Even if this Court were to find spread bets are securities, *Morrison* and its progeny clearly bar the application of Section 10(b) and Rule 10b-5 to extraterritorial transactions. The spread bets at issue are not traded on a domestic exchange, nor did the purchase or sale occur within the United States.

Dr. Sabrdaran anticipates the SEC will argue that as Mr. Afsarpour was advised that IG Index *may* hedge spread bets by purchasing securities in the underlying market (*see* Cmplt. ¶¶37-38), his wagers "required" IG Index to purchase the underlying security traded on the NASDAQ Stock Market. *See SEC v Compania Internacional Financiera S.A.*, No. 11 Civ. 4904. 2011 WL 3251813 (S.D.N.Y. Jul. 29, 2011). *Compania* is distinguishable from the facts of this case. There, the SEC moved for a preliminary injunction and asset freeze in an insider trading case involving the purchase in the United Kingdom of contracts for difference ("CFDs") for the shares of a company whose shares were traded on the New York Stock Exchange. *Id.* at *1. One defendant was a money manager based in Geneva, Switzerland. *Id.* at *2. The SEC alleged that

---

[5]   The SEC alleges that Dr. Afsarpour purchased 75 shares of InterMune stock and that a hairdresser also bought stock. Those allegations are not the subject of this motion to strike.

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

the manager acquired CFD based on material, non-public information.  *Ibid.*  In determining that

the CFD's are securities, the Court observed:

> "CFD purchasers acquire the future price movement of the underlying
> company's common stock (positive or negative) without taking formal
> ownership of the underlying shares."  The prices for CFDs are identical to the
> prices quoted for shares of the company's stock, and in advance of pricing a
> CFD, the broker purchases matching shares of the stock.  "Because identical
> matched transactions occur in shares of the actual common stock immediately
> before the purchase or sale of the CFDs, any influence on the public market
> price of the underlying securities is also reflected in the price of the CFDs.'
> CFD holders receive the benefit of any dividends paid by the company on the
> shares and CFD contracts may include voting rights on the shares."

*Id.* at *3 (internal citations omitted.)

The defendant argued that under *Morrison*, the federal securities laws could reach the

transactions at issue.  *Id.* at *6.  The Court rejected this argument.  First, the Court noted that the

central issue was insider trading in the domestic securities of stock listed on the NYSE.  *Ibid.*

The Court held that although the manager "may have engaged in this insider trading by trading

CFDs in London that were tied to transactions on the NYSE ... this does not negate the fact that

its alleged deceptive conduct involved securities listed on a domestic exchange.  *Ibid.*

The allegations related to Mr. Afsarpour's spread bets are distinguishable from the facts

presented in *Compania*.  Here, Mr. Afsarpour was advised that his spread bets may be hedged by

purchasing the underlying asset.  While the SEC alleges that IG Index hedged some of its

positions by purchasing InterMune securities, the complaint is silent as to whether IG Index

hedged all of the bets by purchasing InterMune securities and whether it hedged by acquiring

InterMune securities before or after the spread bets were placed.  Further, the SEC's complaint is

silent on whether IG Index's alleged hedging occurred before or after InterMune's December 17,

2010 announcement about Esbriet.  Moreover, the SEC does not allege any facts addressing

whether Mr. Farhang's December 17, 2010 conversation with the IG Index broker occurred

before or after InterMune's public announcement.  Finally, the SEC's complaint does not allege

any facts that would suggest that the spread bets were the functional equivalents of InterMune

securities.

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

The difference between this case and *Compania* is made more evident by the fact that the CFDs in *Compania* involved *identical matched transactions* in shares of the actual common stock *immediately before* the purchase or sale of the CFDs.  Thus, any influence on the public market price of the underlying securities was also reflected in the purchase price of the CFDs. Further, CFD holders receive the benefit of any dividends paid by the company on the shares and CFD contracts may include voting rights on the shares.  It is this direct correlation between the CFDs and stock prices that led the *Compania* court to conclude that the CFD purchases involved the purchase of securities listed on a domestic exchange. *Compania*, 2011 WL 3251813 at *7. Essentially, the CFD's at issue were functional equivalents of NYSE-listed stock because: (1) the CFD holders received dividends on the shares paid by the issuer, (2) the CFD holders had voting rights on the shares, and (3) the prices for CFDs are the prices for common stock and any profits or losses incurred by the CFD holders were identical to that of the common stock.  *Id.* at *6; *see also In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 454-55 (S.D.N.Y. 2012).  None of those factors are present with regard to Mr. Afsarpour's spread bets.

*In re Optimal U.S. Litig.* is instructive.  The case was a putative class action stemming from the Plaintiffs' investment in a fund that invested all its assets with Bernard Madoff and his firm. *Id.* at 452.  Plaintiffs alleged that the fund failed to conduct sufficient due diligence on Madoff, ignored red flags and made misstatements and omissions in connection with the purchase and sale of the shares. *Ibid.*  On a first round of motions to dismiss, the Court denied the Defendants' *Morrison* motion holding that it would be better resolved on a more developed factual record that established where all the shares were issued. *Ibid.*  After the Second Circuit Court of Appeal issued its decision in *Absolute Activist Master Fund LLC v. Ficeto*, *supra*, the Court issued an order to show cause why the Exchange Act claims should not be dismissed in light of the Second Circuit's decision which clarified the scope of the extraterritorial application of the Exchange Act. *Ibid.*

The defendants solicited investments in Optimal US pursuant to explanatory memoranda ("EMs") that authorized the purchase of many instruments not listed in a U.S. exchange. *Id.* at 455.  The Court observed that while the investment strategy disclosed in the EMs authorized the

purchase of stocks and options there were no allegations of a direct correlation between Optimal U.S. shares and shares listed on the NYSE. *Ibid.* The Court held "it would disregard *Morrison's* presumption [against extraterritorial application of the Exchange Act] to extend the holding in *Compania* to reach the allegations here." *Ibid.* The Court also rejected the argument that the "economic reality" of the purchase of Optimal US shares was essentially an investment in the NYSE. *Ibid.* The Court observed that the relationship between Optimal US shares was not "economically equivalent" to the purchase of stock on the NYSE sufficient to trump the presumption of extraterritoriality. *Id.* at 456. The Court concluded:

> [t]he issue of the extent to which the Exchange Act may reach foreign instruments referencing U.S. stock is an issue that many district courts have grappled with and which requires further guidance from appellate courts. However, given that plaintiffs' federal securities law claims fail to satisfy the standard in *Absolute Activist* and their extremely tenuous and speculative connection to securities listed on a U.S. stock exchange, plaintiffs have failed to overcome the presumption against the extraterritorial reach of the Exchange Act.

*Ibid.* The relationship between the spread bets and InterMune securities is equally speculative as the complaint obliquely references that some bets were hedged. Without a stronger connection between Mr. Afsarpour's wagers and the NASDAQ Stock Market, the SEC's vague and conclusory allegations cannot stand and should be stricken. *See MVP Asset Mgmt.*, 2012 WL 2873371 at *6 (holding that the allegation that certain extraterritorial stock purchases were consummated when funds were wired to a brokerage account in New York and then wired to another account in New York "are insufficient to establish the existence of a domestic transaction, as required under Section 10(b).") The SEC's improper attempt to interject impertinent and immaterial allegations has the prejudicial effect of adding almost $900,000 to its disgorgement.

**IV.     The Allegations Related to Tippees Should Be Stricken Because the SEC Fails to Allege the Tippees Knew That the Information Was Disclosed in Violation of a Relationship of Trust and/or Knew that the Disclosure Was for Personal Benefit.**

Insider trading involves the purchase or sale of securities based upon material non-public information. *U.S. v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998). The elements of a violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 for tipping liability are: (1) the

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904

tipper possessed material, nonpublic information regarding the issuer or a security; (2) the tipper disclosed the information to the tippee; (3) the tippee traded in the issuer's securities while in possession of the information; (4) the tippee knew or should have known that the information was disclosed in violation of a relationship of trust; and (5) the tipper benefitted by the disclosure to the tippee. *Dirks v. SEC*, 463 U.S. 646, 654-64 (1983).

In the instant case, the SEC further seeks to hold Dr. Sabrdaran liable for the spread bets of a pharmacist residing in Cheadle, England and the stock purchases of a hair dresser in Santa Monica, California as well. According to the SEC, Mr. Afsarpour spoke with "Pharmacist No. 1" by telephone on December 10, 11 and 13, 2010 who placed his own spread bets. Cmplt. ¶ 41-43. Additionally, the SEC alleges that "Hairdresser No. 1" spoke with Mr. Afsarpour before she bought InterMune stock. *Id.* at ¶ 44. The SEC seeks to hold Dr. Sabrdaran liable for $107,900 in profits related to the trades by Pharmacist No. 1 and Hairdresser No. 1. *Id.* at ¶ 43 & ¶ 45. The problem, however, is that the complaint does not contain a single allegation that either the pharmacist or the hairdresser knew that the alleged inside information was disclosed in violation of a relationship of trust. The complaint does not allege that Mr. Afsarpour – as the alleged tipper – benefitted by disclosure to the downstream tippees or that the downstream tippees knew that the alleged disclosure was made in exchange for a personal benefit. *See Dirks*, 463 U.S. at 666 (reversing judgment against tipper where they received no personal benefit for revealing secrets); *U.S. v. Newman*, 2014 WL 6911278, *8 (2nd Cir. 2014) ("[W]e conclude that a tippee's knowledge of the insider's breach necessarily requires knowledge that the insider disclosed confidential information in exchange for personal benefit.) In the instant case, the SEC alleges that Mr. Afsarpour knew Dr. Sabrdaran had a duty to maintain the confidentiality of InterMune's information but the complaint is silent on whether Mr. Afsarpour knew that the disclosure was in exchange for a personal benefit. In addition, the SEC fails to allege any facts showing that Mr. Afsarpour tipped the downstream tippees (the hairdresser and pharmacist) in exchange for a personal benefit or that the tippees knew that the information was disclosed in exchange for a personal benefit. Thus, the allegations that seek to impose liability for the trades of Mr. Afsarpour and the downstream tippees should be stricken as well.

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 ● FAX: (415)409-8904

**V.     The Allegations Should Be Stricken Without Leave to Amend**

1

2          Generally, the courts look to five factors to determine whether leave to amend is

3   appropriate: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and

4   whether the plaintiff has previously amended the complaint. *Johnson v. Buckley*, 356 F.3d 1067,

5   1077 (9th Cir. 2004). "Futility alone can justify the denial of a motion to amend." *Ibid.* (quoting

6   *Nunes v. Ashcroft*, 348 F.3d 815, 818 (9th Cir. 2003). Here, the Court generally should deny

7   leave to amend as amendment would be futile. As explain in Section II, *supra*, the spread bets

8   placed by Mr. Afsarpour are wagers. They are not securities. Although some of those bets may

9   have been hedged, it is clear that these spread bets are not like CFDs or other financial

10  instruments that courts have deemed to be securities. It is implausible at best to believe there are

11  additional facts that the SEC could allege to transform these wagers into securities. Likewise, the

12  transactions for which the SEC seeks to penalize Dr. Sabrdaran occurred in the United Kingdom

13  and are therefore beyond the reach of the Exchange Act. Under the test articulated in *Morrison*

14  and refined in *Absolute Activist*, it is abundantly clear that irrevocable liability did not occur in

15  the United States nor did title pass in the United States. Because these transactions are not

16  domestic, the SEC cannot use the Exchange Act to reach them and there are no additional facts

17  the SEC could allege that would change this conclusion.

18                                    **CONCLUSION**

19         The SEC's case is based on extraterritorial conduct that does not involve the purchase or

20  sale of a security. Further, the complaint fails to allege the necessary elements of a violation of

21  Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. Consequently, the Court

22  should strike the allegations set forth in the Notice of Motion without leave to amend.

23

24  Dated: January 12, 2015                        CANNATA, CHING & O'TOOLE LLP

25                                                 /s/ Mark P. Fickes
                                                   MARK P. FICKES
26                                                 Attorneys for Defendant
                                                   SASAN SABRDARAN

27

28

CANNATA, CHING & O'TOOLE LLP
ATTORNEYS AT LAW
100 Pine Street, Suite 350
San Francisco, CA 94111
TEL: (415)409-8900 • FAX: (415)409-8904