UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

    v.

SASAN SABRDARAN, et al.,

            Defendants.

Case No.  14-cv-04825-JSC

**ORDER GRANTING IN PART MOTION
TO DISMISS AND DENYING MOTION
TO STRIKE**

Re: Dkt. Nos. 21, 22

      Plaintiff Securities and Exchange Commission ("SEC") alleges that Defendants Sasan Sabrdaran ("Sabrdaran") and Farhang Afsarpour ("Afsarpour") violated the antifraud provisions of the Securities Exchange Act of 1934 ("Exchange Act").  (*See* Dkt. No. 1.)  The gravamen of the complaint is that Defendants engaged in insider trading; specifically, that Sabrdaran, an employee of pharmaceutical company InterMune, Inc. ("InterMune"), tipped Afsarpour to material non-public information about the progress through the European regulatory approval process of Esbriet, one of InterMune's products, and that Afsarpour acted on that tip by engaging in transactions in connection with InterMune securities.  (*See id.* ¶ 1.)  Now pending before the Court are Sabrdaran's Motion to Dismiss the complaint and Motion to Strike portions of the complaint. (Dkt. Nos. 21, 22.)  Having considered the parties' submissions, and having had the benefit of oral argument, the Court GRANTS IN PART Sabrdaran's motion to dismiss and DENIES the motion to strike.

**BACKGROUND**

**A.**    **Complaint Allegations**

      This case arises out of allegations of insider trading involving transactions in the securities of InterMune, a then-publicly traded pharmaceutical company incorporated under the laws of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Delaware and headquartered in Northern California.  (Dkt.  No. 1 ¶ 1, 5.)  At all relevant times,

2    InterMune's common stock was registered with the SEC under Exchange Act Section 12(b);

3    InterMune stock traded on the NASDAQ stock market, and InterMune options also traded on

4    various exchanges.  (*Id.*)  InterMune also filed periodic reports with the Commission as the

5    Exchange Act requires.  (*Id.*)  Sabrdaran, a trained physician and resident of San Francisco,

6    worked as the director of Drug Safety Risk Management at InterMune from April 2006 until his

7    termination in March 2012.  (*Id.* ¶ 7.)  Afsarpour is a British citizen who resides in England.  (*Id.*

8    ¶ 8.)  Sabrdaran and Afsarpour had been close friends for years, speaking on the phone often,

9    visiting each other regularly, and caring for each other's ailing parents.  (*Id.* ¶ 25.)

10          This case involves tipping of material, non-public information pertaining to the regulatory

11    approval process to market an InterMune pharmaceutical product for use in the European Union

12    ("EU"), which Sabrdaran was intimately involved in.  Before turning to the allegations specific to

13    the approval process for the product at issue here, background on the EU marketing authorization

14    approval process in general is helpful.

15          *Marketing Authorization Approval Process Before the European Medicines Agency*

16          The European Medicines Agency is responsible for approving pharmaceutical drugs for

17    marketing in the EU.  The Committee for Medicinal Products for Human Use ("CMPH"), a

18    scientific advisory committee, prepares the European Medicines Agency's opinions on medicines.

19    (*Id.* ¶ 13.)  Upon receipt of a marketing approval application ("MAA"), the CMPH appoints two

20    members, designated the Rapporteur and co-Rapporteur, to assess the drug.  (*Id.*)  The Rapporteurs

21    issue formal questions and comments to the applicant in prescribed formats at established

22    intervals:  the first communication is issued 80 days after receipt of the MAA, then 120 days, 150

23    days, 180 days, and 210 days—all excluding the time the applicant takes to respond to each

24    inquiry.  (*Id.*)  Informal communication may also occur between the CMPH and the applicant

25    throughout this process, which culminates in the Rapporteur's presentation of findings and

26    recommendation to the CMPH for a vote on the opinion.  (*Id.*)

27          Thus, the usual time frame for presenting a recommendation to the CMPH is 210 days

28    after the receipt of an MAA, excluding the applicant's response time.  (*Id.* ¶ 14.)  Rarely the

CMPH may be able to issue an opinion within 180 days.  (*Id.*)  In any event, the CMPH then forwards its opinion to the European Medicines Agency for ratification.  (*Id.*)  Once the European Medicines Agency ratifies the CMPH's decision, the particular medicine at issue is marketable throughout the EU.  (*Id.*)

*InterMune's Marketing Authorization Application for Esbriet*

InterMune manufactures Esbriet to treat idiopathic pulmonary fibrosis, a fatal lung disease.  (*Id.* ¶ 12.)  In March 2010, InterMune submitted to the European Medicines Agency an application for approval to market its Esbriet in the EU.  (*Id.* ¶¶ 1, 12.)  A small team of employees at InterMune was responsible for shepherding Esbriet through the European Medicines Agency's regulatory process.  (*Id.* ¶ 15.)  Sabrdaran was one member of this group, referred to throughout the complaint as the "Esbriet Team."  (*Id.*)

After submitting its MAA in March of 2010, InterMune made public statements that it anticipated a CMPH and European Medicines Agency decision in the first half of 2011.  (*Id.*)  On a telephone call on October 28, 2010, InterMune's Chief Executive Officer stated that this anticipated timing was based on the "typical timeline" for the CMPH rendering a decision 210 days after submission "if everything goes perfectly."  (*Id.*)  Later in 2010—specifically, on June 15, July 23, and September 15—the Esbriet Team received communications that the review was going even better than anticipated.  (*Id.* ¶ 16.)  During this time period, Sabrdaran learned of positive developments set forth in the Day 80 report and Day 120 list of questions.  (*Id.* ¶ 26.)

On November 15, 2010, a European Medicines Agency liaison emailed a consultant for InterMune indicating that "most probably Esbriet will go for a positive Opinion" at the CMPH's vote during its December 2010 meeting, which was scheduled for December 13 through 16, 2010.  (*Id.* ¶ 17.)  On November 16 and 17, another European Medicines Agency employee confirmed as much, stating that the "trend is positive" and there were "no major issues" with InterMune's application.  (*Id.*)  On November 29, 2010, the Rapporteurs issued the formal Day 150 report, which stated that Esbriet "could be approvable" provided that InterMune satisfactorily responded to some outstanding issues.  (*Id.*)

On December 2, 2010, InterMune's consultant emailed InterMune personnel, including

United States District Court
Northern District of California

United States District Court
Northern District of California

Sabrdaran, and wrote that he "had [ ] feedback from the Rapporteurs and they think that [InterMune] can reach a positive opinion in December, as long as all the issues are resolved and [ ] no other concerns are raised between now and the end of the [CMPH review]."  (*Id.* ¶ 18.)  An InterMune employee responded to this email by emailing the Esbriet Team, including Sabrdaran, on December 2, 2010, writing, "This is great news!"  (*Id.*)

The CMPH's reply to InterMune's Day 150 responses stated, for the first time, that Esbriet "is approvable" provided that InterMune committed to perform certain post-approval follow-up measures.  (*Id.* ¶ 19.)  The week of December 6, 2010, the EMA liaison confirmed that Esbriet would be put up for a positive opinion during the CMPH's meeting on December 13 through 16, 2010.  (*Id.*)

All of the foregoing communications were private and confidential, and subject to InterMune's policy to share the communications only on a need-to-know basis, even internally.  (*Id.* ¶ 20.)  InterMune's policy until its December 17, 2010 announcement—*i.e.*, until *after* the CMPH voted to issue a positive opinion—was to refrain from any public comment "on the content or tone of any dialogue with the [European Medicines Agency], including the [CMPH], concerning its application to market Esbriet in the EU."  (*Id.*)

On December 17, 2010, InterMune publicly announced that the CMPH had issued a positive opinion.  (*Id.* ¶ 21.)  InterMune's stock and options prices increased significantly:  as of December 20, 2010, its stock price more than doubled, and its call options showed an even bigger spread.  (*Id.* (call option with April 2011 expiration increased nearly 5-fold, while call option with a December 2010 expiration increased a multiplier of more than 200).)

*Sabrdaran's Knowledge of Material Non-Public Information*

Because Sabrdaran was on the Esbriet Team, he was contemporaneously aware of the communications between the European Medicines Agency and InterMune and the fact that Esbriet was on calendar for a positive opinion vote at CMPH's December 2010 meeting.  (*Id.* ¶ 22.)  Sabrdaran was also privy to a number of the communications listed above; he saw the Day 80 report and Day 120 list of questions, the Day 150 Report; the December 2, 2010 email from InterMune's consultant and the internal response; as well as the CMPH's reply to InterMune's

Day 150 response, which unequivocally stated that Esbriet was approvable.  (*Id.* ¶¶ 22, 26.)

Sabrdaran also received other communications regarding Esbriet's status in the regulatory process and its likely approval.  One such communication was a December 8, 2010 email from the InterMune's Chief Regulatory and Drug Safety Officer titled "EU Update—HIGHLY CONFIDENTIAL" that the CMPH had moved its consideration of Esbriet to the afternoon of December 14, 2010.  (*Id.*)  The following day, the same InterMune executive sent the Esbriet Team, including Sabrdaran, an email indicating that "over the past 2 weeks we have succeeded in converting our applications classification from ['']could be approvable['] to ['']is approvable.[']" (*Id.*)

Sabrdaran also was privy to a slew of documents that emphasized his duty of confidentiality with regard to InterMune information generally, and information about Esbriet's application process in particular.  (*See id.* ¶¶ 23-24.)  Generally, Sabrdaran's employment letter of February 2006 stated that he had a duty of confidentiality, and he signed a document acknowledging this duty in April of that year.  (*Id.* ¶ 23.)  Similarly, Sabrdaran's written performance review for 2010 specified that Sabrdaran had a duty to protect InterMune's confidential and proprietary information and was subject to the company's policy against insider trading and tipping.  (*Id.*)

With respect to information about Esbriet in particular, on November 18, 2010 Sabrdaran received an email indicating that the company could not "stress enough how critically **confidential** the Day 150 [List of Issues] will be.  Please do not discuss with anyone prior to our meeting[.]"  (*Id.* ¶ 24 (emphasis in original).)  On November 29, 2010, Sabrdaran received an email from the InterMune executive leading the Esbriet approval process reminding the Esbriet team to "please maintain 100% confidentiality."  (*Id.*)  On December 2, 2010, InterMune imposed a trading blackout period on Sabrdaran and other employees who knew about the progress of InterMune's regulatory approval.  (*Id.*)  Sabrdaran also warned others about the importance of confidentiality:  the same day, he emailed InterMune's consultant asking him not to "share the possibility of early/Dec opinion with anybody else at InterMune."  (*Id.*)

United States District Court
Northern District of California

1       *Sabrdaran's Tipping*

2           Telephone and text message records from June through December 2010 indicate that

3    Sabrdaran communicated regularly with Afsarpour during this time, and some of these

4    communications preceded Afsarpour "taking actions consistent with Sabrdaran apprising him of

5    developments relating to" the confidential information about the CMPH's processing InterMune's

6    MAA for Esbriet.  (*Id.* ¶ 26.)  For example, on October 10, 2010, Sabrdaran—who at the time had

7    learned of the CMPH's positive news from the Day 80 and Day 120 reports—spoke with

8    Afsarpour on the phone for 40 minutes.  (*Id.*)  The following day, Afsarpour opened a spread

9    betting account with IG Index, a London financial company.[1]  (*Id.*)  Afsarpour placed spread bets

10   on InterMune common stock in November 2010—*i.e.*, bets that banked on the increase in price of

11   the underlying security—which were the first spread bets he had ever placed on equities.  (*Id.* ¶¶

12   27-28.)

13           Likewise, on November 29, 2010, Sabrdaran, who was in London for Esbriet Team

14   meetings with the CMPH, had seen the Day 150 report just one day earlier, which disclosed the

15   CMPH's statement that Esbriet would likely be approved at the December meeting.  (*Id.* ¶ 29.)

16   The following day, Sabrdaran and Afsapour spoke on the telephone for 39 minutes.  (*Id.*)

17           Similarly, on December 10, 2010, Afsarpour left Sabrdaran a voicemail in Farsi saying, "I

18   thought you might have some new news for me[.]"  (*Id.* ¶ 30.)  Later that day the two men spoke

19   for 22 minutes.  (*Id.*)  Within the three days leading up to this conversation, Sabrdaran had learned

20   of the CMPH's reply to the Day 150 responses, which characterized Esbriet as "is approvable" for

21   the first time.  (*Id.*)  Sabrdaran had also seen the internal InterMune emails celebrating that

22   characterization.  (*Id.*)

23        *Afsarpour's Stock Purchases and Spread Bets*

24         At a poker night in Afsarpour's home on December 12, 2010, he urged approximately six

25   friends to purchase InterMune securities.  (*Id.* ¶ 31.)  Afsarpour told the friends that they would

26   need to move quickly before a favorable decision on InterMune's application to market Esbriet

27

28   [1] "A spread bet is an agreement in which the purchaser purchases from a counterparty the
opportunity to profit from changes in the price of an underlying asset[.]"  (Dkt. No. 1 ¶ 27.)

1   was approved, and if they did not have their own accounts, they could give Afsarpour money to

2   purchase securities for them through his own account.  (*Id.*)

3          On December 13, 2010, Afsarpour sent a Facebook message to a friend in Farsi noting that

4   he tried to contact the friend by phone because Afsarpour had "good news" to share and it was

5   "not too late if you have money."  (*Id.* ¶ 32.)  In the Facebook messages that followed, Afsarpour

6   agreed to buy InterMune shares on the friend's behalf in exchange for the friend buying $17,940

7   in gold for Afsarpour.  (*Id.*)  Likewise, on December 17, 2010, prior to the public announcement

8   that the CMPH had approved Esbriet, Afsarpour confirmed to another friend via e-mail that he

9   received over £20,000 from the friend, who responded, "thank God that it got there in time.  I hope

10  that we become rich people."  (*Id* at ¶ 33.)

11         Afsarpour also made several purchases for himself.  On December 16, 2010, the day before

12  the public announcement, Afsarpour purchased 75 shares of InterMune common stock through his

13  account at National Securities Corp. in New York.  (*Id.* ¶ 34.)  Between December 9 and 16,

14  Afsarpour deposited £134,500 into his IG Index spread betting account, including £87,000 that he

15  obtained from friends.  (*Id.* ¶ 35.)  Part of this deposit was £20,000 in cash advances from

16  Afsarpour's credit card.  (*Id.*)  This was the first time that Afsarpour had ever used his credit card

17  to obtain a cash advance for spread betting.  (*Id.*)

18         Afsarpour's spread bets after December 10, 2010 were different from the ones he placed

19  before inasmuch as they (a) included not only daily bets but quarterly bets; (b) were based not

20  only on the price of InterMune common stock but InterMune call  options; (c) were significantly

21  larger bets; and (d) were not subject to stop loss instructions.[2]  (*Id.* ¶ 36.)  The disclosure

22  documents that Afsarpour received from IG Index when he opened his spread bet account

23  indicated that the company may hedge its liability by opening analogous positions on the

24  market—*i.e.*, purchasing the securities underlying the spread bet—and stated that Afsarpour "will

25  not place . . . a Bet that contravenes any primary or secondary legislation or other law against

26

27  _____

    [2] A stop loss instruction or stop loss order tells a broker to either buy or sell shares of the stock if a
    specified price is reached.  It is designed to prevent excessive losses on a stock trade.  *What is a
    Stop-Loss Order to Sell?*, Finance.Zacks.Com, http://finance.zacks.com/stoploss-order-sell-
28  9808.html (last visited Feb. 26, 2015).

insider dealing[,]" *i.e.*, insider trading.  (*Id.* ¶ 37.)  IG Index did in fact hedge Afsarpour's spread bets by purchasing substantial amounts of InterMune call options traded on a U.S. exchange.  (*Id.* ¶ 38.)  IG Index would only post the spread bet to Afsarpour's account after hedging by purchasing the options.  (*Id.*)  IG Index purchased its options through Barclays Capital, a broker dealer registered in New York.  (*Id.*)

In sum, Afsarpour's trading—in terms of both the 75 shares of common stock he purchased and the spread bets he made—yielded $877,369 in profits.  (*Id.* ¶¶ 34, 39.)

### Afsarpour's Tipping

Afsarpour also tipped two friends, referred to in the complaint as Pharmacist No. 1—a resident of England—and Hairdresser No. 1—a California resident formerly related by marriage to Afsarpour.  (*Id.* ¶¶ 10-11, 40.)  Afsarpour and the pharmacist spoke on the phone on December 10, 11, and 13, 2010 in calls ranging from 2 to 16 minutes.  (*Id.* ¶ 41.)  They spoke again on December 17, 2010 for 8 minutes after InterMune announced that the CMPH had issued a positive opinion approving Esbriet.  (*Id.*)  The next day, December 18, following the public announcement, they spoke for 25 minutes.  (*Id.*)  On December 14, 2010, the pharmacist placed a spread bet on InterMune common stock; this first bet was unsuccessful and he deleted it.  (*Id.* ¶ 42.)  On December 16, 2010, the pharmacist placed an even higher spread bet; by December 20, his bets yielded $107,900 in profit.  (*Id.* ¶ 43.)

The hairdresser spoke with Afsarpour about InterMune the week of December 12.  (*Id.* ¶ 44.)  She opened a brokerage account on December 13, 2010; deposited $60,000 in the account via wire transfer on December 15, then purchased 4,250 shares of InterMune on December 16, 2010.  (*Id.*)  By December 20, the hairdresser's investment in InterMune stock yielded $91,800 in profit.

If the pharmacist and hairdresser's profits are imputed to Sabrdaran and Afsarpour, Defendants' profits from the insider trading total $1,077,069.  (*Id.* ¶ 46.)

### Defendants' Conduct After the SEC's Investigation Began

When the SEC first contacted Afsarpour to discuss his InterMune trading activity, Afsarpour informed the SEC that he "happened across" InterMune's stock when he mistakenly

United States District Court
Northern District of California

typed the wrong ticker symbol into a search engine.  (*Id.* ¶ 48.)  He stated that he intended to type symbol "ITNMD" for International monetary Systems LTD, but instead typed the symbol "ITMN" for InterMune.  (*Id.* ¶¶ 9, 48.)  Afsarpour did not mention to the SEC that he knew Sabrdaran.  (*Id.* ¶ 48.)  However, Afsarpour later told one of the attendees of the December 2010 poker game at his house that he had been tracking InterMune's stock performance since 2009, when he learned that Sabrdaran worked there.  (*Id.*)

In March of 2011, Afsarpour paid $26,000 to Sabrdaran.  (*Id.* ¶ 49.)  Two months later, when the SEC faxed Sabrdaran's attorney a document request, which included a request to search Sabrdaran's computers, Sabrdaran used file cleaning software on his work laptop to delete files.  (*Id.* ¶ 50.)

**B.    Procedural History**

The SEC initiated this action on October 30, 2014.  The one-count complaint alleges that Defendants, in connection with the purchase or sale of a security, by use of means or instrumentalities of interstate commerce, mails, or a national securities exchange, have employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statement not misleading; or engaged in acts, practices or courses of business which have operated or would have operated as a fraud or deceit upon persons in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  (Dkt. No. 1 ¶ 54.)

The SEC contends that Sabrdaran tipped Afsarpour either deliberately or recklessly to material, non-public information regarding InterMune's progress in the regulatory approval process for Esbriet's market approval in the EU.  (*Id.* ¶ 52.)  The complaint alleges that Sabrdaran knew the information was material and non-public, and that in sharing the information with Afsarpour he breached his fiduciary duty of confidentiality to InterMune shareholders for an improper purpose.  (*Id.*)  The complaint further alleges that Sabrdaran received a personal benefit in tipping Afsarpour.  (*Id.*)  The SEC likewise contends that Afsarpour knew the information was material and non-public and that Sabrdaran had breached his duty by disclosing the information to him.  (*Id.* ¶ 53.)  Afsarpour nonetheless used this information to trade stock and place spread bets

United States District Court
Northern District of California

1    for himself and others, and also tipped others—Pharmacist No. 1 and Hairdresser No. 1, who

2    themselves purchased InterMune stock and placed spread bets based on this information.  (*Id.*)

3          By way of relief for the alleged violations, the SEC seeks judgment:  (1) enjoining

4    Defendants from further violating Section 10(b) and Rule 10b-5; (2) ordering Defendants to

5    disgorge, with pre-judgment interest, any ill-gotten gains as a result of their conduct; (3) ordering

6    Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act; (4) barring

7    Sabrdaran from servicing as an officer and director pursuant to Section 21(d)(2) of the Exchange

8    Act; and (5) any other relief as the Court may deem just and appropriate.  (Dkt. No. 1 at 15.)

9          After the complaint was filed, Plaintiff and Sabrdaran each filed a consent to proceed

10   before a magistrate judge, and shortly thereafter Sabrdaran filed the instant motions.  (*See* Dkt.

11   Nos. 11, 12, 21, 22.)  Sabrdaran has filed a motion to dismiss the complaint in its entirety pursuant

12   to Rule 12(b)(6) (Dkt. No. 21), as well as a motion to strike portions of the complaint (Dkt. No.

13   22).  Afsarpour has since waived formal service of process and likewise consented to magistrate

14   jurisdiction.  (Dkt. Nos. 27-28.)  Afsarpour has not yet answered the complaint or formally joined

15   the instant motions, though his counsel appeared in court at the February 26, 2015 hearing on

16   Sabrdaran's motions.[3]  Given all parties' consent, the instant motions are properly before the

17   Court.  *See* 28 U.S.C. § 636(c).

18                                      **LEGAL STANDARD**

19   **A.    Motion to Dismiss**

20         A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege

21   "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

22   550 U.S. 544, 570 (2007).  A facial plausibility standard is not a "probability requirement" but

23   mandates "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*,

24

25   ───────────────────────────

     [3] Counsel for Afsarpour appeared at the February 26, 2015 hearing on Sabrdaran's motion, and the
26   SEC suggested deferring resolution of the instant motion until Afsarpour filed his own.  Counsel
     for Afsarpour indicated that Afsarpour likely would not file a Rule 12(b)(6) motion to dismiss in
27   the event the Court denies the motions currently before the Court, and therefore suggested that the
     Court resolve the instant motions even though Afsarpour had not yet formally joined them.  The
28   Court will treat the motions as if Afsarpour joined in them so that his objections are preserved for
     the record.

United States District Court
Northern District of California

United States District Court
Northern District of California

556 U.S. 662, 678 (2009) (internal quotations and citations omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party."  *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").

Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under which a party is only required to make "a short and plain statement of the claim showing that the pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively").  The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 663.  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 663-64.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted).

**B.   Motion to Strike**

Pursuant to Federal Rule of Civil Procedure 12(f) a court may "strike from a pleading an

United States District Court
Northern District of California

1  insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "[T]he

2  function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise

3  from litigating spurious issues by dispensing with those issues prior to trial[.]"  *Sidney Vinstein v.*

4  *A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  "Rule 12(f) motions are generally

5  'disfavored' because they are 'often used as delaying tactics, and because of the limited

6  importance of pleadings in federal practice.'"  *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1478

7  (C.D. Cal. 1996) (citations omitted).  Accordingly, Rule 12(f) motions "should not be granted

8  unless the matter to be stricken clearly could have no possible bearing on the subject of the

9  litigation[.]  If there is any doubt whether the portion to be stricken might bear on an issue in the

10  litigation, the court should deny the motion."  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d

11  1048, 1057 (N.D. Cal. 2004) (internal citations omitted).   "With a motion to strike, just as with a

12  motion to dismiss, the court should view the pleading in the light most favorable to the nonmoving

13  party."  *Id.*  "Ultimately, whether the grant a motion to strike lies within the sound discretion of

14  the district court."  *Cruz v. Bank of N.Y. Mellon*, No. 12-08846, 2012 WL 2838957, at *2 (N.D.

15  Cal. July 10, 2012) (citing *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir.

16  2010)).

17  **DISCUSSION**

18      Both of Sabrdaran's motions are premised on the same legal arguments:  first, that the

19  transactions at issue involve placing spread bets, which are not "securities" for the purposes of a

20  Section 10(b)/Rule 10b-5 violation; second, that the alleged transactions did not occur in the

21  United States and are therefore beyond the reach of U.S. securities laws; and third, that the

22  complaint fails to allege that the "downstream" tippees—*i.e.*, the pharmacist and hairstylist—knew

23  either that the information they received was confidential and obtained in breach of a duty or that

24  the tips were made in exchange for a personal benefit.  (Dkt. No. 21 at 2, 7; Dkt. No. 22 at 2, 8.)

25  **A.    Motion to Dismiss**

26      1.    Applicable Law

27      To place Sabrdaran's arguments for dismissal in context, a brief sketch of the statutory

28  scheme at issue is helpful.  Rule 10b-5, enacted pursuant to Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), sets forth alternative bases for securities fraud liability.  In addition to prohibiting

(1) the "mak[ing of] any untrue statement[s]," 17 C.F.R. § 240.10b-5, Rule 10b-5 also prohibits

(2) the use, "in connection with the purchase or sale of any security," of "any device, scheme, or

artifice to defraud" or any other "act, practice, or course of business" that "operates . . . as a fraud

or deceit."  Both Section 10(b) and Rule 10b-5 bar fraudulent conduct committed "in connection

with the purchase or sale of any security."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.1b-5.

> There are two types of insider trading that these laws prohibit.  The first is the
> "'traditional' or 'classical theory' of insider trading liability, [Section] 10(b) and
> Rule 10b-5 are violated when a corporate insider trades in the securities of his
> corporation on the basis of material, non-public information."  *United States v.*
> *O'Hagan*, 521 U.S. 642, 641-52 (1997).   Trading on such information qualifies
> as a "deceptive device" under [Section] 10(b) because "a relationship of trust and
> confidence [exists] between the shareholders of a corporation and those insiders
> who have obtained confidential information by reason of their position with that
> corporation."  *Chiarella v. United States*, 445 U.S. 222, 228 (1980).  Thus,
> Section 10(b) acts to "prohibi[t] an insider, who has a fiduciary duty to a
> corporate entity, from using material non-public information to the insider's
> advantage in order to make secret profits."  *SEC. v. Franco*, 253 F. Supp. 2d 720,
> 726 (S.D.N.Y. 2003).  In contrast, under the "misappropriation theory" of insider
> trading, an individual violates Section 10(b) and Rule 10b-5 when
> when he misappropriates confidential information for securities trading purposes,
> in breach of a duty owed to the source of the information.  Under this theory, a
> fiduciary's undisclosed, self-serving use of a principal's information to purchase
> or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the
> principal of the exclusive use of that information.  In lieu of premising liability on
> a fiduciary relationship between company insider and purchaser or seller of the
> company's stock, the misappropriation theory premises liability on a fiduciary-
> turned-trader's deception of those who entrusted him with access to confidential
> information.  The misappropriation theory is . . . designed to protec[t] the integrity
> of the securities markets against abuses by outsiders to a corporation who have
> access to confidential information that will affect th[e] corporation's security
> price when revealed, but who owe no fiduciary or other duty to that corporation's
> shareholders.

*O'Hagan*, 521 U.S. at 652.  To establish that a defendant is liable for insider trading under this

misappropriation theory, the SEC must prove (1) that the information at issue was both material

and nonpublic; (2) that the defendant breached a duty of confidentiality in sharing the information;

and (3) that the defendant acted with scienter.  *Aaron v. SEC*, 446 U.S. 680, 691 (1980).   Courts

have expanded insider trading liability to reach situations where the insider or misappropriator in

possession of material nonpublic information (the tipper) does not himself trade but discloses the

information to an outsider (a tippee) who then trades on the basis of the information before it is

1   publicly disclosed.  *See Dirks v. SEC*, 463 U.S. 646 (1983).

2       2.      The Complaint States a Claim Upon Which Relief May Be Granted

3       The SEC charges Sabrdaran and Afsarpour under the misappropriation theory of insider

4   trading.  Sabrdaran contends that the complaint must be dismissed in its entirety for three reasons:

5   (1) because the spread bets Afsarpour was alleged to have made in the complaint do not qualify as

6   a "security" for the purposes of Section 10(b) and Rule 10b-5; (2) that U.S. securities laws cannot

7   reach the extraterritorial activities alleged in the Complaint; and (3) that the Complaint does not

8   allege that the downstream tippees knew that the information was disclosed in violation of a

9   relationship or trust or fiduciary duty or that the information was disclosed for the discloser's

10  personal benefit.  The Court will address each argument in turn.

11      a.      *Whether Afsarpour's Spread Bets were made "In Connection With"
                Securities for the Purposes of Section 10(b) of the Exchange Act*

12

13      Sabrdaran's first argument for dismissal is that the spread bets at issue in the complaint do

14  not qualify as "securities" for the purposes of Section 10(b) / Rule 10b-5 liability.  The SEC

15  responds that, while spread bets themselves may not qualify as securities, they were certainly

16  made "in connection with securities," and this is all that Section 10(b) and Rule 10b-5 require to

17  create liability.  (Dkt. No. 29 at 9-10.)  The Court concludes that the complaint falls just short of

18  sufficiently alleging that the stock option purchases and spread bets at issue are "in connection

19  with securities":  the spread bets are "in connection with" securities to the extent that they were

20  hedged, but the complaint lacks sufficient allegations regarding the timing of the hedging.

21      As a threshold matter, Sabrdaran does not contend that Afsarpour's common stock

22  purchases are outside the reach of the Exchange Act.  In any event, such an argument would fly in

23  the face of established securities law, as fraudulent purchases of common stock certainly give rise

24  to liability under Section 10(b) and Rule 10b-5.  *See* 15 U.S.C. § 78c(a)(10) (defining "security"

25  as including "stock").  Thus, the insider trading claims premised on Afsarpour's purchases of

26  InterMune common stock through his New York account certainly survive the instant motion to

27  dismiss.  Nevertheless, Sabrdaran contends that the complaint should be dismissed because

28  Afsarpour's spread bets are outside the scope of the Exchange Act.

United States District Court
Northern District of California

Both Section 10(b) of the Exchange Act and the Securities Act define "security" by enumerating the types of instruments that qualify and, in the case of Section 10(b), those that do not. *See* 15 U.S.C. § 78c(a)(10); *id.* § 77b(a)(1).[4]  As the Supreme Court recently noted, "[f]or the purposes of these provisions, the [ ] Exchange Act defines 'security' *broadly* to include not just things traded on national exchanges, but also 'any note, stock, treasury stock, security future, security-based swap, bond, debenture . . . [or] certificate of deposit for a security." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014) (citation omitted).  Spread bets are not included in the list of enumerated instruments under either statute.  *See id.*  Nor does the Exchange Act include spread bets in the list of instruments that are *not* securities.  *See* 15 U.S.C. § 78c(a)(10).  The Court assumes for purposes of this motion that the spread bets at issue here are not themselves a "security" within the meaning of the Exchange Act.

In *SEC v. Zandford*, 535 U.S. 813 (2002), however, the Supreme Court emphasized that the plain language of the Exchange Act only requires that a fraudulent scheme or device be "in connection with" a securities transaction.  *Id.* at 819.  The *Zandford* Court made clear that to meet this "in connection with" standard, "the securities transaction[ ] and breaches of fiduciary duty"

---

[4] Specifically, the Exchange Act defines a security as:

> [A]ny note, stock, treasury stock, security future, security-based stock swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).  The Securities Act's definition is almost identical, only it does not contain the final clause beginning with "but shall not include[.]"  *Id.* § 77b(a)(1).

merely must "coincide." *Id.* at 824-25.  Interpreting *Zandford*, the Ninth Circuit has explained that the allegations of fraud merely must "'coincide' with the securities transaction" and be "easily characterized as having 'more than some tangential relation to' the securities themselves." *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002) (citation omitted), *amended by* 320 F.3d 905 (9th Cir. 2003), *abrogation on other grounds recognized by Proctor v. Vishay Intertech. Inc.*, 584 F.3d 1208 (9th Cir. 2009); *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999) ("The court should consider whether the plaintiff has shown some causal connection between the fraud and the securities transaction in question.").  Along similar grounds, the Ninth Circuit has held that the "in connection with" test is "as broad and flexible as is necessary to accomplish the statute's protective purposes[,]" and is met if the alleged fraud "somehow touches upon" or has "some nexus" with "any securities transaction[.]"  *SEC v. Rana Res., Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (citations omitted).

The complaint here satisfies the "in connection with" test, assuming the SEC can allege that IG Index purchased the InterMune call options as a hedge to Afsarpour's spread bet before InterMune's December 17, 2010 announcement.  First, there is no dispute that the InterMune call options purchased by IG Index are securities within the meaning of the Exchange Act. (Dkt. No. 1 ¶ 9.)  Second, the complaint plausibly alleges that Afsarpour made the spread bet with IG Index based on confidential insider information.  (*Id.* ¶¶ 26-36.)  Third, the complaint's factual allegations plausibly suggest that IG Index purchased the InterMune call options "in connection" with Afsarpour's spread bet; indeed, the allegations suggest that *because of* Afsarpour's spread bet IG Index purchased the InterMune call options. (*Id.* ¶¶ 37-38.)  Thus, the alleged fraudulent activity—making the spread bet based on confidential insider information—is "connected with" the purchase of InterMune securities.

At least one other court has held that spread bets are made "in connection with" securities when they are hedged by the purchase of options which are indisputably securities within the meaning of the Act.  In *SEC v. Suterwalla*, No. 06-cv-1446 DMS (LSP), 2008 WL 9371764 (S.D. Cal. Feb. 4, 2008), the SEC accused a British stockbroker of using material, non-public information about a company's business negotiations to place spread bets with a U.K.-based

16

United States District Court
Northern District of California

1   brokerage firm banking on an increase in the company's value.  *Id.* at *1-2.  The same day that the

2   defendant placed his spread bets—and sometimes within two minutes—the U.K.-based brokerage

3   firm purchased call options of the company on United States exchanges to hedge its risk from

4   those bets.  *Id.* at *3.  Just as Sabrdaran argues here, the defendant in *Suterwalla* contended that

5   his ten spread bets could not give rise to insider trading liability because they were not "securities"

6   within the meaning of the Exchange Act.  *Id.* at *2.

7         The court squarely rejected this argument, concluding that the SEC's allegations that the

8   defendant knew that his "bets led to purchases of [the company's o]ptions to hedge those bets"

9   was "sufficient to satisfy the 'in connection with' requirement between [the defendant's] bet . . .

10  and [his] broker's purchase of [securities] to hedge the bet."  *Id.* at *3.   The court found the

11  connection was sufficient to withstand a motion to dismiss given complaint allegations that the

12  defendant placed the spread bets within three hours after obtaining the confidential information,

13  and that the defendant himself was a stockbroker who knew that his broker would hedge his bets

14  by purchasing the company's underlying securities.  *Id.*[5]

15        While *Suterwalla* is not binding authority—and arguably applied an incorrect legal

16  standard given that it predates the Supreme Court's decision in *Morrison v. National Australia*

17  *Bank, Ltd.*, 561 U.S. 247 (2010), which clarified the scope and standards of the Exchange Act and

18  is discussed in further detail below—the Court agrees with its reasoning that a foreign spread bet

19  actually hedged by a broker purchasing call options on the underlying security on a United  States

20  exchange creates a sufficient connection with domestic securities.  And the harm that this

21  arrangement causes to individuals who trade on the United States market is clear:  just as the

22  insider information that caused the call option to be purchased predicted it would, the price of the

23  underlying stock soars, yet the seller still must tender the stock to the broker at the lower price.

24  Thus, when hedging is tied to spread bets, the spread bets cause harm in connection with domestic

25  _____

26  [5] The court held in the alternative that the complaint sufficiently alleged transactions "in
    connection with" securities based on a "common scheme" that included both the defendant's call
27  option purchases—which were plainly securities within the meaning of Section 10(b)—and the
    spread bets.  *Suterwalla*, 2008 WL 9371764, at *4 ("Even [if] one part of the course of business
28  was legitimate, the entire scheme to defraud the market is within the SEC's jurisdiction." (citing
    *Zandford*, 535 U.S. at 821-22)).

securities.  This is precisely the type of conduct that the Exchange Act is meant to deter.

But the complaint here is inadequate in one small respect:  it is silent, or at least ambiguous, as to the timing of IG Index's hedging.  Specifically, the complaint does not allege whether IG Index hedged Afsarpour's spread bets, that is, purchased the InterMune call options, before or after InterMune's December 17, 2010 public announcement about Esbriet and thus after the "confidential" information to which it was connected would have already been public.  Of course, if IG Index purchased the call options after the announcement, it would not have been a very successful hedge; the complaint, however, does not allege that the hedge was successful, only that it was made.  At oral argument, the SEC represented that it could specifically allege that IG Index's hedge was, in fact, placed *before* the public announcement.  Thus, while the SEC does not sufficiently allege that Afsarpour's spread bets were "in connection with" securities in the complaint as written, if the SEC can include allegations that IG Index actually purchased the InterMune call options prior to the company's public announcement about Esbriet, the SEC will have stated a claim upon which relief may be granted.  *See Suterwalla*, 2008 WL 9371764, at *3-4.

Sabrdaran's arguments to the contrary are unpersuasive.  First, his reliance on decades-old Supreme Court case law obscures the line of authority that has developed in the intervening years that emphasizes the broad scope of both Rule 10b-5 and the "in connection with" test.  Specifically, Sabrdaran cites *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), for the proposition that a spread bet is not a security, and that the test for determining whether something is a security is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."  (Dkt. No. 21 at 13.)  But the issue before the Court is not whether Afsarpour's spread bets are analogous to investment contracts like in *Tcherepnin*.  *Cf.* 389 U.S. at 336.  Rather, based on the Supreme Court and Ninth Circuit case law that have followed *Tcherepnin*, the question is whether the transaction at issue falls under the broadly-interpreted "in connection with" requirement.  As alleged, it does.

Sabrdaran's attempts to distinguish *Suterwalla* fare no better.  To be sure, the Court agrees that the facts alleged in *Suterwalla* gave rise to a stronger inference that the defendant in that case

United States District Court
Northern District of California

1    knew that his spread bets would cause his broker to purchase the underlying securities in the

2    United States market:  in particular, that the defendant himself was a former investment broker

3    with knowledge of the way the market works.  2008 WL 9371764, at *4.  In contrast, the SEC

4    here alleges only that Afsarpour's broker informed him that it *could* or *may* hedge his bets by

5    purchasing the underlying securities.  (Dkt. No. 1 ¶¶ 37-38.)  Discovery in this case may well

6    reveal that Afsarpour did not know that IG Index would hedge his spread bets; however, the facts

7    alleged in the complaint give rise to a plausible inference that Afsarpour may have known, and

8    this is sufficient to withstand a 12(b)(6) motion to dismiss.

9         Trying a different tack, Sabrdaran contends that the Court should not rely on *Suterwalla*

10   because it "was decided before the U.S. Supreme Court threw out decades of precedent favoring

11   the 'effects' test and adopted the 'transactional test' to determine whether the securities laws could

12   reach extraterritorial transactions."  (Dkt. No. 32 at 8 (citing *Morrison v. Nat'l Australia Bank,

13   Ltd.*, 561 U.S. 247 (2010)).)  The upshot of *Morrison* is that Section 10(b) and Rule 10b-5 only

14   apply to transactions involving securities listed in domestic exchanges, not foreign exchanges.

15   561 U.S. at 265, 267 ("[I]t is in our view only transactions in securities listed on domestic

16   exchanges, and domestic transactions in other securities, to which § 10(b) applies.").  However,

17   the holding in *Suterwalla* squares with *Morrison*:  the district court concluded the SEC's claims

18   were actionable because the fraudulent spread bets were alleged to be made "in connection with"

19   call options on the company's stock purchased on United States exchanges.  *See Suterwalla*, 2014

20   WL 9371764, at *4.  In other words, in *Suterwalla*, as here, it is not the international spread bets

21   themselves that are actionable under Section 10(b) and Rule 10b-5, but the fact that the spread bets

22   are hedged by the broker's purchase of underlying securities on domestic exchanges.[6]  The instant

23   case, with its hedging, does not present a *Morrison* scenario, and thus *Morrison* does not change

24   the Court's conclusion.

25

26   _____

27   [6] *Suterwalla*'s conclusion that the spread bets give rise to insider trading liability because they are part of a common scheme with the securities purchases on domestic exchanges, may be the only part of the court's conclusion subject to change after *Morrison*.  But this was only an alternative theory of affirming the sufficiency of the complaint and not, in any event, a theory the Court adopts here.

28

United States District Court
Northern District of California

1    Finally, Sabrdaran contends that *Suterwalla* is inapposite because the court gave deference

2 to the SEC's interpretation of the transaction at issue.  (Dkt. No. 32 at 8.)  The *Suterwalla*

3 court, almost in passing, noted that its conclusion that the spread bets were "in connection with"

4 securities based on the broker's purchase of the underlying security to hedge the bets was based in

5 part on giving "weight to the SEC's reasonable interpretation of the transaction and [also on] the

6 broad application of the securities statutes and rules to the allegations in the [complaint]."

7 *Suterwalla*, 2008 WL 9371764, at *4.  But the analysis in *Suterwalla* did not end there; in fact,

8 rather than mere blind reliance on the agency's interpretation of the transaction, the court—as set

9 forth above—provided a detailed explanation of why the spread bets, under the circumstances

10 presented, were sufficiently "in connection with" securities to give rise to insider trading liability.

11 In any event, even if this Court were not to consider *Suterwalla*, it would reach the same

12 conclusion.

13    In short, for all of the above reasons, the complaint will not be dismissed in its entirety.

14 With respect to the 75 shares of common stock that Afsarpour purchased, the complaint

15 sufficiently alleges that Afsarpour engaged in transactions that were "in connection with"

16 domestic securities for the purposes of Section 10(b) and Rule 10b-5.  However, to the extent the

17 SEC wishes to hold Defendants liable for insider trading based on Afsarpour's spread bets, the

18 SEC must amend the complaint to include allegations regarding the timing of IG Index's hedges.

19           b.    *Whether the Exchange Act Reaches the Transactions at Issue*

20    Sabrdaran next contends that even if the spread bets are "in connection with" securities, the

21 instant complaint represents an improper attempt to apply the Exchange Act to overseas securities

22 transactions in "direct contravention" of the Supreme Court's decision in *Morrison v. National*

23 *Australia Bank, Ltd.*, 561 U.S. 247 (2010).  (Dkt. No. 21 at 14.)  The SEC insists that Congress

24 overruled *Morrison* when it amended the jurisdictional language of the Exchange Act through

25 Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-

26 Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), and, in any event, the allegations in the

27 complaint pass muster under the test set forth in *Morrison*.  (Dkt. No. 29 at 12-14.)  The Court

28 need only address the latter argument:  the complaint states a claim—with respect to common

stock trades, as is, and with respect to the spread bets (assuming the SEC can allege that IG Index hedged Afsarpour's hedge bets prior to InterMune's public announcement about Esbriet) even under the stricter test laid out in *Morrison*; thus, it need not determine whether the Dodd-Frank Act revived the broader tests that *Morrison* rejected.

In *Morrison*, the Supreme Court addressed the extraterritorial reach of Section 10(b) and Rule 10b-5, and held that there is a presumption against extraterritorial application of the Exchange Act.  561 U.S. at 266-67.  In that case, foreign investors brought a civil action against a foreign corporation for securities fraud relating to securities traded on foreign exchanges.  *Id.* at 272.  Australian investors purchased shares in an Australian bank whose stock shares were listed on the Australian Stock Exchange Limited, but not in a United States—*i.e.*, domestic— exchange.  *See id.*  Some executives at the bank had manipulated the financial models of a subsidiary, causing the subsidiary's income stream to appear more valuable than it really was.  *See id.*  The resulting write-downs caused the bank's share price to drop.  *See id.*  The Court held that because the case did not involve securities listed on a domestic exchange, and because all aspects of the purchases occurred abroad, section 10(b) could not apply and the complaint must be dismissed. *See id.* at 273.

The *Morrison* court cautioned that "there is no affirmative indication in the Exchange Act that [Section] 10(b) applies extraterritorially, and we therefore conclude that it does not."  *Id.* at 265.  The Court explained that "[t]he focus of the Exchange Act is . . . upon purchases and sales of securities in the United States[,]" and, accordingly, the statute "reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  *Id.* at 273.  The Supreme Court rejected various circuit courts' formulations of the test to determine whether conduct abroad falls within Section 10(b)'s reach, including the Second Circuit's "effects" and "conduct" tests, which analyzed whether a particular transaction had a substantial effect in the United States.  *Id.* at 257.  Instead, the Supreme Court adopted its own "transactional test," which asks "whether the purchase or sale [at issue] is made in the United States, or involves a security listed on a domestic exchange[.]"  *Id.* at 269-70.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Although the Ninth Circuit has not yet addressed *Morrison*, other Circuit courts have.   In

2  doing so, they have seized on the idea that the first transactional test depends simply on whether

3  the transaction involves the purchase or sale of a security listed on an American exchange; for the

4  second test, if the security is not so listed, "it is the location of the *transaction* that establishes (or

5  reflects the presumption of) the [Exchange Act's] inapplicability." *United States v. Georgiu*, —

6  F.3d — , Nos. 10-4774, 11-4587, 12-2077, 2015 WL 241438, at *5 (3d Cir. Jan. 20, 2015)

7  (citations omitted); *see also Absolute Activist Master Fund LLC v. Ficeto*, 677 F.3d 60, 66 (2d Cir.

8  2012) ("[A] securities transaction is domestic when the parties incur irrevocable liability to carry

9  out the transaction within the United States or when title is passed in the United States.").  As the

10  Third Circuit recently explained, what matters is whether "some of the relevant transactions

11  *required the involvement* of a purchaser or seller working with a market maker and committing to

12  a transaction in the United States, incurring irrevocable liability in the United States, or passing

13  title in the United States." *Georgiu*, — F.3d —, 2015 WL 241438, at *6.

14    Given its recent vintage, not many district court cases have delved at all—let alone

15  deeply—into the scope of the "transactions test" set forth in *Morrison*, but several from the

16  Southern District of New York are instructive.  In *SEC v. Compania Internacional Financiera*

17  *S.A.*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813 (S.D.N.Y. July 29, 2011), defendant Chartwell

18  Asset Management Services ("Chartwell") was charged with insider trading based on its purchase

19  in the U.K. on a U.K. exchange of several contracts for difference ("CFDs").  *Id.* at *1.  The CFDs

20  gave it the right to acquire the future price movement of the underlying company's common stock,

21  which was traded on U.S. exchanges, without taking ownership of the underlying shares.  *Id.* at

22  *1, 3.  Chartwell's broker, however, purchased shares of the underlying common stock before

23  pricing the CFD.  *Id.* at *6.  The *Compania Internacional Financiera* court concluded that the

24  CFDs at issue were securities because the "broker purchases matching shares of the stock" on the

25  United States market just before the defendant purchased the CFDs.  *Id.*  The CFD purchase price

26  reflected any influence of the underlying stock purchase, and the CFDs were therefore *tied* to the

27  purchase of a domestic security.  *Id.*  In reaching this conclusion, the court emphasized that

28  exempting such transactions—that is, foreign CFD purchases—from the reach of Section 10(b)

United States District Court
Northern District of California

1  "misreads *Morrison*, which never states that a defendant must itself trade in securities listed on

2  domestic exchanges or engage in other domestic transactions." *Id.* at *6. In addition, the court

3  concluded that the CFDs at issue were the "functional equivalent" of the underlying stock because

4  "CFD holders receive the benefit of dividends paid by the company on shares and CFD contracts

5  may include voting rights on the shares" and the CFD prices follow identically the prices of the

6  underlying stock. *Id.*

7      *In re Optimal U.S. Litigation*, 865 F. Supp. 2d 451, 454-55 (S.D.N.Y. 2012), reached the

8  opposite result. Notably, the *Optimal* court did not expressly disagree with *Compania*

9  *Internacional Financiera*'s interpretation of "in connection with" in the context of examining

10 Section 10(b)'s extraterritorial reach after *Morrison*; rather, the case involved a different type of

11 transaction. In *Optimal*, the court dismissed a Section 10(b) complaint against defendants that

12 solicited foreign investments in a U.S. company pursuant to certain "explanatory memoranda" that

13 set forth a complex investment strategy involving, among many other things, the purchase of

14 stocks and call options on domestic exchanges. *Id.* at 455. The Court declined to find a sufficient

15 connection between foreign investments in Optimal U.S. and domestic securities for a number of

16 reasons, including that the investment strategy was very complex, there was no "direct

17 correlation" between the foreign investments and the purchase of domestic stock, and there were

18 no allegations that any such trades on domestic exchanges were actually made. *Id.* Thus, the

19 relationship between the defendant's foreign investments and any domestic security was too

20 attenuated to give rise to Section 10(b) liability for extraterritorial transactions. *Id.*

21      The facts alleged in this case look more like *Compania Internacional Financiera* than

22 *Optimal*. The complaint alleges that Afsarpour's broker told him that it may hedge his spread bets

23 by purchasing shares of the underlying InterMune stock and it actually did so before posting the

24 spread bets to his account (*see* Dkt. No. 1 ¶¶ 37-38), though this timing will become even clearer

25 once the SEC amends the complaint, as it represented. The complaint also alleges that spread bets

26 function much like CFDs: the placer of the spread bet, like the purchaser of the CFD, pays money

27 betting on the increased price of the underlying security. Unlike *Optimal*, where there were no

28 allegations that the domestic security was ever actually purchased, the complaint here alleges that

23

United States District Court
Northern District of California

the broker actually purchased the underlying stock in connection with the defendant's foreign transaction just as in *Compania Internacional Financiera*.  And while Sabrdaran focuses on the fact that the spread bets here are not the "equivalent" of the underlying stock and did not necessarily come with the same level of connection as the CFDs in *Compania Internacional Financiera*, other courts have taken this approach even post-*Morrison* where the foreign transaction involved a broker purchasing the underlying United States security.  *See SEC v. Maillard*, No. 13-cv-4299 (VEC), 2014 WL 1660024, at *4 (S.D.N.Y. Apr. 23, 2014) (denying motion to dismiss Section 10(b) insider trading claims against defendant who purchased CFDs abroad because the transactions "required [a broker] to purchase the underlying security traded" on a domestic exchange and, though "one could theoretically imagine a case in which a CFD was purchased and the seller decided not to hedge the transaction by purchasing the underlying security, that did not happen here").  At bottom, just as in *Compania Internacional Financiera* and *Maillard*, that Afsarpour himself did not purchase the underlying domestic securities is not fatal to the complaint.  Rather, as set forth above—and to the extent that the SEC amends the complaint to include allegations about the timing of the hedges—the SEC has sufficiently alleged that Afsarpour's spread bets "involved" a security traded on domestic exchanges because IG Index actually bought call options in the underlying security before posting any of his spread bets to his account.  *See Morrison*, 561 U.S. at 269-70.

In light of the Court's decision that the allegations in the complaint sufficiently meet the transactional test, it need not resolve the debate over whether the Dodd-Frank Act overruled *Morrison*, as the SEC contends.  *See SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 916-17 (N.D. Ill. 2010); *see also Compania Internacional Financiera*, 2011 WL 3251813, at *6 n.2 (suggesting that the Section 929P9(b) of the Dodd-Frank Act may have reinstated the tests rejected in *Morrison* but declining to determine that issue given that the foreign CFDs at issue were sufficiently connected to domestic securities).[7]

---

[7] As the parties have noted, a number of other cases from the Southern District of New York have made passing references stating or suggesting that Section 929P(b) of the Dodd-Frank Act may have revived extraterritorial reaches of Section 10(b) claims after *Morrison*, but none actually analyzed the issue.  *See, e.g.*, *Liu v. Siemens*, 978 F. Supp. 2d 325, 328 (S.D.N.Y. 2013); *SEC v.*

United States District Court
Northern District of California

c.     *Whether the Tippees Knew that the Information was Confidential*

Finally, Sabrdaran contends that the complaint must be dismissed because, even if the spread bets are actionable and Section 10(b) can reach them, there are insufficient allegations to state a claim for insider trading on a misappropriation theory.  Specifically, Sabrdaran argues that there are no allegations that the tippees—*i.e.*, the recipients of material, non-public information—including Afsarpour and the "downstream tippees" that he tipped (the pharmacist and the hairdresser)—knew that the inside information was disclosed in violation of a relationship of trust or in exchange for a personal benefit.  Thus, at least from Sabrdaran's perspective, the entire complaint should be dismissed for failure to state a claim.  At bottom, Sabrdaran asks the Court to rule that he may only be liable for, that is, have to pay as disgorgement, his own profits (if any) from the purported insider trading scheme, and not those of Afsarpour or his tippees.

To state a claim for a Section 10(b) insider trading violation based on misappropriation (tipping) liability, the plaintiff must allege facts sufficient to establish the plausibility of the following elements:  (1) the tipper possessed material, nonpublic information regarding the issuer of a security; (2) the tipper disclosed the information to the tippee; (3) the tippee traded in the issuer's securities while in possession of the information; (4) the tippee knew or should have known that the information was disclosed in violation of a relationship of trust; and (5) the tipper benefited from the disclosure to the tippee.  *Dirks v. SEC*, 463 U.S. 646, 654-66 (1983).  Here—given the Court's ruling that the spread bets are actionable—Sabrdaran argues that the fourth and fifth elements are lacking.

i.     Afsarpour as Tippee

The SEC's complaint sufficiently alleges all five elements of insider trading liability as to the trades that Afsarpour engaged in himself; indeed, Sabrdaran concedes that the first *four* elements are present.  (Dkt. No. 21 at 20 ("[T]he SEC alleges that Mr. Afsarpour knew Dr.

---

*Tourre*, No. 1 Civ. 3229 (KBF), 2013 WL 2407172, at *1 n.4 (S.D.N.Y. June 4, 2013); *SEC v. Gruss*, No. 11 Civ. 2420, 2012 WL 3306166, at *3 (S.D.N.Y. Aug. 13, 2012); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 627 n.3 (S.D.N.Y. 2010).  Thus, the Court declines to rely on these conclusions.  *See, e.g.*, *Turner v. Imperial Stores*, 161 F.R.D. 89, 97 (S.D. Cal. 1995) (declining to rely on the conclusions of other courts reached without analysis or citation).

United States District Court
Northern District of California

Sabrdaran had a duty to maintain the confidentiality of InterMune's information[.]").)  Thus, the only element at issue with respect to Afsarpour is whether the complaint sufficiently alleges that Sabrdaran benefited from the disclosure to Afsarpour.  It does.  The "personal benefit" required for insider trading liability may be pecuniary, or financial, in nature.  *United States v. Jiau*, 734 F.3d 147, 152-53 (2d Cir. 2013).  But the benefit need not be financial, so long as it "of some consequence[,]" such as a "meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature."  *United States v. Newman*, 773 F.3d 438, 452 (2d Cir. 2014),

Here, the SEC alleges that, following the tips and within six months after Afsarpour reaped a substantial profit from his trades, he gave $26,000 to Sabrdaran.  This allegation supports a plausible inference that Sabrdaran benefited from Afsarpour's trading.  At the very least, then, the bulk of the allegations in the complaint—at least the $877,369 in profits that Afsarpour obtained as tippee—survive Sabrdaran's motion to dismiss.

ii.      Pharmacist and Hairdresser as Downstream, Secondary Tippees

The downstream tippees present a more complicated case.  The question is whether the SEC may proceed with its claims of liability against Sabrdaran relating to the $107,900 and $91,800 that the pharmacist and hairdresser respectively profited.  The SEC concedes that the complaint nowhere alleges that the pharmacist or hairdresser were aware of Sabrdaran's duty not to disclose confidential information, his breach of that duty, or any benefit he received or Afsarpour received by tipping them.  (Dkt. No. 29 at 17-18.)

In light of the SEC's concession, Sabrdaran argues that the Second Circuit's recent decision in *United States v. Newman*, 773 F.3d 438 (2014), bars any liability for Sabrdaran stemming from the pharmacist or hairdresser's transactions.  In *Newman*, the Second Circuit held that "in order to sustain a conviction for insider trading, the Government must prove beyond a reasonable doubt that the tippee knew that an insider disclosed confidential information *and* that he did so in exchange for a personal benefit."  773 F.3d at 442.  This rule squares with the Supreme Court's earlier decision in *Dirks v. SEC*, 463 U.S. 646, 654-66 (1983); *Newman* made explicit that the tippee must also have knowledge of the tipper's benefit.  The *Newman* court

expressed concern at the recently expanded scope of SEC insider trading prosecutions, "which are increasingly targeted at remote tippees many levels removed from corporate insiders" instead of those "who directly participated in the tipper's breach . . . or tippees who were explicitly apprised of the tipper's gain by an intermediary tippee." *Id.* at 448 (citations omitted). Sabrdaran alleges this is what the SEC is doing here in seeking to hold him liable for the profits obtained by the pharmacist and hairdresser who, under the standard set forth in *Newman*, do not qualify as tippees. The SEC, however, does not seek a finding of liability against Sabrdaran based on the tips to the pharmacist and hairdresser; rather, the SEC argues that the allegations related to these downstream tippees are relevant only to the remedies stage of this litigation—that is, the scope of disgorgement attributable Sabrdaran and Afsarpour for their insider trading. (*Id.*)

"It is well settled in the Ninth Circuit that a tipper can be required to disgorge his tippees' profits, whether or not the tippees themselves have been found liable." *SEC v. Gowrish*, No. C 09-05883 SI, 2011 WL 2790482, at *7 (N.D. Cal. July 14, 2011); *see also SEC v. Clark*, 915 F.2d 439, 453 (9th Cir. 1980) ("a tipper may be liable for the profits realized by this tippees"). While the usual focus of a disgorgement figure is the amount of a given defendant's unjust enrichment, disgorgement may extend beyond a liable tipper or tippee's own profits because it is designed both "to deprive a wrongdoer of unjust enrichment, *and* to deter others from violating securities laws by making violations unprofitable." *SEC v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010) (emphasis added) (citation omitted); *see also, e.g.*, *Gowrish*, 2011 WL 2790482, at *8. The consensus among district courts is that the court "has the discretion to order that [a] defendant disgorge all of the profits of the insider trading scheme"—even those beyond the transactions that gave rise to securities fraud liability—"but the [c]ourt is not required to do so." *Gowrish*, 2011 WL 2790482, at *7; *see also SEC v. Falbo*, 14 F. Supp. 2d 508, 528 & n.25 (S.D.N.Y. 1998) (holding tipper liable for profits he realized trading but declining "to hold him jointly and severally liable for anyone else's illicit gains" where "the SEC fail[ed] to present any evidence indicating that [he] derived any financial benefit from the illegal trading of anyone he tipped").

There is nothing in *Newman* that suggests that the Second Circuit intended to undercut the long line of authority holding that an individual liable for insider trading may be on the hook for

United States District Court
Northern District of California

1    profits gained by tippees, even where the tippees are not themselves liable for insider trading

2    because they did not have the requisite knowledge.  *See, e.g.*, *Clark*, 915 F.2d at 454;  *SEC v.*

3    *Contorinis*, 743 F.3d 296, (2d Cir. 2014) ("Our prior cases indicate that an insider trader may be

4    ordered to disgorge not only the unlawful gains that accrue to the wrongdoer directly, but also the

5    benefit that accrues to third parties whose gains can be attributed to the wrongdoer's conduct. We

6    have long applied that principle in the tipper-tippee context.").  Thus, Sabrdaran may have to

7    disgorge Afsarpour's profits even if Afsarpour is ultimately found not liable, and Afsarpour may

8    have to disgorge the profits of the hairdresser and pharmacist even though they will not be found

9    liable in this lawsuit.  The more challenging question is whether the Court can order Sabrdaran to

10   disgorge the profits of the hairdresser and pharmacist, that is, his indirect tippees.  Again,

11   however, *Newman*, the case upon which Defendant's motion is premised, does not say "no" as a

12   matter of law.  Accordingly, at this stage in the litigation the Court declines to dismiss the

13   complaint, or part of it, based on these tippees' lack of knowledge about the impropriety of the

14   information they received or the expectation of a benefit to the tipper.

15   **B.     Motion to Strike**

16          Sabrdaran's motion to strike advances the same legal arguments as his motion to dismiss.

17   Indeed, most of the content of the motions are identical.  Because the Court has already addressed

18   each of these arguments, no separate analysis is required.  For the reasons described above, none

19   of Sabrdaran's legal arguments warrant striking allegations from the complaint.  Even absent

20   amendment from the SEC to add allegations about the timing of the hedging, the allegations in the

21   complaint as written pertaining to Afsarpour's spread bets placed with a London-based broker that

22   hedged his bets by purchasing securities on domestic exchanges are certainly relevant evidence

23   that could bear on this litigation.  *Cf. Platte Anchor Bolt*, 352 F. Supp. 2d at 1057.  The profits that

24   the downstream tippees earned may be attributable to Defendants, so—while not themselves

25   charged with insider trading—their actions likewise bear on the subject of the litigation.  *See id.*  It

26   may well be that the SEC cannot succeed on Section 10(b) claims premised on certain challenged

27   transactions and may not be entitled to disgorgement of profits from the downstream tippees, but

28   the SEC has alleged sufficient facts to proceed to discovery on all of these allegations as all are

certainly relevant to the actionable claims at bar.  The Court therefore declines to strike these allegations from the complaint.

### CONCLUSION

For the reasons described above, the Court DENIES Sabrdaran's motion to strike portions of the complaint and GRANTS IN PART Sabrdaran's motion to dismiss on the narrow issue of the absence of allegations about the timing of IG Index's hedging.  This dismissal is without prejudice, and the Court grants the SEC leave amend its pleading to include such allegations.  Any amended complaint shall be filed by March 18, 2015.

This Order disposes of Docket Nos. 21 and 22.

**IT IS SO ORDERED**.

Dated:  March 2, 2015

JACQUELINE SCOTT CORLEY
United States Magistrate Judge