UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

　　　　　　Plaintiff,

　　　v.

SASAN SABRDARAN, et al.,

　　　　　　Defendants.

Case No. 14-cv-04825-JSC

**ORDER RE POST-TRIAL AND
REMEDY MOTIONS**

Re: Dkt. Nos. 170, 175

　　　　Plaintiff Securities and Exchange Commission ("SEC") charge that Defendants Sasan
Sabrdaran and Farhang Afsarpour engaged in insider trading in violation of the antifraud
provisions of the Securities Exchange Act of 1934. Following a three-week trial, the jury returned
a verdict in the SEC's favor. Now pending before the Court are Defendants' joint motion for
judgment as a matter of law, or in the alternative, a new trial and the SEC's post-trial remedies
motion. (Dkt. Nos. 170, 175.[1]) Having had the benefit of oral argument on March 23, 2017, and
having carefully considered the parties' written submissions, including their post-oral argument
submissions, the Court DENIES Defendants' motion and GRANTS IN PART the SEC's remedies
motion as set forth below.

## BACKGROUND

　　　　The SEC alleged that Defendants engaged in insider trading when Dr. Sabrdaran, an
employee of pharmaceutical company InterMune, Inc., tipped his long-time friend Afsarpour to
material, non-public information about the progress through the European regulatory approval
process of Esbriet, one of InterMune's products, and Afsarpour then acted on that tip by engaging

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
ECF-generated page numbers at the top of the documents.

in transactions in connection with InterMune securities. After receiving the nonpublic information about Esbriet's EU approval on the eve of the public announcement in December 2010, Afsarpour—who lives in the UK—placed certain online financial bets on the price changes in InterMune stock and options; specifically, he placed spread bets through a London-based company called IG Index and also bought InterMune stock via his stockbroker in New York. Afsarpour urged others to invest in InterMune as well, some of whom did.

Dr. Sabrdaran served on the InterMune team seeking marketing approval for Esbriet from the European Medicines Agency. Afsarpour is a close personal friend of Dr. Sabrdaran, and they communicated by phone, email, Facebook and other means frequently to discuss developments in their lives, philosophy, and other personal issues. They also tried to visit each other when one of them was present in the other's country. Afsarpour contended that he started placing spread bets on InterMune stock in November 2010 based on his own research about the company. He insisted that, based on publicly available information, he believed that InterMune would receive approval from the European Medicines Agency during the first quarter of 2011 to market and sell Esbriet in the European Union, and that this approval would be announced during the first quarter of 2011. He maintained that he did not receive any material nonpublic information from Dr. Sabrdaran or anyone else regarding InterMune.

Early in the case, the Court granted in part and denied in part Defendants' motions to dismiss and denied their motion to strike portions of the initial complaint. (Dkt. No. 36.) Defendants argued, among other things, that the transactions at issue involve spread bets, which are not "securities" for the purposes of a Section 10(b) and Rule 10(b)-5 violation. The Court concluded that the SEC, with minimal amendment, could plausibly allege that Afsarpour's spread bets were "in connection with" securities by alleging that IG Index had hedged his spread bets, which the SEC amended to do. After discovery, the Court denied the SEC's motion for partial summary judgment on the same issue, holding that to establish a securities violation under Section 10(b) and Rule 10(b)-5, the SEC need not necessarily prove that Afsarpour subjectively knew that his fraudulent activity was "in connection with" the purchase or sale of a security, but that a reasonable trier of fact might not find that Afsarpour's spread bets necessarily met that test.

Trial began on October 17, 2016. The parties agreed that Defendants shared a very close friendship; beyond that, the SEC and Defendants presented very different accounts. The SEC elicited testimony and proffered documentary evidence connecting the confidential and public announcements about Esbriet, communications between Defendants, and Afsarpour's trading activity. For example, there was testimony that Dr. Sabrdaran communicated with Afsarpour shortly after receiving a confidential, internal InterMune email stating that the European Medicines Agency had given the green light for Esbriet—the "As Good As It Gets" email. There was testimony that Afsarpour executed very few trades on InterMune until mid-December 2010, the eve of Esbriet's imminent approval announcement; that the days leading up to the announcement he encouraged friends to invest heavily in InterMune; and that the day before the public announcement he invested more heavily than ever before, in more highly leveraged transactions than ever before, using credit cards to fund his bets, which he had never done before. The SEC entered emails into the record in which, the day before the public announcement, Afsarpour wrote to friends telling them to get their money in *that day* before it was too late.

In the SEC's case-in-chief, the jury heard from Dan Welch, InterMune's CEO, who described the company's business and confidentiality policies generally. Steven Porter and Marianne Porter, doctors and InterMune executives, repeated InterMune's confidentiality policies, explained the process of regulatory review before the European Medicines Agency generally and for Esbriet in particular, described Dr. Sabrdaran's role in the group that worked on Esbriet's drug safety, and discussed who knew about its approval before the news became public. Dr. Spencer Hudson, another doctor on the Esbriet team, also testified about what he and the other members of the team knew as they shepherded the drug through the approval process. They testified that InterMune learned on December 10, 2010 that the European Medicines Agency would announce Esbriet's approval on December 17, 2010.

Apart from InterMune employees, two employees from IG Index testified. Bridget Messer, a financial services attorney who is the company's chief commercial officer, discussed the "spread bets" that IG Index offers, explaining how the company often hedges its customers' spread bets, how the contracts each customer—including Afsarpour—signs in advance of placing

any spread bets inform them that IG Index might hedge, and how IG Index's internal compliance department investigated trades in InterMune in December 2010 and froze Afsarpour's account.

The company's chief information officer, Jonathan Noble, also testified, further explaining how spread bets work. He also described Afsarpour's IG Index spread bets and identified instances where IG Index hedged his bets, which he stated it did for a majority of his transactions. He noted that, prior to December 10, 2010, Afsarpour placed only three InterMune orders that were actually executed, whereas between then and December 17, 2010, he placed many more executed trades; and testified that Afsarpour made much riskier InterMune investments after December 10, 2010. As of the close of business on December 15, 2010, Afsarpour had approximately £145,000 on InterMune in his IG Index account. Of that amount, £20,000 pounds were deposited through credit cards that day. In contrast, Afsarpour made no credit card transactions from October 11 through December 9, 2010. Noble testified that an IG Index employee had telephone conversations with Afsarpour on December 13 and 14, 2010, and the jury heard recordings of those phone calls. As to hedging, Noble testified that IG Index did not itself purchase InterMune stock to hedge Afsarpour's bets. Instead, for some of the spread bets IG Index entered into contracts for difference ("CFDs") with a French brokerage in London called Cheuvreux and instructed that company to trade in the underlying stock; Noble did not know if Cheuvreux actually purchased the underlying stock on a U.S. market. He testified that IG Index hedged other spread bets through similar transactions with a brokerage called Macquarie.

Stockbroker Michael Burkoff testified that Afsarpour purchased 75 shares of InterMune stock through him on December 16, 2010, that the purchase was Afsarpour's idea, and that Afsarpour had called him months earlier to discuss InterMune for the first time.

SEC investigative attorney Drew Panahi testified extensively about the agency's investigation into Afsarpour's InterMune trades. Through Panahi, the jury was shown charts of Afsarpour's trades and his phone calls with Dr. Sabrdaran, which coincided, and his emails with the SEC where he denied knowing anyone at InterMune. Panahi told the jury that Afsarpour's profits from spread bets placed between December 10 and December 17, 2010 totaled $877,510.53. According to Panahi, Afsarpour said he knew IG Index would hedge his spread

bets. An SEC economist, Dr. Carmen Taveras, also testified as an expert on the SEC's behalf. The jury was shown charts she prepared showing Afsarpour's daily payments into his IG Index account and how the percentage of his IG Index accounts dedicated to InterMune changed over time, largely after December 10, 2010.

The jury also heard from a number of Afsarpour's friends—either live or via videotaped deposition—who testified to what Afsarpour told them about InterMune and how they responded: by giving Afsarpour money to invest or opening their own brokerage accounts to do so. One invested $60,000 in InterMune on December 16, 2010—her first and last time betting on stocks.

At the close of the SEC's case, both parties moved for judgment as a matter of law. The Court denied the SEC's motion for judgment as a matter of law that Afsarpour's spread bets were "in connection with" securities for the purposes of liability based on evidence that IG Index hedged the spread bets. Defendants moved on two separate grounds. First, Defendants argued that there was no evidence that Afsarpour knew or had reason to know that Dr. Sabrdaran breached a duty of confidentiality or trust as required to show a tip for the purposes of a Section 10(b) and Rule 10b-5 violation. The Court denied the motion, concluding that there was sufficient circumstantial evidence that there was a tip. Second, Defendants moved for judgment as a matter of law on the claims based on Afsarpour's spread bets, contending that (1) there was no evidence that Afsarpour knew his spread bets would be hedged; and (2) objecting to the chart the SEC used to show IG Index's hedging activity, without which, they argued, there was no evidence that IG Index ever hedged the spread bets. The Court denied the motion.

In Defendants' cases-in-chief, the jury heard from expert witness Torben Voetmann, a financial consultant, who opined that Afsarpour's betting behavior was consistent with publicly available information—i.e., that Afsarpour traded on InterMune based on following signals from the market and publicly available information about the European Medicines Agency—and did not change before and after the December 10, 2010 phone call with Dr. Sabrdaran.

The jury also heard extensive testimony from Defendants themselves. Both testified that they communicate regularly about all sorts of topics, but not work. Afsarpour testified that he did not know Dr. Sabrdaran worked at InterMune when he made the investments and that he came

across InterMune by accident when his daughter's boyfriend, Tom Rogerson, asked him to look up a stock under the ticker symbol "ITNM," and he mistakenly entered "ITMN"—InterMune's symbol. Rogerson testified at trial that he did not remember any such request.

In any event, Afsarpour testified that he has long engaged in day trading, making daily investments based on following the markets and engaging in technical analysis to determine the performance of a stock. He further testified that Dr. Sabrdaran never disclosed any non-public information about Esbriet's approval process to him, that he instead made InterMune investments based on his own research, and that it never came up in conversation that Afsarpour was placing spread bets on InterMune until after it happened. According to Afsarpour, Dr. Sabrdaran became very angry and upset with him once he learned that Afsarpour had invested in InterMune. During its investigation Afsarpour initially told the SEC he did not know anyone who worked at InterMune and removed Dr. Sabrdaran from his list of friends on Facebook before turning that list over to the SEC.

Dr. Sabrdaran testified that he always took seriously InterMune's confidentiality policies and that he never discussed InterMune, let alone Esbriet's regulatory approval process, with Afsarpour. He offered explanations for the phone calls with Afsarpour that had nothing to do with InterMune or Esbriet. On cross-examination, Dr. Sabrdaran acknowledged that he erased the hard drive from his laptop and deleted certain Facebook messages from Afsarpour before turning his messages over to the SEC, but contended that he did so to protect his privacy, not to hide anything from the Commission. Dr. Sabrdaran explained that he had since been fired from InterMune and had not found work as a physician or drug safety executive in the pharmaceutical industry.

The parties renewed their motions for judgment as a matter of law at the close of evidence; the Court again denied the motions and sent the case to the jury.

The jury deliberated for one day then returned a verdict in favor of the SEC, answering all five questions on the verdict form in the affirmative. (Dkt. No. 165; *see also* Dkt. Nos. 161-1, 163-1.) Specifically, the jury found that (1) Dr. Sabrdaran breached a duty of trust and confidence to InterMune by intentionally disclosing material, non-public information concerning InterMune to Afsarpour; (2) Afsarpour knew, or should have known, that Dr. Sabrdaran disclosed material,

non-public information to him in violation of Dr. Sabrdaran's duty to maintain confidentiality; (3) Dr. Sabrdaran personally benefitted from the disclosure to Afsarpour; (4) Afsarpour knew, or should have known, that Dr. Sabrdaran disclosed the material, non-public information to him for Dr. Sabrdaran's personal benefit; and (5) Afsarpour used the material, non-public information Dr. Sabrdaran disclosed to him to engage in transactions that were in connection with a purchase or sale of a security.  (*Id.*)

Defendants' joint motion for judgment as a matter of law or, in the alternative, a new trial followed.  (Dkt. No. 170.)  The SEC thereafter filed its motion for remedies and final judgments to be imposed against Defendants.  (Dkt. No. 175.)  The Court agreed to hear the motions together. After oral argument, the SEC submitted notices of supplemental authority notifying the Court of insider trading cases where a court ordered joint and several disgorgement against a tipper who received no direct portion of the ill-gotten profits.  (Dkt. Nos. 183, 187.)  In addition, at the Court's invitation, Defendants submitted a supplemental brief addressing, in part, the revised arguments and calculations that the SEC raised for the first time in its reply brief in support of its remedies motion. (Dkt. No. 188.)

## DISCUSSION

### I.       Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial

Defendants move for a new trial under Rules 50(b) and 59 on the grounds that the jury's verdict was contrary to the weight of the evidence and that the Court erroneously instructed the jury on the "personal benefit" and "in connection with" requirements.

#### A.       Legal Standard

A Rule 50(b) motion is appropriate when the evidence permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.  *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009), and the court "may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A "jury's verdict must be upheld if it is supported by substantial

United States District Court
Northern District of California

evidence, which is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2007).

Under Rule 59, a court has the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The grounds for a new trial include: (1) a verdict that is contrary to the weight of the evidence; (2) a verdict that is based on false or perjurious evidence; or (3) to prevent a miscarriage of justice. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation marks and citation omitted). Erroneous evidentiary rulings and errors in jury instructions are also grounds for a new trial. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

When a Rule 59 motion for a new trial is based on insufficiency of the evidence, the court may weigh the evidence and assess the credibility of witnesses and need not view the evidence from the perspective most favorable to the prevailing party. *See Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). The decision to grant a new trial motion lies within the court's discretion. *See Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (9th Cir. 2007). But "the court is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (internal quotation marks and citation omitted). Rather, a new trial should be granted where, after "giv[ing] full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed" by the jury. *Landes Contr. Co.*, 833 F.2d at 1365.

B.    Analysis

1.    *The Jury's Verdict that Dr. Sabrdaran Intentionally or Recklessly Disclosed Material, Non-Public Information to Afsarpour was not Contrary to the Weight of the Evidence*

Defendants first contend that the Court should order a new trial because the jury's finding that Dr. Sabrdaran tipped Afsarpour is contrary to the weight of the evidence. Defendants urge that the SEC presented no direct evidence of a tip and the circumstantial evidence was weak, and thus that the verdict rested only on "strained inferences and speculation" of a tip.

Relevant here, Section 10(b) and Rule 10b-5 are violated under the "misappropriation theory" of insider trading when "an individual misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. 642, 652 (1997). Among other elements, to establish that a defendant is liable for insider trading under this theory, the SEC must prove that the tipper defendant—here, Dr. Sabrdaran—breached a duty of confidentiality in sharing information with the tippee—Afsarpour. *Aaron v. SEC*, 446 U.S. 680, 691 (1980). Defendants challenge the jury's finding that the SEC proved this latter element.

While Defendants first fault the SEC for failing to present any direct evidence that Dr. Sabrdaran shared a tip, direct evidence is not necessary. *See SEC v. Truong*, 98 F. Supp. 2d 1096, 1097-98 (N.D. Cal. 2000); *see also SEC v. Horn*, No. 10-cv-955, 2010 WL 5370988, at *4 (N.D. Ill. Dec. 16, 2010) ("Direct evidence of insider trading is, indeed, rare; and the SEC is entitled to prove its case through circumstantial evidence.") (collecting cases). But it "may not base insider trading actions on strained inferences and speculation." *Id.* (citation omitted). In meeting its burden, the SEC must identify the facts that the tippee allegedly possessed. *Truong*, 98 F. Supp. 2d at 1098.

The SEC has met its burden. The timing of Defendants' phone calls, Afsarpour's trading activity, Afsarpour's communications with other friends that emphasized the deadline to invest was right before the imminent public announcement, as well as evidence that Afsarpour was so sure that the price of InterMune stock would rise that he convinced a number of friends who had never invested in the stock market before to invest large sums of money, support a reasonable inference that Dr. Sabrdaran told Afsarpour that InterMune was about to obtain regulatory approval for Esbriet. While Dr. Sabrdaran himself told the jury that he never disclosed insider information to Afsarpour, the jury was not required to believe him. The jury heard evidence that Dr. Sabrdaran had lied to his InterMune boss about a ski trip in Switzerland. The jury also may have found it less than credible that Dr. Sabrdaran never discussed his job with his close friend. Similarly, Afsarpour's story that he simply happened upon InterMune while entering the ticker symbol for another company on Rogerson's request was unlikely and not corroborated by

Rogerson, which gave the jury grounds to discount Afsarpour's credibility, as well. It was not against the weight of the evidence for the jury to conclude that Dr. Sabrdaran tipped Afsarpour about Esbriet's imminent approval.

Defendants also argue that the SEC "made the jury and the defense guess as to when the alleged tip actually occurred" and "waited until its . . . rebuttal closing argument . . . to reveal that if an actionable tip occurred in this case, it occurred on December 10, 2010." (Dkt. No. 170 at 9-10 (record citation omitted).) Not so. The SEC's theory from the beginning was that Dr. Sabrdaran shared information with Afsarpour during their phone calls in the week leading up to the public Esbriet approval announcement. Indeed, the SEC's expert witness, Dr. Taveras, testified that she reached her opinion that Afsarpour must have traded on inside information based on the assumption that the tip occurred on December 10, 2010.

Defendants identify evidence that supports their position that Afsarpour traded not on the basis of material, non-public information, but based on his own technical analysis of InterMune stock and publicly available information about the timing of regulatory approval announcements in the European Medicines Agency. A reasonable factfinder could infer that there was no insider trading based on this evidence. But, taken in the context of the entire trial, and in particular given Defendants' credibility problems and the weight of the circumstantial evidence, it does not leave the Court with the "definite and firm conviction" that the jury made a mistake in finding that there was insider trading. *See Landes Constr. Co.*, 833 F.2d at 1371.

### 2. *The "Personal Benefit" Requirement*

Defendants next argue that the Court's instruction about the "personal benefit" requirement was improper and, in any event, the jury's finding that Dr. Sabrdaran tipped Afsarpour for a personal benefit was contrary to the weight of the evidence.

#### a. The Court's Instruction was Proper

The Court instructed the jury that to find that Defendants engaged in insider trading the SEC must prove by a preponderance of the evidence that they used a device, scheme or artifice to defraud in connection with the purchase or sale of a security and that they "acted intentionally." (Dkt. No. 160 at 88; *see also* Dkt. No. 154 at 22 (Court's Second Proposed Jury Instructions).)

10

Explaining tipper and tippee liability, the Court instructed that "[a]s to Dr. Sabrdaran, the SEC must establish: . . . [t]hat Dr. Sabrdaran breached his duty of trust and confidence to InterMune by disclosing material, non-public information to Mr. Afsarpour *in exchange for a personal benefit*." (Dkt. No. 160 at 90-91 (emphasis added); *see also* Dkt. No. 154 at 27.)  The Court also instructed the jury that "[a]s to Mr. Afsarpour, the SEC must establish: . . . [t]hat Mr. Afsarpour knew or should have known that Dr. Sabrdaran had breached his duty of trust and confidence for Dr. Sabrdaran's personal benefit."  (Dkt. No. 160 at 92; *see also* Dkt. No. 154 at 30.)

The Court defined "personal benefit" for the jury as follows:

> A personal benefit for these purposes includes anything of value, including money or friendship, and may be inferred when an insider makes a gift of nonpublic information to a friend.  Personal benefit includes not only monetary gain, such as a cut of the take or a gratuity from the tippee, but also a reputational benefit or the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend.  The benefit does not need to be financial or tangible in nature; it could include, for example, maintaining a useful networking contact, improving the tipper's reputation, obtaining future financial benefits, or making a gift of confidential information to a trading relative or friend.

(Dkt. No. 160 at 91-92; *see also* Dkt. No. 154 at 29.)  The Court also gave instructions on the level of intentional conduct required to prove insider trading, explaining that:

> To establish that Dr. Sabrdaran and Mr. Afsarpour acted with intent to deceive, manipulate, or defraud, the SEC must prove that Dr. Sabrdaran and Mr. Afsarpour acted knowingly or recklessly and did not act inadvertently, carelessly, or by mistake. "Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, which is either known to the defendant or is so obvious that the defendant must have been aware of it.

(Dkt. No. 160 at 93-94; *see also* Dkt. No. 154 at 33.)

While Defendants disputed the personal benefit instruction and offered their own, they conceded in their pre-trial submission that the SEC's proposed instruction—which the Court adopted in relevant part—"is consistent with the Ninth Circuit's decision in *United States v. Salman*, 792 F.3d 1087 (9th Cir. 2015)." (Dkt. No. 94 at 7 n.1.)  Defendants instead offered an instruction based on the Second Circuit's decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), in which that court held that to prove receipt of a personal benefit sufficient to

establish Section 10(b) and Rule 10b-5 insider trading liability, the SEC must prove that the tipper gained something of actual pecuniary value from the tip, or that the tipper and tippee had a meaningfully close relationship that generated an exchange that was objective, consequential, and represented at least a potential gain of a pecuniary or similar nature. *Newman*, 773 F.3d at 452-53. Defendants made clear that they offered the *Newman*-based instruction with the hope that the Supreme Court would accept that approach and reject the Ninth Circuit's approach.

Shortly after trial, the Supreme Court decided *United States v. Salman*, 137 S. Ct. 420 (2016). The Court reaffirmed its earlier holding in *Dirks v. SEC*, 462 U.S. 646 (1983), that a tipper breaches his fiduciary duty, and thus exposes himself to liability, when he "personally will benefit, directly or indirectly, from his disclosure" of inside information. *Salman*, 137 S. Ct. at 427 (quoting *Dirks*, 462 U.S. at 664). The Supreme Court explained that "[t]his personal benefit can 'often' be inferred 'from objective facts and circumstances,' . . . such as 'a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient." *Salman*, 137 S. Ct. at 427 (quoting *Dirks*, 462 U.S. at 664). The Court held that in particular, "'[t]he elements of fiduciary duty and exploitation of nonpublic information also exist *when an insider makes a gift of confidential information to a trading relative or friend*.'" *Salman*, 137 S. Ct. at 427 (emphasis in original) (quoting *Dirks*, 462 U.S. at 664). In *Salman*, as in *Dirks*, the Supreme Court reasoned that such conduct exposed the tipper to liability the same as if he had traded on the inside information and then provided the proceeds as a gift to the close friend or relative. 137 S. Ct. at 427-28; *Dirks*, 462 U.S. at 667. *Salman* expressly rejected the Second Circuit's more narrow interpretation of the personal benefit requirement, 137 S. Ct. at 428—the interpretation Defendants advanced in their proposed jury instruction—and affirmed the Ninth Circuit's decision in *Salman*, 792 F.3d 1087 (9th Cir. 2015), the case to which Defendants conceded the jury instruction conformed.

Now, for the first time, Defendants focus on the absence of an instruction that the tipper intended to benefit *the tippee*. Defendants insist that *Dirks* and *Salman* establish two separate standards: one for a "direct" personal benefit and one for an "indirect" personal benefit. The "gift-giving principle" that *Dirks* and *Salman* recognized is an example of "indirect" personal benefit

and, according to Defendants, it requires the SEC to establish the tipper's intent to benefit the tippee. (Dkt. No. 170 at 14-19). Defendants thus argue that the "jury instructions erroneously suggested that an intent to benefit the recipient was not required to satisfy the personal benefit requirement in any way." (Dkt. No. 170 at 13.) They then combine intent to benefit the tippee with the tipper's personal benefit, contending that "the jury was improperly instructed that if Dr. Sabrdaran tipped [ ] Afsarpour without intending to benefit [ ] Afsarpour and in exchange for nothing but friendship itself, the jury could find that the personal benefit requirement was satisfied" and "[t]hat is not the law." (*Id.* at 20.)

Defendants' jury instruction challenge fails for several reasons. First, neither *Dirks* nor *Salman* requires an instruction about intent to benefit the recipient. To the contrary, the Supreme Court explained that the required personal benefit for the tipper can be inferred from various "objective facts and circumstances," "'such as a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, *or* an intention to benefit the particular recipient.'" 137 S. Ct. at 427 (quoting *Dirks*, 463 U.S. at 664) (second emphasis added). The personal benefit requirement is also satisfied "when an insider makes a gift of confidential information to a trading relative or friend." 137 S. Ct. at 427 (quoting *Dirks*, 463 U.S. at 664). Thus, a showing of a tipper's intent to benefit the recipient may be sufficient to show a personal benefit, but it is not required.

Second, Defendants never objected to the personal benefit instruction on this ground before or during the trial; the only objection they raised was that the tipper's personal benefit had to be financial or tangible, as in *Newman*. (*See* Dkt. No. 94 at 6-8 & n.1.) They never offered a proposed instruction that addressed their current position that *Dirks* requires instructing the jury that the tipper intended to benefit the tippee. Thus, Defendants waived the argument, *see* Fed. R. Civ. P. 51(c), and may only object to the instruction on the grounds that it constituted plain error. *See* Fed. R. Civ. P. 51(d)(2). It is not, for the reasons explained above.

Defendants' reliance on *SEC v. Yun*, 327 F.3d 1263, 1281 (11th Cir. 2003), is unpersuasive. There, the court instructed the jury that to find liability the SEC must establish that the tipper breached a fiduciary duty by disclosing material nonpublic information intentionally or

severely recklessly and declined to include the defendants' proposed instruction about personal benefit. *Id.* at 1281. The SEC relied heavily on the "severely reckless" instruction in its closing argument and the defendants' attorneys were foreclosed from arguing lack of personal benefit because of the denied instruction. The Eleventh Circuit held the instructions were clearly erroneous and the defendants were entitled to a new trial. *Id.* at 1282. Unlike *Yun*, Defendants here do not challenge the Court's instruction about the level of intent—which the Ninth Circuit has defined to include recklessness—and the Court did not fail to instruct the jury about the personal benefit requirement. Moreover, the *Yun* opinion does not provide a detailed description of the complete set of jury instructions, thus leaving the Court little to work with in comparing the instructions in this case. Thus, while the SEC's statements based on erroneous jury instructions in *Yun* warranted a new trial, the SEC's statements throughout closing argument that relied on the Court's proper jury instructions here do not. Moreover, *Yun* focused on whether the instructions adequately recited the requirement that the tipper disclosed information with the intent to personally benefit *himself*, not whether the court sufficiently instructed the jury that it had to find the tipper did so intending to benefit the *tippee*, the belated argument Defendants make here.

Finally, in their supplemental brief, Defendants cite the district court's jury instructions in *SEC v. Gowrish*, No. C 09-5883 SI, Dkt. No. 143 at 6 (N.D. Cal. Feb. 14, 2011). *Gowrish* does not suggest that the personal benefit instruction here was plain error as the SEC's personal benefit theory there was different: the tipper was not a close personal friend or relative of the tippee, as here. *See SEC v. Gowrish*, No. C 09-05883 SI, 2011 WL 2790482, at *1-2 (N.D. Cal. July 14, 2011), *aff'd*, 510 F. App'x 588 (9th Cir. 2013). Thus, the Supreme Court's pronouncement in *Dirks,* as recently reaffirmed in *Salman*, that "the elements of fiduciary duty and exploitation of nonpublic information also exist *when an insider makes a gift of confidential information to a trading relative or friend,*" *Salman*, 137 S. Ct. at 427 (emphasis in original; internal quotation marks and citation omitted), did not apply.

            **b.**      **The Jury's Verdict was not Contrary to the Weight of the Evidence**

Defendants maintain that even if the jury instruction was proper, the jury's finding that the SEC satisfied the personal benefit requirement was contrary to the weight of the evidence. Not so.

The jury heard myriad evidence about Defendants' extremely close friendship. Defendants talked to each other regularly about many subjects, recommended self-help books and seminars to each other, gave each other advice, and made travel plans together. This was enough for the jury to conclude that Dr. Sabrdaran likely gave Afsarpour a gift of insider information to nurture their close relationship.

Defendants argue that the record "belies the notion [that] Dr. Sabrdaran disclosed anything with intent to benefit Mr. Afsarpour" during the December 10, 2010 phone call. (Dkt. No. 170 at 22.) Defendants highlight: (1) Dr. Sabrdaran's testimony that he did not know that Afsarpour was trading in InterMune stocks at that time and Afsarpour's testimony that he did not tell Dr. Sabrdaran that he was trading until December 17, 2010 (Dkt. No. 170 at 22; Dkt. Nos. 170-1 at 59, 71-72); (2) Defendants' testimony that when Dr. Sabrdaran learned for the first time on December 17, 2010 that Afsarpour was trading in InterMune stocks he reacted with shock and dismay (Dkt. No. 170 at 22; Dkt. No. 170-1 at 50-54, 71-74); and (3) Afsarpour's December 19, 2010 Facebook message telling Dr. Sabrdaran to "call me say a couple of bad words[,]" which Afsarpour explained means to air the negative feelings Dr. Sabrdaran harbored against him after learning that he had been trading in InterMune stock. (Dkt. No. 170 at 22-23; Dkt. No. 170-1 at 55-59, 117.) Defendants contend that this testimony reflects that Afsarpour apologized to Dr. Sabrdaran, and "co-conspirators don't apologize for what they were doing all along." (Dkt. No. 170-1 at 86.) Again, in the face of the circumstantial evidence, the jury reasonably discredited Defendants' accounts. And the significant evidence about Defendants' longstanding friendship is enough to reasonably infer that Dr. Sabrdaran's motivation to tip was to nurture that relationship.

At bottom, all Defendants do is highlight evidence that conflicts with the jury's verdict. Based on that evidence alone, Defendants insist that "loose talk between friends" is not enough to support the personal benefit required for insider trading liability. A reasonable factfinder might have concluded that Dr. Sabrdaran was merely negligent in disclosing information about Esbriet's imminent approval and, thus, that his "loose talk" with Afsarpour led to Afsarpour's trades. But the evidence at trial supported both conclusions and, given the weight of the circumstantial evidence, Defendants' innocent explanation is not the likelier story. When the jury is presented

15

with competing evidence, it is not the Court's role to substitute its own view for the conclusions the jury reached after hearing all the competing evidence. *See Roy*, 896 F.2d at 1176. This is especially true when the fact question is particularly nuanced as the Supreme Court has noted the personal benefit requirement is. *See Salman*, 137 S. Ct. at 429 ("[D]etermining whether an insider personally benefits from a particular disclosure, a question of fact, will not always be easy for the [factfinder].") (citing *Dirks*, 463 U.S. at 664). Rather, even if it were a close call whether Dr. Sabrdaran tipped for a personal benefit, "it is not quite clear that the jury has reached a seriously erroneous result" given the evidence presented at trial. *Carrethers v. Bay Area Rapid Transit*, No. 09-1101, 2012 WL 1004847, at *2 (N.D. Cal. Mar. 26, 2012) (internal quotation marks omitted) (citing *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 690 (9th Cir. 1997)).

c.    The Court Declines to Grant Judgment as a Matter of Law
Regarding Personal Benefit

Lastly, Defendants argue that because there is no evidence that Dr. Sabrdaran tipped for a personal benefit, it follows that there is not substantial evidence that Afsarpour knew or had reason to know that Dr. Sabrdaran had done so. (Dkt. No. 170 at 23.) As discussed above, the jury's finding that Dr. Sabrdaran tipped Afsarpour for a personal benefit—*i.e.*, to nurture their friendship—was not contrary to the weight of the evidence because the jury heard significant testimony about the closeness of Defendants' relationship and there is significant circumstantial evidence that a tip occurred. This combination is enough for a reasonable factfinder to conclude that Dr. Sabrdaran tipped for his personal benefit; indeed, the jury reasonably concluded as much.

*    *    *

Because the "personal benefit" jury instructions were proper, the verdict was not contrary to the weight of the evidence, and because there was substantial evidence to support the jury's finding that Dr. Sabrdaran tipped Afsarpour for a personal benefit, the Court declines to grant a new trial or enter judgment as a matter of law in Defendants' favor on this ground.

3.    *The "In Connection With" Requirement*

Trying a different tack, Defendants next argue that the jury instruction and evidence about whether Afsarpour's transactions were "in connection with" the sale or purchase of securities

warrants a new trial or judgment as a matter of law. The trial record reflects that Afsarpour

engaged in three types of transactions: he purchased InterMune stock, made spread bets on

InterMune stock, and placed spread bets on InterMune options.[2] Notably, Defendants concede

that Afsarpour's stock purchases meet the "in connection with" requirement, since he purchased

InterMune stock on a U.S. stock exchange through his New York-based stockbroker. They

nevertheless maintain that the Court's jury instruction about the "in connection with" requirement

was improper and, even if it was correct, the verdict must be set aside because there is insufficient

evidence that Afsarpour's spread bets were "in connection with" U.S. securities.

a.      The Court's Instruction Was Proper

The Court instructed the jury that "in connection with" the purchase or sale of a security

> means that there was some nexus or relationship between the
> allegedly fraudulent conduct and the sale or purchase of securities in
> the United States securities market. A defendant's conduct may be
> in connection with a purchase or sale of a security even if the
> defendant did not actually participate in any securities transaction.

(Dkt. No. 160 at 89; Dkt. No. 54 at 24.)

Defendants first argue that the Court should have required the jury to address whether each

type of transaction at issue was "in connection with" the sale and purchase of securities. Thus,

Defendants are really crying foul about the verdict form rather than the jury instructions. "As a

general rule, the court has complete discretion over whether to have the jury return a special

verdict or a general verdict." *Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991) (citations

omitted). "This discretion extends to determining the form of the special verdict, provided the

questions asked are adequate to obtain a jury determination of the factual issues essential to

judgment." *Id.* (internal quotation marks and citation omitted). So it is here.

The SEC argued that all of Afsarpour's transactions were part of a single scheme, device,

or artifice to defraud. When discussing the proposed verdict form with counsel during the trial,

the Court noted that whether each transaction was in connection with the sale of a security is a

---

[2] Other downstream tippees also placed spread bets on InterMune stocks and options. The Court refers only to Afsarpour in this section, but the analysis applies to the spread bets these other individuals placed, as well.

question of remedy, not liability, as long as the device or scheme to defraud is in connection with a security. (Dkt. No. 174-2 at 132.) When the Court mentioned that the jury need not "be unanimous on which particular transaction" is in connection with a security, Defendants did not disagree, and they repeatedly conceded that Afsarpour's stock purchases were in connection with a security. (*Id.*) Indeed, in the context of criminal cases, courts have long held that a jury need not unanimously decide what underlying facts make up a particular element. *See Richardson v. United States*, 526 U.S. 813, 817 (1999) ("[A] federal jury need not always decide unanimously . . . which of several possible means the defendant used to commit an element of the crime.") (noting that use of a knife or a gun could satisfy use of force element necessary to establish robbery); *Schad v. Arizona*, 501 U.S. 624, 632 (1991) (plurality op.) ("[T]here is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.") (quotation marks and citation omitted); *see, e.g.*, *United States v. Bayyouk*, 607 F. App'x 735, 736-37 (9th Cir. 2015) (in a criminal prosecution for obstruction of agency proceedings, noting that "[a]ny potential disagreements among the jury members regarding the particular false statement by which [the defendant] obstructed the SEC investigation are merely differences of means, and therefore do not violate his right to a unanimous jury verdict") (citations omitted). While Defendants urge the Court to reject this line of cases because it assumes that the jury could have found any of the possible transactions "in connection with" securities and no reasonable jury could find the spread bets were, the Court concludes otherwise, as explained in more detail below. Moreover, Defendants never requested a unanimity instruction at trial despite multiple opportunities to do so. The Court's special verdict form and instruction accurately reflected the law and thus do not constitute plain error or warrant a new trial.

Defendants also argue that the instruction was improper because it did not require the jury to find that Afsarpour *knew* or *intended* that all of his transactions were in connection with the sale or purchase of a security. (Dkt. No. 170 at 25.) The Court rejected this argument in the context of resolving the SEC's motion for partial summary judgment when it held that "to establish a securities violation under Section 10(b) or Rule 10b-5, the SEC need not necessarily prove that Afsarpour subjectively knew that his fraudulent activity was 'in connection with the purchase or

18

sale of any security.'" (Dkt. No. 99 at 2.) The Court clarified that while "the SEC must prove that there was some nexus or relationship between the spread bets on InterMune stocks and the purchase of the InterMune stocks themselves[,] . . . Afsarpour's knowledge of that nexus or relationship—that is, the connection to the purchase or sale of a security—while certainly potentially relevant, is not an element of the 'in connection with' requirement." (*Id.* at 4 (citing Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, at 427 (2007 ed.) (Instruction 18.0).) Nothing in Defendants' current motion—which relies on the same case that was the subject of supplemental briefing at the summary judgment stage—changes the Court's conclusion.

Defendants also note, in a footnote, that the Court's "in connection with" instruction derived from General Instruction 18.0 in the Ninth Circuit's Manual of Model Civil Jury Instructions, which were written to apply to actions brought under Rule 10b-5(b) for false or misleading representations in connection with the purchase or sale of securities, not actions under Rule 10b-5(a) and (c) for operating a device, scheme, or artifice to defraud. The introductory comment explains that the model instruction applies to Rule 10b-5 actions as opposed to private damages actions that carry separate statutory requirements; in other words, the important distinction is not the type of Rule 10b-5 action but that it is being brought by the SEC, as is this case. *See* Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, at 427 (2007 ed.) (Introductory Comment to Instruction 18.0). And indeed, the instructions say they "focus" on 10b-5 disclosure claims—*i.e.*, Rule 10b-5(b) claims—but do not state that the rules are inapplicable to other Rule 10b-5 cases. Further, each type of Rule 10b-5 action uses the same "in connection with purchase or sale of a security" language, which suggests that the same meaning applies; Defendants have not identified any authority that holds otherwise.

For each of these reasons, the Court declines to grant a new trial on the grounds that the jury instruction or special verdict form were wrong on the "in connection with" a security requirement.

           b.      The Jury's Verdict was not Contrary to the Weight of the Evidence

Lastly, Defendants argue that even if they are wrong on the legal arguments, the Court

must set aside the jury's verdict because there is insufficient evidence that Afsarpour's spread bets affected the U.S. securities market for InterMune common stock or options because the SEC's documentary evidence of IG Index's hedges was inadmissible hearsay and the testimony from the IG Index witnesses did not establish that the company's hedges affected the U.S. securities market.

Defendants first challenge the admission of the documentary evidence of IG Index's hedging. Specifically, Defendants contend that Exhibits 218 and 219, spreadsheets that reflect client trades and IG's hedges on InterMune stock by date and time, are inadmissible hearsay rather than business records. Defendants made the same argument in their motion in limine, and the Court overruled the objection, noting that the declarations of IG Index employee Bridget Messer established that the information in the documents met the business records requirement because it (1) was extracted from IG Index's trading activity database at or near the time of the hedging transaction, (2) the records were maintained as part of IG Index's regularly conducted business activity, (3) making trading activity records was part of IG Index's regular and routine business practice, (4) Messer was qualified to testify about the records, and (5) Defendants had not shown that the records indicated a lack of trustworthiness. (Dkt. No. 107 at 1-2, 4.)

At trial, IG employee Noble gave more color to the spreadsheets. He explained that the spread bets and hedges are contemporaneously recorded in IG Index's database. (Dkt. No. 170-1 at 16-18.) But the columns on the chart reflecting phone calls between the customer and IG Index are not; that information required listening to recordings of telephone calls after the fact to match each hedge to a particular client's spread bet. (*Id.* at 17-18, 21.) Similarly, Noble explained that IG Index added a unique identification number for each spread bet and color coded the charts for the purposes of making the transaction history easier to understand. (*Id.* at 13-15.) In short, the underlying transaction data stems from IG Index's contemporaneously recorded transactions database, but IG Index added some annotations after the fact that made the information easier for the jury to read and digest.

To the extent that the additional information, like color coding and assignment of unique identifiers for each transaction, is not itself a business record, it was still appropriately before the

jury as summary evidence pursuant to Federal Rule of Evidence 1006. Summary evidence is admissible if "the underlying materials upon which the summary is based (1) are admissible and (2) were made available to the opposing party for inspection." *United States v. Aubrey*, 800 F.3d 1115, 1130 (9th Cir. 2015). "The purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge or jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011) (quotation marks and citation omitted). Here, the underlying IG data about each spread bet and hedge transaction was admissible as business records. The limited additional information that IG Index added that was not part of the business record merely clarifies the information.

The cases Defendants cite are inapposite. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984); *United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993). In *Paddack*, an ERISA case, the court held that compliance audit reports compiled by a third-party auditor were not business records of the Trust Fund or Employer, since they were prepared only when a deficiency was suspected and for the purposes of litigation. *Paddack*, 745 F.2d at 1258. Likewise, in *Blackburn*, the court held that the district court erred in admitting as a business record a pair of computer printouts with lens readings for eyeglasses and a handwritten prescription for eyeglasses because the document was prepared after Blackburn's arrest at the behest of the FBI for use in an ongoing criminal investigation. *Blackburn*, 992 F.2d at 670. Here, in contrast, IG Index —not a third party—prepared the charts and the information set forth therein was almost exclusively part of its contemporaneous transaction records; only minimal annotations were done in preparation of litigation. Once again, the Court overrules Defendants' objection. The spreadsheets of InterMune spread bet and hedging transactions at IG Index were properly before the jury.

With that matter settled, there is no question that there was substantial evidence before the jury to find that Afsarpour's spread bets were "in connection with" the sale and purchase of a security. The jury heard testimony that InterMune stock traded only on exchanges in the United States. (Dkt. No. 174-2 at 2.) IG Index employee Noble testified that IG Index hedged 237 of Afsarpour's spread bets on options and 50 of the spread bets on options placed by downstream

21

tippee Balvinder Nijjar by purchasing the equivalent number of lots of InterMune contract options by purchasing 14,600 shares of InterMune stock from a U.S. exchange. (*Id.* at 51, 56-57, 59, 97-99, 101; Dkt. No. 170-1 at 104-08, 102.) Noble clarified that IG Index used Cheuvreux, a French brokerage located in London, to place the hedging transactions on the spread bets on InterMune common stock, because IG Index itself is not a member of a U.S. exchange and thus cannot buy the underlying stock. (Dkt. No. 170-1 at 23-24.) Specifically, IG Index entered a contract for difference with Cheuvreux, and IG Index instructed Cheuvreux to purchase the underlying stock; Noble did not know if Cheuvreux actually purchased InterMune stock. (*Id.* at 24-26.) To hedge the spread bets on options, Noble testified that IG Index traded with Macquarie. (*See* Dkt. No. 170-1 at 31.) The SEC did not introduce any records from Macquarie or other records evidencing IG's hedging of spread bets on options. Instead, the SEC introduced a spreadsheet that IG Index had prepared showing the transactions IG Index entered into with Cheuvreux and Macquarie. (Dkt. No. 170-1 at 112.)

While this evidence is not sufficient to conclude that, on their own, every single one of Afsarpour's spread bets was "in connection with" a security, that is not the test. The general scheme or artifice to defraud must "somehow touch[ ] upon" or have "some nexus with" "any securities transaction," rather than every transaction at issue having a direct connection. (Dkt. No. 36 at 16 (citations omitted).) *See also SEC v. Zandford*, 535 U.S. 813, 819 (2002); *SEC v. Rana Res., Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993). Noble's testimony that IG Index hedged many of the spread bets that Afsarpour and downstream tippee Nijjar placed by purchasing contracts for difference with Cheuvreux, along with IG Index's business records reflecting those transactions, constitute substantial evidence that at least some of Afsarpour's spread bets were "in connection with" the sale or purchase of securities in the U.S. market, so the verdict is not contrary to the weight of the evidence.

Defendants emphasize that IG Index never received title to InterMune securities, and that Noble did not know if Cheuvreux actually purchased the underlying InterMune stock as IG Index instructed it to do, and that the jury "could not have found that the contract for difference, itself, was a purchase or sale of a U.S. security, or that it affected the U.S. securities market for

InterMune." (Dkt. No. 170 at 26-27.) Not so. Even absent Cheuvreux's underlying purchase, IG

Index's purchases of contracts for difference—CFDs—were "in connection with" a U.S. security.

In a similar insider trading case, one district court explained that "CFDs provide foreign investors

with a way to access American exchange-traded securities without opening U.S. brokerage

accounts." *SEC v. Compania Internacional Financiera S.A.*, No. 11 CIV 4904, 2011 WL

3251813, at *2 (S.D.N.Y. July 29, 2011). As a result, courts have held that contracts for

difference are securities within the meaning of Section 10(b) and Rule 10b-5. *See, e.g.*, *SEC v.

Maillard*, No. 13 CIV 5299, 2014 WL 1660024, at *3 (S.D.N.Y. Apr. 23, 2014) (denying motion

to dismiss insider trading case, noting that CFDs purchased in Luxembourg as a result of insider

trading harm the U.S. market); *Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *3

(S.D.N.Y. July 29, 2011) ("CFDs [entered into in the UK]. . . constitute securities as defined by

the federal securities laws."); *Freudenberg v. E*Trade Fin. Corp.*, No 07 CIV 10400, 2008 WL

2876373, at *6-7 (S.D.N.Y. July 16, 2008) ("[A] CFD is a 'security' as that term is broadly

defined in the Securities Exchange Act of 1934.").[3] Thus, there is substantial evidence on which a

reasonable jury could find that the spread bets IG hedged by purchasing CFDs with Cheuvreux are

"in connection with" securities.

And perhaps most importantly, even if IG did not hedge any of the spread bets, the jury's

verdict would not be contrary to the weight of the evidence, as Afsarpour's purchase of InterMune

stock and options are, in and of themselves, a sufficient basis for the jury's conclusion that

---

[3] Defendants concede that a contract for difference is a security, but argue that the contract for difference at issue here was not listed or entered into in the U.S. so it does not qualify as "in connection with" securities. (*See* Dkt. No. 178 at 12; *see also* Dkt. No. 177 at 31 n.4 (Dr. Sabrdaran joins Afsarpour's motion).) Likewise, citing *SEC v. Maillard*, No. 13 CIV 5299, 2014 WL 1660024, at *3 (S.D.N.Y. Apr. 23, 2014), Defendants argue that there was no evidence regarding "who received title to any InterMune options it contended resulted from IG Index's hedging of Mr. Afsarpour's spread bets, or where such title was passed" and thus, under *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010), the jury verdict cannot be based on Afsarpour's spread bets. (Dkt. No. 176 at 20.) But in *Maillard* the Court rejected that argument, noting that "[i]f an investor could escape [the U.S. securities laws] regime by the simple expedient of trading in CFDs overseas, the transparency and fairness of the U.S. markets would be seriously undermined. Nothing in *Morrison* requires that result." 2014 WL 1660024, at *2 n.5. The Court likewise rejects it here.

23

Defendants' scheme to defraud was "in connection with" U.S. securities. Defendants have not cited any authority that requires every transaction to be "in connection with" a security, and the Court has found none. Instead, it is the general scheme to defraud that must meet that test. There was substantial evidence for the jury to conclude that the SEC proved as much. Defendants are not entitled to a new trial on this ground.

                    c.        The Court Declines to Enter Judgment as a Matter of Law That Afsarpour's Spread Bets Were not "In Connection With" Securities

On the same grounds, Defendants ask the Court to enter judgment as a matter of law that Afsarpour's spread bets were not "in connection with" securities. The Court declines to do so for the reasons explained above.

* * *

Because the Court's jury instruction was appropriate and there was substantial evidence to support the jury's finding that at least some of Afsarpour's transactions, and thus Defendants' overall scheme, was "in connection with" the purchase or sale of securities, the Court declines to order a new trial or enter judgment as a matter of law in Defendants' favor. The Court thus DENIES Defendants' motion for a new trial or, in the alternative, judgment as a matter of law. The jury's verdict stands.

## II.    Remedies Motion

Having determined that the jury's verdict should stand, the Court turns to the SEC's motion for an order on remedies and a final judgment against each Defendant. The SEC requests that the Court permanently bar Dr. Sabrdaran from serving as an officer or director of a publicly traded company, order both Defendants to pay disgorgement and prejudgment interest, impose the maximum civil penalties available under the law against Dr. Sabrdaran, and enjoin both Defendants from any further securities law violations.[4]

As a preliminary matter, the Court must resolve an evidentiary dispute. In connection with its reply in support of its remedies motion, the SEC submitted new evidence. (Dkt. Nos. 180-1,

---

[4] The SEC initially asked the Court to impose civil penalties against both Defendants but withdrew the request for penalties against Afsarpour in its reply. (*See* Dkt. No. 180 at 28 & n.30.)

180-2.) Based on this evidence, the SEC substantially revised—and in particular, decreased— its disgorgement, prejudgment interest, and penalties calculations. (*See id.*) Defendants object to these reply materials. (Dkt. No. 181.) In general a court will not consider evidence submitted for the first time in a reply without giving the opposing party an opportunity to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). The Court overrules Defendants' objections because the Court gave Defendants an opportunity to file a supplemental submission responding to the SEC's reply arguments and evidence. *See Provenz*, 102 F.3d at 1483.

A.      Officer and Director Bar Against Dr. Sabrdaran

A district court "may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine," any person "from acting as an officer or director [of a public company] if the person's conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). The decision whether to impose an officer and director bar is within the court's discretion. *See SEC v. First Pac. Bancorp.*, 142 F.3d 1186, 1193 (9th Cir. 1998) (citations omitted). In exercising that discretion, a district court may consider:

> (1) the "egregiousness" of the underlying securities law violation;
> (2) the defendant's "repeat offender" status; (3) the defendant's
> "role" or position when he engaged in the fraud; (4) the defendant's
> degree of scienter; (5) the defendant's economic stake in the
> violation; and (6) the likelihood that misconduct will recur.

*Id.* (quoting 15 U.S.C. § 78u(d)(2)). Courts have also considered "whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might [have been] sufficient, especially where there [was] no prior history of unfitness." *SEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995).

The parties dispute what the SEC's burden is in seeking an officer and director bar; Dr. Sabrdaran urges that the SEC must show his "substantial unfitness" to serve as an officer or director, while the SEC argues that the standard has been lowered to "unfitness," and they propose different tests to meet each standard. (*Compare* Dkt. No. 177 at 30, *with* Dkt. No. 175 at 19.) In the Sarbanes-Oxley Act of 2002, Congress changed the statutory language of the SEC's burden in seeking an officer and director bar from showing "substantial unfitness" to serve to showing

"unfitness" to serve. *SEC v. Levine*, 517 F. Supp. 2d 121, 144-45 (D.D.C. 2007).

Congress, however, did not provide any guidance on the meaning of the term unfitness or "whether its deletion of the word 'substantial' was meant to increase or reduce the government's quantum of proof." *Id.* at 144 (citation omitted). In *Levine*, the court noted that "[i]t is clear from the history of the legislation, however, that Congress's intent was to reduce the government's burden." *Id.* at 144-45 (citations omitted). The SEC contends that the Court should apply the test adopted by the D.C. district court in *Levine*, which considered the same factors the Ninth Circuit recognized in *First Pacific Bancorp* along with two additional factors: (1) the defendant's acknowledgement of wrongdoing and (2) the credibility of the defendant's contrition. *See Levine*, 517 F. Supp. 2d at 145-46. But the Ninth Circuit has not addressed the factors for determining "unfitness" in post-Sarbanes-Oxley securities cases, and district courts within the Circuit have continued to apply the *First Pacific Bancorp* factors to determine unfitness. *See, e.g.*, *SEC v. Forum Nat'l Invs. Ltd.*, No. ED CV14-02376 JAK (DTBx), 2016 WL 6875953, at *6-7 (C.D. Cal. Nov. 18, 2016) (considering only the *First Pacific Bancorp* factors); *SEC v. Schroeder*, No. C 07-03798 JW, 2010 WL 4789441, at *1 & n.3 (N.D. Cal. Nov. 17, 2010) (considering only the *First Pacific Bancorp* factors but noting that both tests would yield the same result); *Jasper*, 883 F. Supp. 2d 915, 930 n.18 (same); *SEC v. Henke*, 275 F. Supp. 2d 1075, 1086 (N.D. Cal. 2003) (citing *First Pacific Bancorp* and concluding without analysis that the SEC had met its burden of demonstrating the defendant's unfitness). Thus, the Court considers only the *First Pacific Bancorp* factors but notes that both tests would yield the same outcome.

The first, second, fourth, and fifth factors weigh against a permanent bar. First, as for the "egregiousness" of Dr. Sabrdaran's conduct, the trial evidence indicates that Dr. Sabrdaran made a single tip on a single occasion to Afsarpour about a single company. While it is never appropriate to tip material, non-public information, and it is certainly a serious violation of Dr. Sabrdaran's duty to InterMune and harmful to its shareholders and the market, it was not of a magnitude to warrant a finding of "egregiousness" that supports a permanent officer and director bar. Courts tend to relate egregiousness to the isolated versus recurrent nature of the misconduct and whether the defendant abused a position of trust to mislead the public. *See, e.g.*, *SEC v. Hilsenrath*, No. C

03-03252 WHA, 2009 WL 1855283, at *3 (N.D. Cal. June 29, 2009) (finding this factor neutral where there was only a single violation of inaccurate bookkeeping but the defendant "used his position of the highest authority in the company to mislead the public as to the company's true financial state"); *Jasper*, 883 F. Supp. 3d at 930 (noting that the egregiousness factor weighed in favor of a bar where the defendant "on multiple occasions misstated the Company's financials, certified false reports to the SEC, and concealed the Company's backdating practices from the auditors and board of directors"). Relatedly, this is Dr. Sabrdaran's first securities fraud violation, so he is not a "repeat offender." This factor also weighs against a permanent bar. Moreover, while Afsarpour made significant amounts of money from his investments on that tip and caused losses to investors, Dr. Sabrdaran reaped no monetary reward and received only the indirect benefit of strengthening his friendship with Afsarpour. Thus, Dr. Sabrdaran had no direct economic stake in the violation, which likewise weighs against imposing an officer and director bar.

In contrast, the third and final factors both support imposing a permanent bar. As to Dr. Sabrdaran's role at the time of the fraud, as the InterMune executive responsible for drug safety, Dr. Sabrdaran was one of a small number of people privy to information about Esbriet's approval. While he was not serving as a statutory officer or director at the time, his role as drug safety officer involved monitoring clinical drug trials and reporting any issues that may arise; thus, a critical function of his role was to report back news when necessary. Put another way, candor was crucial to his role, but instead of being forthright with his company Dr. Sabrdaran shared inside information with a friend. And while he continues to maintain that he never purposefully tipped Afsarpour, he concedes that when he discovered his friend had traded in InterMune stock, instead of immediately informing his company he remained silent. Thus, Dr. Sabrdaran's role at the company supports a permanent officer and director bar.

The final factor—likelihood that that misconduct will recur—is the most important factor in the unique circumstances of this case. Dr. Sabrdaran's conduct over the course of the SEC's investigation and during trial establish that he is likely to engage in dishonest misconduct again. Time and time again, when faced with difficult questions, Dr. Sabrdaran declined to tell the truth.

When the SEC requested Dr. Sabrdaran's Facebook messages with his friends, he deleted messages with Afsarpour. When the SEC requested Dr. Sabrdaran's hard drive, he erased it. The Court accepts as true Dr. Sabrdaran's explanation that he did so not to hide anything related to an alleged tip, but rather because there was embarrassing personal information on his computer. But even so, his instinctual reaction to delete all files when things get uncomfortable—or, worse yet, truly bad—is the opposite of how an officer or director in a public company should respond.

But even putting that aside, most troubling is that Dr. Sabrdaran echoed the same conduct at trial six years after the alleged tip occurred and the SEC's investigation began. On cross examination SEC counsel confronted Dr. Sabrdaran about an email he sent from Switzerland to his boss, Dr. Marianne Porter, on December 4, 2010. (*See* Dkt. No. 159 at 52.) At the time, Dr. Sabrdaran was in Switzerland to spend the weekend with a woman named Delphine with whom he was having a romantic relationship. (*Id.* at 50.) Dr. Porter had inquired as to why Dr. Sabrdaran had been unable to work that day. In response, Dr. Sabrdaran wrote that he had "just arrived to the hotel with my friends . . . with whom we had gone skiing all day" and that "[t]his was a plan we/they had made long time ago and I couldn't change the day time part of it. . . . I changed my evening plans with them all." (Dkt. No. 159 at 52.) Counsel for the SEC asked Dr. Sabrdaran to admit that "there was no 'them all' there"—*i.e.*, that Dr. Sabrdaran had lied to his boss about being away with friends when he was really with a woman. (*Id.*) On the witness stand, Dr. Sabrdaran responded that he was referring to Delphine *and her son*; but then, when confronted by SEC counsel, he admitted that her son was not there at all and he was only with Delphine. (*Id.* at 52-53.) SEC counsel then asked Dr. Sabrdaran to admit that what he wrote in the email about skiing and having long-standing plans with friends was not true. (*Id.* at 53.) Instead of admitting that he had been dishonest in his email, Dr. Sabrdaran doubled down on his dishonesty, stating that he and Delphine met new people on the bus to the slopes and made evening plans with them—even though in the email he wrote that he had made plans a "long time ago" with friends. (*Id.* at 53-54.) Thus, confronted with an arguably immaterial lie, Dr. Sabrdaran's reaction is to lie further—not only to his boss or the SEC, but to the jury while under oath. This instinct makes it likely that Dr. Sabrdaran will again engage in dishonest misconduct, rendering him substantially unfit to serve as

an officer or director of a public company.

At oral argument, Dr. Sabrdaran conceded that it was a "foolish and regrettable mistake" to delete some of his computer data and not be forthcoming with the SEC and urged the Court not to "penalize human frailty." (Dkt. No. 186 at 67-68.) Dr. Sabrdaran's conduct from 2010 to 2012—his lies to Dr. Porter and obfuscation in the early days of the SEC investigation—can fairly be seen as consequences of human frailty not worthy of an officer and director bar. But he was unable to explain why his testimony on the stand—the continued instinct to lie—does not render him unfit to serve as an officer and director of a public company. In his supplemental brief, Dr. Sabrdaran urges the Court to consider Dr. Sabrdaran's testimony about his email to Dr. Porter "in context"—that is, in light of Dr. Porter's testimony that she had no doubt that Dr. Sabrdaran would fulfill his obligations to InterMune while he was on vacation and that he in fact met her expectations, and that Dr. Sabrdaran received a promotion from director to senior director. (Dkt. No. 188 at 22 (record citations omitted).) This argument is not persuasive. First, to make the context truly complete, InterMune fired Dr. Sabrdaran when it learned of the SEC's investigation into his alleged tip to Afsarpour. Moreover, Dr. Sabrdaran's "context" argument fails to address his tendency to lie when confronted with a difficult situation, which existed while he was otherwise fulfilling his duties at InterMune and remains to date.

In his supplemental brief Dr. Sabrdaran urges the Court to impose "no more than a limited" bar in this case. Other courts have concluded that "a *permanent* bar against serving as an officer or director of a publicly held company is far too draconian a remedy" where, as here, the defendant did not actually gain any money from his violation of the Exchange Act. *Jasper*, 883 F. Supp. 2d at 930 (emphasis added) (citation omitted); *Johnson*, 595 F. Supp. 2d at 45. However, despite the absence of any financial gain from his tip, Dr. Sabrdaran's trial conduct makes him unfit to serve as an officer or director of a public company now or at any point in the future: he has not learned the importance of honesty over the past seven years, which leaves the Court little confidence that he ever will.

Accordingly, although the insider trading conduct at issue here is not as egregious as other cases and involved an isolated event from which Dr. Sabrdaran earned no monetary profit, his role

29

as a drug safety officer and his dishonesty during the SEC investigation and at at trial, warrant imposing a permanent officer and director bar.

> B.  <u>Disgorgement</u>

Next, the SEC seeks an order finding Defendants jointly and severally liable for disgorgement and prejudgment interest. The Court has "broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (noting that disgorgement is an equitable, not a legal, remedy). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *First Pac. Bancorp,* 142 F.3d at 1191. Accordingly, "the amount of disgorgement should include all gains flowing from the illegal activities." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (citation omitted). "[A] tipper *can* be required to disgorge his tippee's profits, whether or not the tippees themselves have been found liable." *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990) (emphasis added) (quotation marks and citation omitted).

Disgorgement need only be a "reasonable approximation of profits causally connected to the violation." *Platforms Wireless*, 617 F.3d at 1096 (citation omitted). The SEC bears the burden of persuasion that its disgorgement figure "reasonably approximates the amount of unjust enrichment." *Id.* (citation omitted). "Once the SEC establishes a reasonable approximation of defendants' actual profits . . . the burden shifts to the defendants to 'demonstrate that the disgorgement figure was not a reasonable approximation.'" *Id.* (citation omitted).

In its opening brief, the SEC sought an order directing both Defendants to disgorge the amount of profits from Afsarpour and all downstream tippees' InterMune stock purchases as well as all their profits from all spread bets placed with IG Index for a total of $1,099,585.45. The SEC has shown that the amount sought reasonably approximates the ill-gotten gains from the insider trading scheme, so the burden shifts to Defendants to demonstrate that the amount sought is not appropriate. *See Platforms Wireless*, 617 F.3d at 1096. Dr. Sabrdaran argues that the Court should order only "minimal" disgorgement against him—though he never names a particular

amount he deems appropriate—because he did not anticipate Afsarpour's trades or collaborate with him. Afsarpour, for his part, argues that the Court should not include spread betting profits or profits from downstream tippees in its calculation. Thus, Afsarpour contends that the only proper disgorgement figure is the amount of profits Afsarpour earned from his purchase of 75 shares of InterMune common stock: $1,548.[5] (Dkt. No. 178 at 9-10.)

In its reply, the SEC clarifies that, in the alternative to its initial higher request for disgorgement of all of Afsarpour's spread bet profits, it seeks joint and several disgorgement of $926,280.35. (Dkt. No. 180 at 15, 27; Dkt. No. 180-2 ¶ 12.) Its new calculations were adjusted to account for some criticisms Defendants lodged in their oppositions. First, the SEC recalculated the profits gained from spread betting and stock purchases based on a closing share price of InterMune stock and options as of the market close on Friday, December 17, 2010—the day of the public announcement—rather than the following Monday as it had in its opening brief. (*See* Dkt. No. 180 at 26 n.29; Dkt. No. 180-2 ¶¶ 4-6, 10; *id.* at 21-25.) Second, the revised calculation only includes profits from spread bets that were hedged—heeding Afsarpour's argument that the initial calculation improperly included $137,400 of profits from two spread bets that IG Index did not hedge. Defendants appear to concede that these adjustments are appropriate, and the Court agrees.

The third change, however, is more controversial: the SEC departs from its initial calculation measuring profits gained from the spread bets themselves—based on IG Index's records of the spread bets from Afsarpour's and Nijjar's spread betting accounts—to instead account for the profits gained from the underlying hedges by third-party entities. (*See* Dkt. No. 180-2 ¶¶ 6-9.) This new disgorgement calculation is based on the trial testimony of InterMune employees describing IG Index's hedging activity generally, the testimony and declarations of SEC investigative attorney Drew Panahi, and certain documentary evidence gathered from Cheuvreux, Macquarie, and Barclay's—the entities involved in carrying out the transactions

---

[5] In his opposition, Afsarpour contended that this amount was $2,681 based on Panahi's trial evidence. (Dkt. No. 178 at 9-10.) The Court assumes that Afsarpour would now contend that the proper disgorgement figure is only $1,548, the SEC's recalculation of profits on Afsarpour's purchase of 75 shares of common stock based on the closing price per share on December 17, 2010 rather than the following Monday. (*See* Dkt. No. 180-2.)

related to IG Index's hedging. (*See id.*; *see also id.* at 5-27.)

There are three questions before the Court when it comes to whether the SEC's requested disgorgement amount is a reasonable approximation of unjust enrichment in this case: (1) whether it should include profits from the spread bet transactions and, if so, whether the proper measure of profit is from the spread bets themselves or the underlying hedges; (3) whether disgorgement should include profits from downstream tippees; and, relatedly, (4) whether Dr. Sabrdaran should be held jointly and severally liable for the total amount. The Court will address each issue in turn.

### 1. *Profits from Directly Hedged Spread Bets are Subject to Disgorgement*

The SEC's adjusted calculation of disgorgement includes profits made from the purchase by third-party entities of InterMune stock and options to hedge spread bets placed by Afsarpour and downstream tippee Nijjar. Defendants argue that these profits cannot count towards disgorgement because spread bets themselves are not securities and the SEC has failed to establish at trial "that IG Index's hedging transactions were domestic securities transactions that violated Section 10(b) and SEC Rule 10b-5, as *Morrison* [*v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010)] requires" and that the jurisdictional language of Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), did not overrule the "transactional test" set forth in that case. (*See* Dkt. No. 178 at 10-12.)

The Court addressed each of these arguments in the context of Defendants' motion to dismiss, but does so again here based not on the complaint allegations but the evidence adduced at trial. Earlier, the Court noted that "the upshot of *Morrison* is that Section 10(b) and Rule 10b-5 only apply to transactions involving securities listed in domestic exchanges, not foreign exchanges[,]" and "it is not the international spread bets themselves that are actionable under Section 10(b) and Rule 10b-5, but the fact that the spread bets are hedged by the broker's purchase of underlying securities on domestic exchanges." (Dkt. No. 36 at 19.) At trial, as discussed above in the context of Defendants' new trial motion, the SEC adduced evidence through two IG Index employees that IG Index indirectly hedged a number of Afsarpour and Nijjar's spread bets. IG Index did not itself purchase InterMune stock or options, but entered into a contract for difference

with other brokerages—Cheuvreux and Macquarie, through another entity—that did. At trial, the SEC entered into the record trading summaries from Cheuvreux showing its InterMune common stock purchases. (Dkt. No. 170-1.) This is enough to establish the spread bets on InterMune stock.

In support of its remedies motion, the SEC has now submitted records showing that as to the hedging on spread bets on InterMune options, IG Index's broker Macquarie had Barclay's execute orders on the InterMune options. (*See* Dkt. No. 180-2 ¶¶ 8-9.) But there is no evidence in the record connecting the Barclay's trades to Macquarie or IG Index, such as testimony from employees of Macquarie or Barclays describing why it engaged in certain transactions. Under these circumstances, the connection between the tip and the ultimate securities purchase is too far attenuated to meet the "in connection with" test: the five steps here—Dr. Sabrdaran's tip to Afsarpour's spread bet to IG Index's swap to Macquarie's transaction with Barclay's to Barclay's purchase of InterMune stock—are too many, at least given the absence of evidence establishing a causal relationship between Barclay's eventual InterMune stock purchase and IG Index. Thus, the SEC has connected the dots between Dr. Sabrdaran's tip and trades of InterMune securities on U.S. markets only with respect to the spread bets on InterMune stock, so the disgorgement figure should only include profits from those transactions.

To be sure, the connection even between the spread bets on stock and the profits on U.S. securities is more attenuated here than it was in the cases on which the Court relied at the motion to dismiss stage. *See, e.g.*, *SEC v. Maillard*, No. 13-cv-4299 (VEC), 2014 WL 1660024, at *4 (S.D.N.Y. Apr. 23, 2014) (denying motion to dismiss Section 10(b) insider trading claims against defendant who purchased CFDs abroad because the transactions involved a third-party broker hedging the CFD by purchasing the underlying security traded on a domestic exchange); *SEC v. Compania Internacional Financiera, S.A.*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *6 (S.D.N.Y. July 29, 2011) (concluding that CFDs purchased in the UK met *Morrison*'s transactional test because the broker "purchase[d] matching shares of the stock" on the U.S. market in tandem with the defendant's purchase of each CFD). But the SEC need only provide a reasonable approximation of profits earned rather than accounting for every dollar. *See Platforms*

33

*Wireless*, 617 F.3d at 1096. The SEC has established that the spread bets that IG Index actually hedged fall within *Morrison*'s reach because securities were purchased in the U.S. by IG Index's broker. Because, once again, the evidence here meets even *Morrison*'s stricter test, the Court need not address the parties' dispute over whether Section 929P(b) of Dodd-Frank revived the broader tests that *Morrison* rejected.[6]

In short, the Court declines to include in the disgorgement amount profits from spread bets on options.

### 2. *Profits from Spread Bets or from Hedge Transactions*

The next question is how to measure the disgorgement figure for the hedged spread bets on stock. In its opening brief, the SEC's requested disgorgement amount calculated the amount of ill-gotten gains from the spread bets themselves—that is, the amount of profit that Afsarpour's IG Index account earned as a result of his spread bets. The SEC offered an alternative in its reply, calculating disgorgement based on the profits earned on the underlying hedge transaction for each

---

[6] "Some courts have, in dicta, assumed, without analysis, that Section 929P(b) superseded *Morrison*." *SEC v. Chicago Convention Center, LLC*, 961 F. Supp. 2d 905, 910 n.1 (N.D. Ill. 2013) (collecting cases). And while the language of Section 929P(b) is jurisdictional, there are reasons to read it as affecting the scope of Section 10(b), as well. *See id.* at 912-917 (noting that the plain language of the provision suggests that it may be jurisdictional but such an interpretation "would create superfluity or contradict legislative intent"). To that end, after oral argument, the SEC filed a notice of supplemental authority alerting the court to a decision by a district court outside of the Ninth Circuit that analyzed whether Section 929P(b) overruled *Morrison*'s transaction test and brought the broader, pre-*Morrison* "conducts and effects" test back. (Dkt. No. 187.) In *SEC v. Traffic Monsoon, LLC*, No. 2:16-cv-00832-JNP, 2017 WL 1166333, at *13 (D. Utah Mar. 28, 2017), the court concluded after detailed analysis that

> the text of Section 929P(b), the legal context in which this amendment was drafted, legislative history, and the expressed purpose of the amendment all point to a congressional intent that, in actions brought by the SEC, Sections 10(b) and 17(a) should be applied to extraterritorial transactions to the extent that the conduct and effects test can be satisfied.

*Id.* at *13 (footnotes omitted). Nevertheless, the *Traffic Monsoon* court noted that the sales in that case satisfied *Morrison*'s transactional test, as well. *Id.* The Court need not stake a position in that debate, as the hedged spread bets meet the *Morrison* test. The Court likewise declines to decide whether *Morrison* only applies to private rights of action under Section 10(b) of the Securities Exchange Act and not SEC enforcement actions, as some courts have concluded. *See, e.g.*, *U.S. Commodity Futures Exchange Comm'n v. Vision Fin. Partners, LLC*, 190 F. Supp. 3d 1126, 1130-31 (S.D. Fla. 2016).

spread bet—that is, the amount that Cheuvreux earned by purchasing InterMune stock after entering the contract for difference with IG Index. The Court concludes that the profits on the spread bets themselves are the appropriate measure.

The measure of disgorgement is the defendant's ill-gotten gains obtained through the violation of the securities law and is meant to deprive the wrongdoer of unjust enrichment. *See Platforms Wireless*, 617 F.3d at 1096 (citation omitted). A defendant is unjustly enriched by the profits he earns—not by money that accrues in a third-party entity's coffers. *See Black's Law Dictionary* (10th ed. 2014) (noting that a claim of unjust enrichment "seeks to recover the *defendant's* gains") (emphasis added); *see also SEC v. Hateley*, 8 F.3d 653, 656 (9th Cir. 1993) (holding that the petitioners' "unjust enrichment" was limited to the fees they actually retained). Accordingly, the proper measure of disgorgement on the spread bets is the profit Afsarpour earned in his IG Index spread betting account for those spread bets on InterMune stock that were hedged.

### 3. *Scope of Disgorgement: Downstream Tippees*

Defendants next argue that the SEC's disgorgement calculation is improper because it seeks to order Defendants to disgorge more than the profits each personally earned from the insider trading scheme. Both Defendants argue that the SEC's figure improperly includes profits from downstream tippees—individuals who traded in InterMune stocks or spread bets after speaking with Afsarpour[7]—and that Dr. Sabrdaran should not be ordered to disgorge profits from any tippees. The Court first address whether Afsarpour's disgorgement should include profits earned by downstream tippees.

The SEC contends that the downstream tippees gained a total of approximately $222,000 that Afsarpour must disgorge.[8] Afsarpour contends that he should not be ordered to disgorge that amount because he did not profit from their gains and there is no evidence that the downstream

---

[7] These individuals include Farahani, Shahbodaghloo, Nijjar, and Bassir.

[8] In their opening brief, the SEC appears to contend that the downstream tippees' profits total $222,074.92. (*See* Dkt. No. 175-2 (including only the profits from Nijjar, Shahbodaghloo, Bassir, and Farahani).) However, in their reply the SEC maintains that the total profit from downstream tippees was $225,873.80. (Dkt. No. 180 at 26.) Some difference is attributable to the date at which profits were measured. At this point, the difference—and the particular amount—is immaterial to the Court's analysis.

tippees knew they were trading on the basis of insider information. The Court declines to deduct the downstream tippees' profits.

In this context, Afsarpour is like the tipper and the downstream tippees the tippee. The Ninth Circuit has emphasized that holding tippers responsible for the gains of downstream tippees is "a necessary deterrent to evasion of Rule 10b-5 liability by . . . enriching a friend or relative[,]" as here. *Clark*, 915 F.2d at 454 (9th Cir. 1990) (emphasis added) (quotation marks and citation omitted). However, exercising their discretion, "some courts have ordered defendants to disgorge only the profits they *personally earned* from the insider trading scheme." *Gowrish*, 2011 WL 2790482, at *7 (emphasis added). In the Ninth Circuit courts are not "required, under all circumstances, to order a tipper to disgorge all downstream profits from an insider trading scheme, no matter the tipper's level of culpability and no matter the actual amount of money received by the tipper." *Gowrish*, 2011 WL 2790482, at *8 n.7. Instead, "a tipper *can* be required to disgorge his tippees' profits." *Clark*, 915 F.2d at 454; *see also Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993); *cf. Platforms Wireless*, 617 F.3d at 1098 (ordering the tipper to disgorge the tippee's profits where the tipper controlled the illegally obtained funds for a time).

The Second Circuit has observed that in the Ninth Circuit

> a defendant's obligation to disgorge all profits depends upon the defendant's level of responsibility for the unlawful enrichment. Where an unjustly enriched defendant was unaware of the illicit conduct of the wrongdoing third party, the court limited the disgorgement to an amount "approximately equal to the unjust enrichment" enjoyed by the defendant. *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993). However, where a defendant had violated securities laws and enjoyed "substantial personal benefit from the infusion of the illegal obtained proceeds" into a third party's account, the court concluded the violator could be required to disgorge the total profit from the illegal conduct." *SEC v. First. Pac. Bancorp.*, 142 F.3d 1186, 1192 (9th Cir. 1998).

*SEC v. Contorinis*, 743 F.3d 296, 305 n.5 (2d Cir. 2014). Thus, an individual liable for insider trading may be on the hook for profits gained by tippees, even where the tippees are not themselves liable for insider trading because they did not have the requisite knowledge.

Here, the trial record reflects that the downstream tippees traded on the basis of

Afsarpour's encouragement. Nijjar placed spread bets on InterMune after speaking with Afsarpour, though he testified that he did some of his own research. Farahani opened her own account to trade after Afsarpour told her it was a good trade; it was the first time she took investment advice from him. Shahbodaghloo invested based on Afsarpour's advice that InterMune was a good company and its drugs were approved in Europe and would likely be approved in the U.S.; she said she did some research herself before buying the shares. Shahbodaghloo, in turn, told Bassir to invest in InterMune. The trial record reflects that each downstream tippee learned about InterMune as a result of Afsarpour. Nijjar, Shahbodaghloo, and Farahani learned about InterMune directly from Afsarpour. The SEC has adequately shown that those three downstream tippees' investments all flowed from Afsarpour's encouragement. While Afsarpour argues that their profits should not be included because there is no evidence that Afsarpour conveyed material, non-public information to them, that is not necessary; while the tippees may not have been aware of the illicit nature of their conduct, Afsarpour was. *See Hateley*, 8 F.3d at 656. The nature of his emails to some of these friends makes that clear; in particular, he emphasized that the deadline to give him money or invest in InterMune themselves was the day before the public announcement, which reflects that he knew he was having those friends trade on the inside information his friend has misappropriated. Requiring Afsarpour to disgorge the downstream tippees' profits deters Rule 10b-5 violations for tippers who tip to enrich a friend or relative. *See Clark*, 915 F.2d at 454.

However, Bassir's profits are yet another step removed from Afsarpour's. The SEC has not cited any case ordering a non-insider tippee like Afsarpour to disgorge profits of downstream tippees once removed—*i.e.*, profits of people that learned about the investment from another person who learned about it from that tippee. The Court has not found any either. Accordingly, Afsarpour need not disgorge Bassir's profits, but he must disgorge his own profits— included in this amount are the trades that Afsarpour executed in his IG Index account on behalf of friends who sent him money to do so—and those of Nijjar, Shahbodaghloo, and Farahani.

4.     *Dr. Sabrdaran is Jointly and Severally Liable for Limited Disgorgement*

The next question is whether the Court should order Dr. Sabrdaran to disgorge the same

amount as Afsarpour—that is, all profits that Afsarpour, Nijjar, Shabodahghloo, and Farahani reaped. The SEC seeks an order holding Sabrdaran jointly and severally liable for the full amount of disgorgement. Dr. Sabrdaran contends that, regardless of the disgorgement amount, he should not be jointly and severally liable with Afsarpour. (*See* Dkt. No. 177 at 20-22.)

One district court has called deciding whether to order joint and several liability in tipper-tippee insider trading cases the "most difficult issue concerning disgorgement . . . ." *Yun*, 148 F. Supp. 2d at 1290. As discussed above, the court has discretion to hold a tipper liable to disgorge all tippees' profits to deter evasion of Rule 10b-5 liability by enriching a friend or relative, including tippees who might not have known that they were trading on illicit tips. *Clark*, 915 F.2d at 454. Thus, in *Clark* the Ninth Circuit concluded that it was not an abuse of discretion to order the tipper to disgorge profits made by a tippee, even when a jury found that the tippee did not violate Section 10(b) and Rule 10b-5. *Id.* But there, unlike here, the tipper defendant also engaged in trades on the inside information, so he had some financial profits of his own. *Id.* at 441-42. Other courts have followed suit, ordering a tipper to disgorge profits he made as well as profits earned by downstream tippees. *See, e.g.*, *Gowrish*, 2011 WL 2790482, at *7; *see also, e.g.*, *SEC v. Svoboda*, 409 F. Supp. 2d 331, 346 (ordering tipper jointly and severally liable for disgorgement and prejudgment interest where tipper and tippee were "full partners in the scheme to misappropriate . . . information and . . . agreed to split evenly all profits earned from illegal trading"); *SEC v. Falbo*, 14 F. Supp. 2d 508, 528 & n. 25 (S.D.N.Y. 1998) (where the tipper himself traded, holding the tipper liable to disgorge profits he realized but declining to hold him jointly and severally liable for downstream traders' illicit gains absent evidence that he derived a financial benefit from their trading).

Aside from *Clark*, the SEC chiefly relies on the Second Circuit's decision in *Contorinis* in its request for joint and several disgorgement against Dr. Sabrdaran. But *Contorinis* is distinguishable. There, the tipper defendant ran an investment fund and illegally traded on the basis of non-public information on behalf of the fund, earning illegal profit for third-party investors. 743 F.3d at 302. The court affirmed an award of disgorgement and prejudgment interest against him, noting that "[t]he tipper is liable for the tippee's gains, whatever they may

be." *Id.* at 303.  But the court noted that the defendant there, who was directing the trading himself on behalf of the fund thus maximizing the illicit gains for his clients, "had *greater* control over the . . . illegal profits than a tipper does over a tippee." *Id.* at 303.  Thus, SEC's reliance on that case is misplaced.

Other Ninth Circuit cases discussing joint and severally liability for securities fraud disgorgement tend to focus on the collaborative nature of the fraudulent scheme.  "Where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they may be held jointly and severally liable for the disgorgement of illegally obtained proceeds." *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1117 (9th Cir. 2006) (alteration marks omitted); *see also id.* (upholding joint and several liability of three defendants that had "the requisite close relationship and jointly benefitted from the illegal scheme").  But where one party to a fraudulent scheme has an agreement with the principal to participate in the scheme but retain only a small portion of the proceeds, it is an abuse of discretion to require that party to disgorge all proceeds. *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993); *see also JT Wallenbrock*, 440 F.3d at 1109 (distinguishing *Hateley*, which involved a "preexisting agreement limiting the defendants to only a share of the ill-gotten gain or requiring them to pay a portion of the proceeds to third parties" and explaining that "[t]he manner in which" a defendant chooses "to spend the illegally obtained funds has no relevance to the disgorgement calculation").  However those cases were not misappropriation insider trading cases: *Hateley* involved defendants' commissions from securities transactions by an unregistered representative of defendants' firm, 8 F.3d at 654, and *JT Wallenbrock* involved a joint scheme to defraud investors through the sale of unregistered promissory notes, 440 F.3d at 1111.  The defendants there collaborated in the violative transactions themselves.  The lack of collaboration between Defendants is the heart of Dr. Sabrdaran's argument against joint and several liability; he maintains that he did not know that Afsarpour would be trading on the information, let alone trading extensively and involving others, so joint and several liability is inappropriate

There is authority from outside the Ninth Circuit to support holding Dr. Sabrdaran jointly and severally liable.  For example, in *SEC v. Texas Gulf Sulphur*, 446 F.2d 1301, 1308 (2d Cir.

1971), corporate insider Kenneth Darke tipped inside information about his mining company to several acquaintances and workers. The SEC brought a civil enforcement action against Darke, but not the tippees. The Second Circuit upheld the trial court's order holding Darke liable to disgorge all the profits realized as a result of his tips even though he did not enjoy any of the tippees' profits. *Id.* at 1308. The *Texas Gulf Sulphur* court explained that "[w]ithout such a remedy, insiders could easily evade their duty to refrain from trading on the basis of inside information" by having a friend or relative conduct the transaction or trading reciprocal tips between insiders of different companies. *Id.* Congress endorsed the reasoning noting that

> [I]f a tipper's communication resulted in profits to his direct tippee and to remote tippees as well, the Commission could obtain disgorgement from the tipper of the profits of both the direct and remote tippees.

H.R. Report 910, 100th Congress, 2d Session, 1988, 1988 U.S. Code Cong. And Admin. News 6043, 1988 WL 169923 n.16 ("H.R. Report 910"). "Under this precedent and congressional authority, it has become well-established that joint liability between a tipper and tippee is appropriate, even if the tipper received few or none of the profits realized by the tippee." *Yun*, 148 F. Supp. 2d at 1291 (citations omitted). This seems all the more apt following the Supreme Court's recent decision in *Salman*, which underscored the importance of holding tippers liable even when they do not receive a financial benefit from the tip; in other words, *Salman* emphasizes that even intangible gifts hold value, even if the value cannot be quantified in a dollar amount. In the end, however, joint liability is not *required*. Following the maxim that disgorgement is an equitable remedy that should not operate as a fine, *see Hateley*, 8 F.3d at 656, a long line of cases has declined to impose joint and several liability, instead applying disgorgement liability only against defendants who actually realize financial profits of an insider trading scheme. *See Yun*, 148 F. Supp. 2d at 1291-92 (collecting cases).

In its briefing, the SEC did not cite any Ninth Circuit cases, or district court cases from within the Circuit or elsewhere, addressing the circumstances present here: a request for joint and several liability to disgorge tippees' profits where the tipper did not realize any profits himself from his own trades or the tippees.' At oral argument the Court asked the SEC to identify such a

1    case; the SEC responded "tippers are almost universally held liable for disgorgement" then cited

2    cases where the tipper retained part of the proceeds from the insider trading scheme.  (Dkt. No.

3    186 at 59-61.)  After the hearing, the SEC filed notices of supplemental authority drawing the

4    Court's attention to three cases it contends fit the bill—that is, cases where the tipper was held

5    jointly and severally liable for disgorgement despite not having retained any of the financial gains

6    from the scheme: *SEC v. Yun*, 148 F. Supp. 2d 1287, 1289-93 (M.D. Fla. 2001), *judgment vacated*

7    *on other grounds by* 327 F.3d 1263 (11th Cir. 2003); *SEC v. Clay Capital Management*, No. 2:11-

8    cv-04020, 2013 WL 5946989, at *6 (D.N.J. Nov. 6, 2013); and *SEC v. Verdiramo*, 907 F. Supp.

9    2d 367, 376 (S.D.N.Y. 2012).[9]  (*See* Dkt. No. 183.)  None of the cases persuades the Court that Dr.

10   Sabrdaran should be jointly and severally liable for the full amount of Afsarpour's disgorgement.

11       First, *Yun* "involve[d] an insider trading scheme in which Donna Yun . . . , the wife of

12   David Yun, president of the Book Fairs Division of Scholastic Corp. . . . , tipped a friend and co-

13   worker, Jerry Burch, to an impending drop in the price of Scholastic stock.  In reliance on this tip,

14   Burch purchased a series of put options and sold them for a profit . . . ."  148 F. Supp. 2d at 1289.

15   The court held Yun jointly and severally liable to disgorge Burch's profits from the trades even

16   though she "received no tangible, monetary benefit" from the trading scheme because given their

17   close business relationship, there could have been an agreement of future consideration with real

18   estate deals or other easily compensable future compensation.  *Id.* at 1292.  In other words, the

19   court based joint and several liability on speculation that the defendants might have arranged for

20   the tipper to receive a tangible, financial benefit.  Here there is no evidence that Defendants

21   arranged for Dr. Sabrdaran to receive a cut of Afsarpour's profits, and the Court declines to base a

22   disgorgement award on mere possibilities that have no support in the record.  Moreover, the

23   Eleventh Circuit vacated the *Yun* jury's verdict and remanded for a new trial.  327 F.3d at 1263.

24   The appellate court did not review the trial court's joint and several disgorgement decision, and

25

26   _____

27   [9] The SEC filed these notices of supplemental authority notwithstanding the Court's statement at
     oral argument that the SEC should not submit any supplemental briefing or cases on disgorgement
     in the tipper/tippee scenario.  (Dkt. No. 186 at 77.)  As Defendants did not object to the notices
28   and addressed the cases in their supplemental briefing (*see* Dkt. No. 188 at 18 & n.4), the Court
     addresses them here.

there is no further remedies decision following a second trial.

The SEC next cites *Clay Capital Management*, in which the court granted summary judgment on insider trading claims against a tipper given his earlier criminal conviction resulting from a guilty plea. 2013 WL 5946989, at *1. In the criminal case, the defendant admitted to tipping his brother-in-law, with whom he was also close friends, multiple times about his company's impending merger and change in stock price, which caused the tippee to trade in the company's stock leading to nearly $3 million in profits. *Id.* The defendant admitted that when he disclosed the information, he "understood that it was likely that" the tippee would use the information to trade; he acted willfully and intentionally; and the two men "discussed a fake 'cover story' to give to the authorities in the event that" they were contacted about the trades. *Id.* *1, 4. The defendant had been sentenced to two years' probation and ordered to pay a $15,000 fine in the criminal action. *Id.* at *1. In the civil matter, after granting the SEC's motion for summary judgment based on the defendant's criminal action admissions, the court found the defendant jointly and severally liable for just over $625,000: the amount of the tippee's profits that remained unpaid following the tippee's $2.1 million disgorgement. *Id.* at *6. In contrast to *Clay Capital Management*, there was no parallel criminal prosecution—let alone conviction—in this case. Nonetheless, *Clay Capital Management* supports the proposition that a court can hold a tipper jointly and severally liable for a *portion* of the tippee's illegal gains.

The SEC's reliance on *Verdiramo* is misplaced. There, the securities fraud involved the unlawful sale of unregistered securities in violation of Section 5 of the Securities Act. 907 F. Supp. 2d at 371. Defendant Richard Verdiramo—the CEO of the company at the heart of the fraudulent scheme—did not sell any of the unregistered stock himself, but was ordered jointly and severally liable to disgorge the profits of the unregistered securities that others sold because he "was a necessary and substantial participant" in the sales and "personally authorized and directed the issuances" of the stock to his co-defendants. *Id.* at 376 (citations omitted). Moreover, Richard Verdiramo profited from the scheme by receiving substantial checks and money transfers from companies that his co-defendants owned and operated, which the defendant had failed to demonstrate were unrelated to the unlawful trading scheme. *Id.* at 366-67 (record citations

42

1   omitted). Because *Verdiramo* is not an insider trading case and there was evidence that the

2   defendant received a financial benefit from the scheme, it does not support the SEC's request for

3   joint and several liability against Dr. Sabrdaran under the circumstances presented here.

4       Principles of equity favor an imposition of *some* joint and several liability for

5   disgorgement against Dr. Sabrdaran, but not the full amount of Afsarpour and the downstream

6   tippees' profits as the SEC urges. Afsarpour's profits are directly causally connected to Dr.

7   Sabrdaran's tip: the jury found that Afsarpour traded on the information Sabrdaran provided.

8   Thus, Dr. Sabrdaran was not only an integral part of the insider trading scheme, but its initial

9   source, so his level of responsibility for others' unjust enrichment is high and supports some

10  disgorgement. *See Contorinis*, 743 F.3d at 305 n.5 (noting that the Ninth Circuit considers "the

11  defendant's level of responsibility for the unlawful enrichment" in deciding disgorgement). While

12  Dr. Sabrdaran received no tangible, monetary benefit from the insider trading scheme, the jury

13  found that he received a personal benefit from tipping Afsarpour; thus, Dr. Sabrdaran received

14  some unjust enrichment from the scheme, and the Supreme Court's recent decision in *Salman*

15  emphasizes the value of such intangible personal benefits.[10] *See Salman*, 137 S. Ct. at 428.

16      On the other hand, ordering Dr. Sabrdaran to disgorge all profits gained as a result of the

17  tip would exceed unjust enrichment and instead operate contrary to its goal as a fine or

18  punishment. *See Hateley*, 8 F.3d at 656. Requiring Dr. Sabrdaran to be jointly and severally

19  liable for the full amount of Afsarpour's disgorgement—including the downstream tippees'

20  profits—would be especially unreasonable here given that there is no evidence that Dr. Sabrdaran

21  had any inkling that Afsarpour would share the tip with others and encourage them to trade or

22  even knew the downstream tippees at all. This conclusion squares with Defendants' December 17

23  correspondence, which reflects that Dr. Sabrdaran became upset with Afsarpour that day; it makes

24  sense that Dr. Sabrdaran was angry because he learned that Afsarpour had told many other people

25

26                

[10] At oral argument, the SEC also maintained that another factor relevant to the Court's equitable

27  consideration of whether to impose joint and several liability is the likely difficulty of collecting
    any disgorgement from Afsarpour in the UK. (Dkt. No. 186 at 61.) The SEC has not cited any

28  authority indicating that difficulty of collection is a relevant factor in the disgorgement analysis, so
    the Court does not consider it.

about the tip or to trade on InterMune in light of the tip. But even without reconciling the evidence in this manner, there is no evidence to support his awareness that others would trade besides Afsarpour himself. Accordingly, the Court will not order Dr. Sabrdaran to disgorge the profits the downstream tippees obtained from their own trades. For the same reason, the Court will not hold Dr. Sabrdaran jointly and severally liable to disgorge the profits that Afsarpour made by placing spread bets in his IG Index account on behalf of his friends using money they wired to him[11]; Dr. Sabrdaran could not have foreseen those friends' involvement in the scheme, and the record reflects that Afsarpour sent those friends their profits after they were realized, so he was not ultimately unjustly enriched for long on those trades.

But Dr. Sabrdaran should be jointly and severally liable for some disgorgement because the jury concluded that he received a personal benefit as a result of his tip and therefore was unjustly enriched. To hold otherwise would render the antifraud provisions toothless against tippers in the insider trading context and run contrary to the statute's attempt to prevent tippers from giving gifts of inside information to friends set forth as set forth in *Salman* and *Dirks*. The Court therefore orders Dr. Sabrdaran jointly and severally liable for disgorgement of Afsarpour's profits from his direct stock purchases and the hedged spread bets on InterMune stock that he made on his own behalf.

C.  <u>Prejudgment Interest</u>

The SEC also argues that the Court should order Defendants to pay prejudgment interest on the money to be disgorged, calculated based on the rate provided in 26 U.S.C. § 6621 for tax underpayment. Dr. Sabrdaran asks the Court not to order him to pay prejudgment interest on any disgorgement he is ordered to pay. Afsarpour appears to concede that some prejudgment interest is appropriate, but argues that the award should be calculated based on the lower treasury-bill rate found at 28 U.S.C. § 1961, which is typically used to calculate pre-judgment interest. (Dkt. No. 178 at 17.)

---

[11] Specifically, Afsarpour placed spread bets on behalf of Vasseghi, Anvarian, Sepahpour Fard, Rogerson, and Vasseghi, who sent him in total £77,200—28.5% of the 237 he invested in spread bets in total. (Dkt. No. 188-1 at 83-84.)

United States District Court
Northern District of California

The Second Circuit has cautioned that the "failure to securities law violators to enjoy a profit does not, standing alone, make it inequitable to compel them to pay interest." *Contorinis*, 743 F.2d at 308. "[C]ourts have required tippers who have been ordered to disgorge their tippees' gains . . . to pay prejudgment interest on those gains" even where, as here, the tipper did not personally enjoy the financial gains themselves. *Id.* (citation omitted); *see, e.g.*, *Rosenthal*, 650 F.3d at 157 n.1. The First Circuit has held that in weighing the equities to determine whether to award prejudgment interest, courts should consider

> the willfulness of the violation, the type and degree of the insider's inadvertence, the position of the insider in the corporation, the length of time between the purchase and repayment, and other circumstances of the case. Bad faith need not be shown.

*SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (citation omitted).

Here, the balance of the equities weighs against awarding prejudgment interest against Dr. Sabrdaran. Dr. Sabrdaran divulged inside information to Afsarpour in breach of a fiduciary duty to his company, but he did so on a single occasion about a single event. Dr. Sabrdaran did not execute any trades himself, realize any financial profits from the trades, or have access to Afsarpour's profit. The SEC does not cite any authority where a Court ordered a tipper to pay prejudgment interest under similar circumstances—that is, where the only personal benefit was to enhance a friendship and the tipper did not enjoy any financial gains. The SEC relies heavily on *Contorinis* in its request for a prejudgment interest award against Dr. Sabrdaran, but that case is distinguishable. Although the defendant did not personally pocket the proceeds of the illegal trades, the court held that prejudgment interest against him was still appropriate because he controlled and executed the trades and curried favor and business from his clients as a result. *Contorinis*, 743 F.3d at 302. Not so for Dr. Sabrdaran.

But, as the defendant in *Contorinis*, prejudgment interest is appropriate against Afsarpour: he executed trades and enjoyed a substantial financial profit which he then sought to hide from the SEC. As for the particular rate, "[o]rdinarily, 28 U.S.C. § 1961 'is to be used for the calculation of prejudgment interest unless the equities of a particular case demand a different rate.'" *Platforms Wireless*, 617 F.3d at 1099 (citing *In re Nucorp Energy, Inc.*, 902 F.2d 729, 734 (9th Cir. 1990)).

45

Thus, the Section 1961 rate is the default. In contrast, Section 6621 may be used where the defendant essentially obtains an unsecured loan through his fraudulent scheme because he makes use of the profits obtained through the fraud. *See, e.g.*, *Platforms Wireless*, 617 F.3d at 1099 & n.16 (holding that use of the Section 6621 rate was not an abuse of discretion) (citation omitted); *see also Contorinis*, 743 F.3d at 307 ("Prejudgment interest on a disgorgement amount is intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government.") (citation omitted).

Ultimately, then, the appropriate rate depends on Afsarpour's access to and use of the ill-gotten gains from the scheme. The record reflects that Afsarpour had no access to the profits the downstream tippees earned, so the default Section 1961 rate applies to these funds. The same is true of the profits Afsarpour earned from placing spread bets in his IG Index account on friends' behalf using money they sent him: because he returned their profits to them, he did not have access to or use of their profits, so the default Section 1961 rate applies. Put simply, none of these funds operated as the equivalent of an interest-free government loan to Afsarpour.

In contrast, however, the higher Section 6621 rate applies to the profits Afsarpour made from his InterMune stock purchases and from the hedged spread bets on InterMune stock he placed with his own funds. While Afsarpour's access to his profits was blocked for some time because IG Index froze his account when the SEC obtained a court order continuing the freeze, ultimately that freeze was lifted and Afsarpour had use of the funds.

### D. Civil Penalties against Dr. Sabrdaran

The SEC next requests that the Court assess against Dr. Sabrdaran the maximum civil penalty allowed by law: three times the proceeds of the illicit trading that took place, including spread bet profits. Dr. Sabrdaran argues that, at most, he should be assessed a "modest" or "minimal" civil penalty: either no penalty at all or some penalty limited to no more than three times the total profits gained only from Afsarpour's purchase of InterMune stocks themselves— *i.e.*, not from profits on spread bets.

The Insider Trading Sanctions Act of 1984, Section 21A of the Securities and Exchange Act, provides for civil penalties for insider trading. *See* 15 U.S.C. § 78u-1(a)(2). "The amount of

46

the penalty which may be imposed . . . shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided" as a result of the unlawful conduct. *Id.* The Act defines "'profit gained' or 'loss avoided'" as "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." *Id.* § 78u-1(e). In other words, the statutory penalty amount is tethered to the profits—the statute "make[s] the amount of financial liability to which a violator of the insider trading laws may be exposed directly proportional to the amount of the profit gained or the loss avoided" from the purchase or sale of a security. *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (citing 15 U.S.C. § 78u-1(a)(2)).

The Ninth Circuit has not addressed application of this civil penalties provision. But the First Circuit, and courts in this District and elsewhere, have applied the following factors:

> (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry.

*Gowrish*, 2011 WL 2790482, at *9 (citing *SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004)); *see also, e.g.*, *SEC v. Mellert*, No. C03-0619 MHP, 2006 WL 927743, at *1 (N.D. Cal. Mar. 29, 2006) (same); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1295 (M.D. Fla. 2001). Ultimately, after considering these factors, the court has discretion to impose a monetary penalty that goes beyond disgorgement of illegal profits to serve the goal of deterrence.[12] *See SEC v. Sargent*, 329 F.3d 34, 42 n.2 (1st Cir. 2003) (citing Section 21A's legislative history); *see also SEC v. Henke*, 275 F. Supp. 2d 1075, 1083 (N.D. Cal. 2003) ("The penalties authorized by the ITSA are intended to supplement traditional equitable remedies of disgorgement to enhance deterrence of insider

---

[12] Dr. Sabrdaran contends that courts do not consider deterrence in the context of civil penalties. (Dkt. No. 177 at 28.) Not so. The First Circuit cases that identify the relevant factors, including a case Dr. Sabrdaran cites, consider the deterrent effect of a civil penalty. *See SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004) (after applying the six factors, concluding that "[w]e are satisfied that the court acted within its discretion to impose a civil penalty on [defendant], not only to punish him but to serve as a deterrent on insider trading generally"); *Sargent*, 329 F.3d at 42 n.2.

trading") (citation omitted); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1295 (M.D. Fla. 2001) (noting that the "twin aims" of a civil penalty are deterrence and punishment) (citation omitted).

The Court has already addressed some of these factors in the context of the officer-director bar. As to the first two factors, Dr. Sabrdaran's conduct was not egregious in comparison with other insider trading cases; his violation consisted of a one-time tip to Afsarpour and, as explained above, he did not obtain any direct financial profit from the trades. While in *Gowrish* the court concluded that the tipper defendant's conduct was egregious because "[h]e was an indispensable actor in the insider trading scheme and broke not only the law but also abused a position of trust[,]" 2011 WL 2790472, at *9, there the defendant tipped on multiple occasions about different companies whose non-public information he learned through his job at a securities company. Dr. Sabrdaran's conduct here does not present such a scenario. Moreover, because Dr. Sabrdaran did not profit financially from the insider trading scheme, he is left owing the disgorgement amount described above—*i.e.*, more money than he earned due to the activity for which he is liable. These two factors weigh against a civil penalty. *See, e.g.*, *Sargent*, 329 F.2d at 42 (noting that a "one-tip tip" by a defendant who "did not personally realize any trades or direct profit" did not require civil penalties); *Yun*, 148 F. Supp. 2d at 1295.

The third factor considers the deterrent effect of a penalty in light of a defendant's financial worth. *See Yun*, 148 F. Supp. 2d at 1297. Here, Dr. Sabrdaran failed to submit any evidence of his financial condition. At trial, he testified that he has been unemployed since he left InterMune, and he asks the Court to infer a low financial worth from that unemployment. But an equally plausible inference is that Dr. Sabrdaran has been able to support himself for multiple years without a job because he has a high financial net worth and substantial savings on which to live. While ability to pay alone does not warrant a civil penalty, *see Mellert*, 2006 WL 927743, at *1, it may in combination with other factors. *See also SEC v. Jasper*, 883 F. Supp. 915, 931 (N.D. Cal. 2010) ("[A]bility to pay is a relevant consideration when determining the amount of civil penalties to impose.") (citations omitted).

The fourth factor, whether the defendant concealed his trading, also supports a penalty. The focus of this factor tends to be concealment of the trading itself—for example, whether the

48

defendant squirreled away the profits of his insider trades to an untraceable account.  *See, e.g.*, *Sargent*, 329 F.3d at 42 (noting that the tippee "made no efforts to conceal his isolated transaction"); *Mellert*, 2006 WL 927743, at *1.  But it may also include making misstatements to the SEC to hide misconduct.  *See, e.g.*, *Gowrish*, 2011 WL 2790482, at *10 (noting that "Defendant did not himself trade, but the SEC has presented some evidence that defendant actively attempted to conceal the trading scheme by working with [the tippee] to come up with explanations for [the tippee's] trades when the SEC was investigating . . . ."); *Yun*, 148 F. Supp. 2d at 1297 (noting that the defendant "engaged in misstatements to SEC investigators in order to obfuscate any misconduct").  Dr. Sabrdaran has done the latter.  He wiped his computer using special file-deleting software after the SEC requested to review all of his files and deleted specific Facebook messages showing communications with Afsarpour.  Dr. Sabrdaran urges that this factor is neutral because he did nothing but hold the SEC to its burden or attempt to protect his privacy by deleting certain files.  While Dr. Sabrdaran's efforts to hold the SEC to its burden at trial are not relevant, the deletion—and thus, concealment—of files and Facebook messages from the SEC tips this factor in favor of a penalty.

The fifth factor weighs against a penalty.  Dr. Sabrdaran is ordered to disgorge more money than he earned from the insider trading scheme, and is permanently barred from serving as an officer or director of a public company; these consequences are likely sufficient to serve as a deterrent.  The sixth factor also weighs against a civil penalty, as Dr. Sabrdaran does not work in the securities industry.

In short, all of the factors weigh against a civil penalty except two: ability to pay and concealment.  But the Court has already taken Dr. Sabrdaran's post-insider trading conduct into account in imposing the serious penalty of a permanent officer and director bar.  No further penalty is necessary or warranted.

And, even if a penalty were appropriate, the Court would limit it to three times the amount of profits from Afsarpour's direct InterMune securities purchases, and not profits from spread bets, which all parties concede are not themselves securities.  (Dkt. No. 177 at 27; *see also* Dkt. No. 180 at 30 ("[T]he SEC has not asked this Court to decide that UK spread bets are securities.");

Dkt. No. 186 at 72 (at oral argument, the Court noting that "[w]ith respect to civil penalties, we're all in agreement . . . that those need come from the securities, themselves, because of the statute").)  The available amount is so limited because the ITSA measures profits gained as "the difference between the purchase or sale price *of [a] security* and the value *of that security*" after dissemination of nonpublic information." 15 U.S.C. § 78u-19e. And, for the same reasons discussed above in the context of disgorgement, the profits from the downstream tippees' purchases of InterMune securities are too attenuated from Dr. Sabrdaran to support a civil penalty against him.  Thus, the $1548 that Afsarpour profited from purchasing 75 shares of InterMune stock are the only profits from the purchase of InterMune shares that the Court would consider towards a possible penalty.  In any event, the Court is not imposing even that limited amount as it would serve no purpose in light of the other remedies and penalties imposed by the Court.

E.    Injunction against Further Securities Law Violations

Lastly, the SEC requests that the Court permanently enjoin Defendants from future violations of Section 10(b) and Rule 10b-5.  The SEC may bring an action in any district court of the United States to enjoin any person who it appears to the SEC "is engaged or about to engage in any acts or practices which constitute or will constitute a violation of" the securities laws.  15 U.S.C. § 77t(b); *see also id.* § 78u(d)(1).  "[U]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." *Id.* § 77t(b); *see also id.* § 78u(d)(1).  The "purpose of injunctive relief against violators of the securities laws is to deter future violations, not to punish the violators." *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  "The granting or denying of injunctive relief rests within the sound discretion of the trial court." *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996) (quotation marks omitted).

> To obtain a permanent injunction, the SEC ha[s] the burden of showing that there [i]s a reasonable likelihood of future violations of the securities laws . . . .  [T]here is no per se rule requiring the issuance of an injunction upon the showing of a past violation, but . . . the existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction.
>
> In predicting the likelihood of future violations, [the court] must assess the totality of the circumstances surrounding the defendant

United States District Court
Northern District of California

and his violations, and [the court] consider[s] such factors as (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

*Id.* at 1295-96 (quotation marks, citations, and alterations omitted).

a.    Degree of Scienter Involved

First, the Court considers "the degree of scienter involved" in Defendants' violations. *See id.* at 1295. To demonstrate "a reasonable likelihood that the wrong will be repeated . . . it will almost always be necessary for the [SEC] to demonstrate that the defendant's past sins have been the result of more than negligence." *Aaron v. SEC*, 446 U.S. 680, 703 (1980). Scienter was an element the jury found with respect to both Defendants. The SEC proved that Dr. Sabrdaran intentionally provided material, non-public information to Afsarpour. Thus, the SEC proved at least reckless disregard with respect to knowledge that Afsarpour would trade or tip others. Based on this finding of "at least reckless disregard" to the tippee's trading, a court in this District concluded that this factor "weighs somewhat in favor of entering an injunction, though not as strongly as it would in a case where the SEC had proven intent to defraud." *SEC v. Gowrish*, No. C 09-05883 SI, 2011 WL 2790482, at *4 (N.D. Cal. July 14, 2011), *aff'd*, 510 F. App'x 588 (9th Cir. 2013).

As to Afsarpour, the SEC likewise proved that he knew or should have known that Dr. Sabrdaran tipped him in violation of his duty to maintain confidentiality. Afsarpour argues that this element nevertheless weighs against an injunction because Afsarpour's conduct during the SEC investigation reflects a naiveté about U.S. securities law that belies scienter. Here, Afsarpour attempts to depict himself as a self-employed, high-school graduate restaurant owner who would not have known that what he was doing was wrong. But at trial, Afsarpour presented himself as a dedicated day trader who had studied the markets on his own and was skilled in technical analysis of the markets. Further, the "Ninth Circuit has rejected the argument that, in the context of the securities fraud statutes, willfulness requires a defendant know that he or she was breaking the law." *United States v. Reyes*, 577 F.3d 1069, 1080 (9th Cir. 2009) (citations omitted). Put simply, "[t]he knowledge required is that the defendant be aware that he is committing the act

which is false—not that he know that his conduct is illegal." *Id.* at 1081 (alteration and citation omitted). Although this language discusses the securities fraud section that bars falsifying records, the Court sees no reason why it would not apply here, as well.

There is sufficient evidence in the record to conclude that Afsarpour knew what he was doing was wrong. When the SEC asked Afsarpour if he knew anyone who worked at InterMune, Afsarpour lied and told them he did not. Likewise, when he gave the SEC his list of Facebook friends—which Afsarpour touts as evidence of his cooperation—he had removed Sabrdaran from the list. The Court agrees that the level of scienter here may not be as high as it would be if, for example, Afsarpour were a U.S.-based securities trader or a financial services attorney well-versed in securities regulations. But the SEC has proved, and the evidence supports, that Afsarpour knowingly traded on Dr. Sabrdaran's inside information then withheld information from the SEC, which supports scienter.

For each of these reasons, scienter weighs somewhat in favor of imposing an injunction against both Defendants.

### b.    Isolated or Recurrent Nature of Infraction

In some instances, when the violation at issue is the only securities law violation by the defendant that the SEC identifies, this factor weighs against an injunction. *See Fehn*, 97 F.3d at 1296 ("[T]he second factor weighs in [defendant's] favor, since the SEC cites no other securities law violations on [defendant's] part . . . ."). But "'first offenders are not immune from injunctive relief." *SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974); *accord Gowrish*, 2011 WL 2790482, at *5. Generally, the question is whether the "violative acts were part of an ongoing pattern of conduct rather than isolated incidents." *SEC v. Jasper*, 883 F. Supp. 2d 915, 929 (N.D. Cal. 2010). Decisions on this factor usually turn on the length of the scheme to defraud, the number of insider transactions, and the number of companies the transactions involved. *See, e.g.*, *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1086 (N.D. Cal. 2015) (finding a two-year scheme to defraud impacting dozens of investors weighs in favor of entering an injunction); *Gowrish*, 2011 WL 2790482, at *5 (finding this factor neutral where defendant was found liable for tipping on three separate occasions with regard to three different companies but only during a 6-month period with

United States District Court
Northern District of California

the same people and same general scheme that ceased before the SEC became involved); *SEC v. 800america.com, Inc.*, No. 02 Civ. 9046(HB), 2006 WL 3422670, at *2, 11 (S.D.N.Y. Nov. 28, 2006) (finding this factor weighed against an injunction because two-and-a-half-year scheme to defraud was an "isolated incident"); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001) (finding this factor weighed against an injunction because it was a first-time violation for trades that occurred within a three-day time period). The scheme here is even more isolated than any of these cases. Defendants' conduct was an isolated incident in their long careers and friendship; thus, this factor vitiates against injunctive relief. *See, e.g.*, *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (denying injunctive relief for isolated, first-time violation); *Yun*, 148 F. Supp. 2d at 1294 (denying injunctive relief for isolated, first-time incident); *see also SEC v. Johnson*, 595 F. Supp. 2d 40, 44 (D.D.C. 2009) (noting that defendant's first offense in a more than ten-year career was an isolated incident but granting temporary injunctive relief).

c.      Recognition of Wrongful Nature of Conduct

Next, the Court considers the degree to which Defendants have recognized the wrongful nature of their conduct. *See Fehn*, 97 F.3d at 1295. A person's "lack of remorse" can be "apparent in" the person's "continued insistence on the validity of his" conduct that has been found to be in violation of the Securities and Exchange Act. *See id.* at 1296. "Promising to stop doing wrong while denying any wrongdoing is the wrong way to establish that wrongdoing will not reoccur." *Ginsburg*, 362 F.3d at 1305; *but see First City Fin. Corp.*, 890 F.2d at 1229 (explaining that securities defendants are "not to be punished because they vigorously contest the government's accusations").

Here, both Defendants urge that they never engaged in a scheme to defraud. Dr. Sabrdaran appears to concede that this factor weighs against him. (*See* Dkt. No. 177 at 13.) Afsarpour contends that this factor weighs in his favor because he is "very remorseful" and if he had to do things over again would have immediately disclosed to the SEC that he knew Dr. Sabrdaran (Dkt. No. 187 at 8), but Afsarpour's declaration does not indicate as much. Instead, he states that he disagrees with the jury's verdict, "still cannot fully understand why" the SEC investigated him, and is silent about lying to the SEC about Dr. Sabrdaran. (Dkt. No. 179 ¶¶ 3-4.) In short,

United States District Court
Northern District of California

Defendants continue to maintain that they did not commit insider trading, despite the jury's clear findings to the contrary. This factor weighs in favor of an injunction. *See, e.g.*, *Gowrish*, 2011 WL 2790482, at *6.

d.  Defendants' Present Occupations

Fourth, the Court considers the likelihood that future offenses might occur due to Defendants' occupations, age, and opportunities to engage in insider trading. *See Fehn*, 97 F.3d at 1295-96; *see, e.g.*, *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980) (noting that the defendant's new business venture "provides ample opportunity for continued misconduct"); *see, e.g.*, *Gowrish*, 2011 WL 2790482, at *6 (noting that the defendant's occupation is still in the business world, which weighs slightly in the SEC's favor). The SEC does not discuss Defendants' occupations in this factor, but notes that they are 55 and 47 years old and thus have years ahead of them in which to engage in insider trading. It also asserts generally that Defendants are "sophisticated, entrepreneur-minded and intelligent individuals" likely to violate the securities laws again. (Dkt. No. 175 at 12.)

Dr. Sabrdaran, for his part, notes that the SEC has not presented any evidence that he is currently employed in a role that creates a risk of future violations as he is unemployed and testified that he has "lost his career" due to this case. He argues that it is unlikely that he will ever find a job at a pharmaceutical company with this judgment against him for a securities law violation. Dr. Sabrdaran relies only on one case to support that contention: in *SEC v. Brethen*, No. C-3-90-071, 1992 WL 420867, at *24 (S.D. Ohio Oct.15, 1992), the court concluded that this factor weighed against an injunction because "a 66-year old corporate executive, who has been found to have engaged in insider trading, is not likely to return to the corporate arena, either as a director or as an employee in an executive capacity, where he will once again have the opportunity to engage in insider trading.") But courts in this District have not considered the likelihood that the business world would accept a defendant but whether the defendant would work in the business world if he could. *See, e.g.*, *Alexander*, 115 F. Supp. 3d at 1087 (finding this factor weighs slightly in favor of injunction where the defendants, both in their late 60s, were currently in prison and no longer worked for the business but "may enter the business world in the future");

54

*SEC v. Small Bus. Capital Corp.*, No. 5:12-CV-03237-EJD, 2013 WL 5955669, at *2 (N.D. Cal. Nov. 6, 2013) (noting that the defendant "did not show that he would not re-enter the brokerage industry if he were able").  Dr. Sabrdaran has not shown that he would not return to a pharmaceutical company if he could, and he is younger than the defendants in the above-cited cases.  This factor weighs slightly in favor of an injunction as to Dr. Sabrdaran.

Afsarpour, for his part, maintains that there is "no likelihood" that he will engage in future violations because he is a restaurant owner in the United Kingdom who does not regularly come into contact with confidential business information about public companies and does not have access to U.S. securities markets as someone living in the U.S.  The Court has no information about whether Afsarpour knows other people who work at public companies.  But, at bottom, this factor generally considers the *tipper*'s role in publicly traded companies, not the tippee's.  Afsarpour's role as a restaurant owner does not support an injunction.

e.     Defendants' Assurances Against Future Violations

"Promises of reformation and acts of contrition are relevant in deciding whether an injunction shall issue, but neither is conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught."  *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978); *see also Fehn*, 97 F.3d at 1296 ("[S]incere assurances of an intent to refrain from aiding and abetting future violations are insufficient, without more, to militate against an injunction.").

Here, Dr. Sabrdaran has not provided any assurances against future violations, which weighs in favor of entering an injunction against him, as he appears to concede.  (*See* Dkt. No. 177 at 13.)  Afsarpour avers that he has "learned important lessons from [his] mistakes and believe[s] that [he] will never repeat these mistakes in the future" and "will never again trade in securities or spread bets in companies where any of [his] family, friends or acquaintances work."  (Dkt. No. 179 ¶ 4.)  "The sincerity of his assurances are weakened in part by the fact that he has not recognized the wrongfulness of his past conduct."  *Gowrish*, 2011 WL 2790482, at *6.  But, as in *Gowrish*, because recognition of wrongfulness is a separate factor, this factor is neutral as to Afsarpour.

f.     Totality of the Circumstances

Thus, four factors weigh in favor of entering an injunction against Dr. Sabrdaran, though one weighs only slightly, and one weighs against. As to Afsarpour, two factors support an injunction, one is neutral, and two weigh against. Still, the factors are not the end-all be-all of the inquiry; the Court is to consider the totality of the circumstances. *See Murphy*, 626 F.2d at 655.

On balance, this first-time misconduct appears to be an isolated incident in Dr. Sabrdaran's otherwise long career in the pharmaceutical industry and in Afsarpour's decades-long history of day trading. Given the isolated nature of the incident and the other remedies the Court has decided to impose, there is no need for an injunction against further violations to reduce the likelihood that Defendants will violate the securities laws in the future. This conclusion is not inconsistent with the Court's imposition of a permanent director and officer bar as to Dr. Sabradaran based on the Court's finding that he is unfit for office in a public company. It is in part because of this bar that the further remedy of injunction is not necessary. After all, the "purpose of injunctive relief against violators of the securities laws is to deter future violations, not to punish the violators." *Randolph*, 736 F.2d at 529. The Court is confident that in light of all the remedies and penalties imposed, the addition of injunctive relief is not necessary to deter future violations.

## CONCLUSION

For the reasons described above, the Court DENIES Defendants' motion for a new trial, or in the alternative, judgment as a matter of law. The Court GRANTS IN PART the SEC's remedies motion as set forth above. The SEC shall submit a proposed judgment in accordance with the following.

1.     Officer & Director Bar:  The Court permanently bars Dr. Sabrdaran from serving as an officer or directly of a public company.

2.     Disgorgement:  The Court orders Afsarpour to disgorge the profits he made from purchasing 75 shares of InterMune stock and from his hedged spread bets on InterMune stock, as well as the same profits from Nijjar, Shahbodaghloo, and Farahani. The Court orders Dr. Sabrdaran jointly and severally liable to disgorge Afsarpour's profits from his direct stock purchases and Afsarpour's own hedged spread bets on InterMune stock, and not spread bets made

by others or that Afsarpour made on behalf of others.

3. <u>Prejudgment Interest</u>: The Court declines to order Dr. Sabrdaran to pay prejudgment interest on the amount he is jointly and severally liable to disgorge. As for Afsarpour, the Court imposes prejudgment interest at the Section 1961 rate for profits in Afsarpour's own spread betting account for trades he made on behalf of his friends and from the profits of trades by Nijjar, Shahbodaghloo, and Farahani. However, Afsarpour must pay prejudgment interest at the higher Section 6621 rate on the profits Afsarpour made from his InterMune stock purchases and from his own hedged spread bets on InterMune stock.

4. <u>Civil Penalties</u>: The Court declines to impose a civil penalty against Dr. Sabrdaran.

5. <u>Injunction</u>: The Court declines to enjoin Defendants from further securities fraud violations.

The SEC shall meet and confer with Defendants as to the proper calculation of the judgment amounts in light of the Court's ruling and shall submit a proposed judgment or judgments to the Court on or before May 26, 2017. Defendants' approval as to form of the proposed judgment of course does not waive any of their arguments against the judgment or its amount and remedies.

This Order disposes of Docket No. 170. Docket No. 175 will remain pending until the entry of judgment.

**IT IS SO ORDERED.**

Dated: May 15, 2017

_Jacqueline Scott Corley_
JACQUELINE SCOTT CORLEY
United States Magistrate Judge